**MUA, SEALEDDOC, CNTDWODT, MegaCase, ComplexCase, PlnDue, DsclsDue, ProHacVice, OSC, APPEAL**

## U.S. Bankruptcy Court
### Eastern District of Louisiana (New Orleans)
### Bankruptcy Petition #: 20−10846

|  |  |
|---|---|
| *Date filed:* | 05/01/2020 |
| *341 meeting:* | 05/29/2020 |
| *Deadline for filing claims:* | 11/30/2020 |
| *Deadline for filing claims (govt.):* | 11/30/2020 |

*Assigned to:* Meredith S. Grabill
Chapter 11
Voluntary
Asset

*Debtor*
**The Roman Catholic Church for the Archdiocese of New Orleans,** *Debtor*
7887 Walmsley Ave.
New Orleans, LA 70125
ORLEANS−LA
Tax ID / EIN: 72−0408966

represented by **Laura F. Ashley**
Jones Walker, et al
201 St. Charles Avenue
Suite 4900
New Orleans, LA 70170
(504) 582−8118
Fax : (504) 589−8118
Email: lashley@joneswalker.com

**Elizabeth J. Futrell**
201 St. Charles Ave
49th Floor
New Orleans, LA 70170−5100
(504) 582−8000
Fax : (504) 589−8260
Email: efutrell@joneswalker.com

**Allison Kingsmill**
Jones Walker LLP
201 St. Charles Avenue
49th Floor
New Orleans, LA 70170
504−582−8252
Email: akingsmill@joneswalker.com

**Mark Mintz**
Jones Walker, et al
201 St. Charles Street
49th Floor
New Orleans, LA 70170
(504) 582−8368
Fax : (504) 589−8368
Email: mmintz@joneswalker.com

**Samantha Oppenheim**
Jones Walker LLP
201 St. Charles Avenue
New Orleans, LA 70170
504−582−8641
Email: soppenheim@joneswalker.com

**Lucas Hodgkins Self**
Jones Walker LLP
201 St. Charles Ave.

New Orleans, LA 70170
504−582−8302
*TERMINATED: 12/15/2020*

**R. Patrick Vance**
201 St. Charles Avenue
49th Floor
New Orleans, LA 70170−5100
(504) 582−8000
Fax : (504) 589−8194
Email: pvance@joneswalker.com

**Edward Dirk Wegmann**
Jones, Walker
201 St. Charles Avenue
49th Floor
New Orleans, LA 70170−5100
(504) 582−8226
Fax : (504) 582−8011
Email: dwegmann@joneswalker.com

*U.S. Trustee*
**Office of the U.S. Trustee**
400 Poydras Street
Suite 2110
New Orleans, LA 70130
(504) 589−4018

represented by **Amanda Burnette George**
Office of the U.S. Trustee
400 Poydras Street
Suite 2110
New Orleans, LA 70130
(504) 589−4092
Fax : (504) 589−4096
Email: Amanda.B.George@usdoj.gov

**Mary S. Langston**
Office of the U.S. Trustee
400 Poydras Street
Suite 2110
New Orleans, LA 70130
504 589−4093
Email: Mary.Langston@usdoj.gov

*Creditor Committee*
**Official Committee of Unsecured Creditors**

represented by **C. Davin Boldissar**
Locke Lord LLP
601 Poydras Street
Suite 2660
New Orleans, LA 70130−6036
(504) 558−5110
Fax : (504) 558−5200
*TERMINATED: 12/20/2021*

**Steven Bryant**
Locke Lord LLP
600 Congress Avenue
Ste 2200
Austin, TX 78701
512−305−4726
Email: steven.bryant@lockelord.com

**Andrew William Caine**
Pachulski Stang Ziehl & Jones
10100 Santa Monica Blvd.,
Ste 13th Floor
Los Angeles, CA 90067
310−277−6910
Fax : 310−201−0760

Email: acaine@pszjlaw.com

**Linda F Cantor**
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard
13th Floor
Los Angeles, CA 90067
310−277−6910
Fax : 310−201−0760
Email: lcantor@pszjlaw.com

**John H. Denenea, Jr.**
Shearman−Denenea, LLC
4240 Canal Street
New Orleans, LA 70119
(504) 304−4582
Fax : (504) 304−4587
Email: jdenenea@midcitylaw.com

**Soren Erik Gisleson**
Herman, Herman, Katz & Cotlar LLP
820 O'Keefe Ave
New Orleans, LA 70113
(504) 581−4892
Fax : (504) 561−6024
Email: sgisleson@hhkc.com

**Bradley C. Knapp**
Locke Lord LLP
601 Poydras Street
Suite 2660
New Orleans, LA 70130
504 558−5210
Fax : 504 910−6847
Email: bknapp@lockelord.com

**Omer F. Kuebel, III**
Locke Lord LLP
601 Poydras Street
Suite 2660
New Orleans, LA 70130−6036
(504) 558−5155
Fax : (504) 558−5200
Email: rkuebel@lockelord.com

**Richard Trahant**
Richard C. Trahant, Attorney at Law
2908 Hessmer Ave.
Metairie, LA 70002
504−780−9891
Email: trahant@trahantlawoffice.com

**Brittany Rose Wolf−Freedman**
Gainsburgh, Benjamin, David, Meunier
& Warshauer, LLC
1100 Poydras Street
Suite 2800
New Orleans, LA 70163
504−522−2304
Fax : 504−528−9973
Email: bwolf@gainsben.com

*Creditor Committee*
**Official Committee of Unsecured**
**Commercial Creditors**

represented by **A. Brooke Watford Altazan**
Stewart Robbins Brown & Altazan, LLC
301 Main St.
Suite 1640
Baton Rouge, LA 70801
225−231−9998
Fax : 225−709−9467
Email: baltazan@stewartrobbins.com

**Brandon A. Brown**
Stewart Robbins Brown & Altazan, LLC
301 Main St.
Ste 1640
Baton Rouge, LA 70801
225−231−9998
Fax : 225−709−9467
Email: bbrown@stewartrobbins.com

**Jamie Dodds Cangelosi**
Stewart Robbins Brown & Altazan, LLC
301 Main St.
Suite 1640
Baton Rouge, LA 70801
225−231−9998
Fax : 225−709−9467
Email: jcangelosi@stewartrobbins.com

**Linda F Cantor**
(See above for address)

**William S. Robbins**
Stewart Robbins Brown & Altazan, LLC
301 Main St.
Suite 1640
Baton Rouge, LA 70801
225−231−9998
Fax : 225−709−9467
Email: wrobbins@stewartrobbins.com

**Nicholas Smeltz**
Stewart Robbins Brown & Altazan, LLC
301 Main Street
Suite 1640
Baton Rouge, LA 70802
225−231−9998
Fax : 225−709−9467
Email: nsmeltz@stewartrobbins.com

**Paul Douglas Stewart, Jr.**
Stewart Robbins Brown & Altazan, LLC
301 Main St.
Suite 1640
Baton Rouge, LA 70801
225−231−9998
Fax : 225−709−9467
Email: dstewart@stewartrobbins.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 02/17/2022 | | 1314 | Notice of Filing of Official Transcript. Notice is given that an official transcript of the hearing held on January 20, 2022 has been filed. |

| | | | |
|---|---|---|---|
| | | | Pursuant to Judicial Conference policy, transcripts are available for inspection only at the clerk's office or may be purchased from the court transcriber for a 90 day period. Contact the clerk's office to request a copy. Attorneys who purchase transcripts will automatically be given PACER access by the clerk's office to the electronic transcript. Notice of Intent to Request Redaction Deadline Due By 2/24/2022. Redaction Request Due By 3/10/2022. Redacted Transcript Submission Due By 3/21/2022. Transcript access will be restricted through 5/18/2022. (Nunnery, J.) Modified on 5/18/2022 to remove access restrictions. (Nunnery, J.). (Entered: 02/17/2022) |
| 03/21/2022 | | 1364 | Notice of Filing of Official Transcript. Notice is given that an official transcript of the hearing held on March 17, 2022 has been filed. Pursuant to Judicial Conference policy, transcripts are available for inspection only at the clerk's office or may be purchased from the court transcriber for a 90 day period. Contact the clerk's office to request a copy. Attorneys who purchase transcripts will automatically be given PACER access by the clerk's office to the electronic transcript. Notice of Intent to Request Redaction Deadline Due By 3/28/2022. Redaction Request Due By 4/11/2022. Redacted Transcript Submission Due By 4/21/2022. Transcript access will be restricted through 6/21/2022. (Nunnery, J.) Modified on 6/21/2022 to remove access restrictions. (Nunnery, J.). (Entered: 03/21/2022) |
| 04/11/2022 | | 1421 | Notice of Filing of Official Transcript. Notice is given that an official transcript of the hearing held on March 28, 2022 has been filed. Pursuant to Judicial Conference policy, transcripts are available for inspection only at the clerk's office or may be purchased from the court transcriber for a 90 day period. Contact the clerk's office to request a copy. Attorneys who purchase transcripts will automatically be given PACER access by the clerk's office to the electronic transcript. Notice of Intent to Request Redaction Deadline Due By 4/18/2022. Redaction Request Due By 5/2/2022. Redacted Transcript Submission Due By 5/12/2022. Transcript access will be restricted through 7/11/2022. (Nunnery, J.) (Entered: 04/11/2022) |
| 04/11/2022 | | 1422 | Notice of Filing of Official Transcript. Notice is given that an official transcript of the hearing held on March 31, 2022 has been filed. Pursuant to Judicial Conference policy, transcripts are available for inspection only at the clerk's office or may be purchased from the court transcriber for a 90 day period. Contact the clerk's office to request a copy. Attorneys who purchase transcripts will automatically be given PACER access by the clerk's office to the electronic transcript. Notice of Intent to Request Redaction Deadline Due By 4/18/2022. Redaction Request Due By 5/2/2022. Redacted Transcript Submission Due By 5/12/2022. Transcript access will be restricted through 7/11/2022. (Nunnery, J.) (Entered: 04/11/2022) |
| 04/26/2022 | | 1472 | Notice of Filing of Official Transcript. Notice is given that an official transcript of the hearing held on April 14, 2022 has been filed. Pursuant to Judicial Conference policy, transcripts are available for inspection only at the clerk's office or may be purchased from the court transcriber for a 90 day period. Contact the clerk's office to request a copy. Attorneys who purchase transcripts will automatically be given PACER access by the clerk's office to the electronic transcript. Notice of Intent to Request Redaction Deadline Due By 5/3/2022. Redaction Request Due By 5/17/2022. Redacted Transcript Submission Due By 5/27/2022. Transcript access will be restricted through 7/25/2022. (Nunnery, J.) (Entered: 04/26/2022) |

| | | | |
|---|---|---|---|
| 05/09/2022 | | <u>1533</u> | Notice of Filing of Official Transcript. Notice is given that an official transcript of the hearing held on April 25, 2022 has been filed. Pursuant to Judicial Conference policy, transcripts are available for inspection only at the clerk's office or may be purchased from the court transcriber for a 90 day period. Contact the clerk's office to request a copy. Attorneys who purchase transcripts will automatically be given PACER access by the clerk's office to the electronic transcript. Notice of Intent to Request Redaction Deadline Due By 5/16/2022. Redaction Request Due By 5/31/2022. Redacted Transcript Submission Due By 6/9/2022. Transcript access will be restricted through 8/8/2022. (Nunnery, J.) (Entered: 05/09/2022) |
| 05/23/2022 | | <u>1566</u> | Notice of Filing of Official Transcript. Notice is given that an official transcript of the hearing held on May 19, 2022 has been filed. Pursuant to Judicial Conference policy, transcripts are available for inspection only at the clerk's office or may be purchased from the court transcriber for a 90 day period. Contact the clerk's office to request a copy. Attorneys who purchase transcripts will automatically be given PACER access by the clerk's office to the electronic transcript. Notice of Intent to Request Redaction Deadline Due By 5/31/2022. Redaction Request Due By 6/13/2022. Redacted Transcript Submission Due By 6/23/2022. Transcript access will be restricted through 8/22/2022. (Nunnery, J.) (Entered: 05/23/2022) |

1

```
 1                    UNITED STATES BANKRUPTCY COURT
                      EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:                      :    Case No. 20-10846

 4   THE ROMAN CATHOLIC CHURCH   :    Chapter 11
     OF THE ARCHDIOCESE OF NEW
 5   ORLEANS,                     :    New Orleans, Louisiana
                                       January 20, 2022
 6        Debtor.                 :    1:30 p.m.

 7   : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

 8                      TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE MEREDITH S. GRABILL,
 9                  UNITED STATES BANKRUPTCY JUDGE


10
     APPEARANCES:
11
     For the Debtor:             Jones Walker LLP
12                               BY:  SAMANTHA OPPENHEIM, ESQ.
                                      MARK MINTZ, ESQ.
13                               201 St. Charles Ave., 51st Floor
                                 New Orleans, LA  70170
14
     For Official Committee of   Locke Lord LLP
15   Unsecured Creditors:        BY:  BRADLEY C. KNAPP, ESQ.
                                 601 Poydras Street, Suite 2660
16                               New Orleans, LA  70130-6036


17
     Audio Operator:             JENNIFER NUNNERY
18

19   Transcript prepared by:     JANICE RUSSELL TRANSCRIPTS
                                 1418 Red Fox Circle
20                               Severance, CO  80550
                                 (757) 422-9089
21                               trussell31@tdsmail.com

22

23   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.

24

25
```

7

2

1    APPEARANCES (via telephone):

2    For the Debtor:                Jones Walker LLP
                                    BY:  EDWARD DIRK WEGMANN, ESQ.
3                                   201 St. Charles Ave., 51st Floor
                                    New Orleans, LA  70170
4
     For Official Committee of     Stewart Robbins
5    Unsecured Commercial          BY:  WILLIAM S. ROBBINS, ESQ.
     Creditors:                    301 Main St., Suite 1640
6                                  Baton Rouge, LA  70801-0016

7    For Official Committee of     Pachulski Stang
     Unsecured Creditors:          BY:  ANDREW W. CAINE, ESQ.
8                                  10100 Santa Monica Blvd.,13th Fl.
                                   Los Angeles, CA  90067
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                        P R O C E E D I N G S

2        (Call to Order of the Court)

3              THE COURT:  All right.  You may be seated.

4              All right.  Good afternoon.

5              We're in Case No., we're here in Case No. 20-10846, In

6    re Roman Catholic Church of the Archdiocese of New Orleans.

7              Let's take appearances in the courtroom, starting with

8    the debtor.

9              MS. OPPENHEIM:  Good afternoon, your Honor.  Samantha

10   Oppenheim and Mark Mintz here with me on behalf of the debtor

11   as debtor in possession.

12             THE COURT:  All right.

13             Is this the Tort Committee?

14             MR. KNAPP:  Yes, your Honor.  Brad Knapp with Locke

15   Lord on behalf of the Official Committee of Unsecured Creditors

16   and I believe on the phone is my co-counsel, Andy Caine.

17             THE COURT:  Okay.  It's nice to meet you, Mr. Knapp.

18   All right.

19             All right.  And do we have a, United States Trustee on

20   the line?

21        (No response)

22             THE COURT:  No United States Trustee?  All right.

23             The Commercial Creditors Committee?

24             MR. ROBBINS:  Your Honor, it's Will Robbins for

25   Commercial Committee.

 1            THE COURT:  Okay.

 2            Do we have anybody from pre-petition lender, Hancock

 3  Whitney?

 4      (No response)

 5            THE COURT:  All right.

 6            Anyone else on the line wishing to make an appearance?

 7  All right.

 8            MR. WEGMANN:  Dirk Wegmann, your Honor.  I'm on the

 9  line on behalf of the debtor.

10            THE COURT:  Okay, very good.

11            All right.  Ms. Oppenheim, are we going to --

12            MS. OPPENHEIM:  Thank you, your Honor.

13            THE COURT:  Okay.  This'll be a short one today.

14            MS. OPPENHEIM:  Yes, your Honor.

15            So in light of the recent docket entries, the only

16  matter that's left on today's agenda is the debtor's expedited

17  9019 motion --

18            THE COURT:  Uh-huh (indicating an affirmative

19  response).

20            MS. OPPENHEIM:  -- which was filed at ECF No. 20 -- 12

21  -- excuse me -- 1232.

22            THE COURT:  Okay.

23            MS. OPPENHEIM:  So this motion concerns two proposed

24  settlements of workers' compensation claims involving two

25  separate claimants.  First, the debtor seeks to settle the

5

1   claim of George Harrison, who is an employee of the Archdiocese

2   for $50,000.  And second, the debtor seeks to settle two claims

3   of Ms. Jeannette Wimberly-Brown, who is an employee of Our --

4   excuse me -- an employee of Resurrection of Our Lord School,

5   and we seek to settle those claims for $35,000.

6          THE COURT:  Okay.

7          MS. OPPENHEIM:  And as I said, Ms. Wimberly-Brown is

8   not an employee of the debtor.  She's an employee of that

9   school --

10         THE COURT:  Uh-huh (indicating an affirmative

11  response).

12         MS. OPPENHEIM:  -- and that school is owned by

13  Resurrection of Our Lord Parish.  Although those are non-debtor

14  entities, they do participate in the Archdiocese's insurance

15  program.

16         THE COURT:  Okay.

17         MS. OPPENHEIM:  This means that the Archdiocese

18  administers and pays their insurance claims.

19         THE COURT:  Okay.

20         MS. OPPENHEIM:  So the debtor seeks court approval

21  under Bankruptcy Rule 9019 of those settlements and we also

22  request that the Court modify the stay to the extent necessary

23  to allow the settlement amounts to be paid.

24         THE COURT:  Okay.

25         MS. OPPENHEIM:  The --

1          THE COURT:  And, and these, to be clear, these are

2    pre-petition injuries, alleged injuries that, that we're

3    settling, correct?

4          MS. OPPENHEIM:  Yes, your Honor.

5          THE COURT:  Okay.

6          MS. OPPENHEIM:  That is correct.  The injuries

7    occurred in 2017 for Mr. Harrison and then for Ms. Wimberly-

8    Brown, one occurred in 2017 and one occurred in 2019.

9          THE COURT:  Okay.

10         MS. OPPENHEIM:  Yes.

11         THE COURT:  All right.  I've read the, the motion and

12   I do observe that there have been no objections filed.  I went

13   -- have -- I went ahead and had this hearing simply because it

14   was set on an expedited review and I wanted to make sure that,

15   you know, everyone that, that wanted to appear and be heard

16   could, could appear and be heard.

17         Mr. Knapp, I note that there are no objections from

18   the Tort Committee, that's correct, and you have no objection

19   to the stay being lifted to pay these, these claimants out?

20         MR. KNAPP:  That's, that's correct, your Honor.

21         THE COURT:  Okay.

22         All right.  I've reviewed the motion.  I do find that

23   the settlement, well, I trust the, the debtor's litigators to

24   assess the risk of litigation and I rely on their

25   representation to tell me that the settlement amounts are going

1    to save on those litigation costs and they've considered the

2    risk of litigation.

3           So I, with that, I find the deal is fair and equitable

4    and in the best interest of the estate.  So if you haven't

5    already, you can submit a proposed order and we'll turn it

6    around for you.

7           MS. OPPENHEIM:  All right.  Thank you, your Honor.  An

8    order was submitted yesterday morning.

9           THE COURT:  Okay, perfect.

10          MS. OPPENHEIM:  So you, y'all should have that.

11          THE COURT:  All right.

12          So that is the only thing that have, we have left on

13   our docket.  As Ms. Oppenheim mentioned, this Court just issued

14   an order moments ago continuing the hearing on the UCC motion

15   to compel that we've been carrying for months now.

16          So I would hope that when we meet next Thursday to

17   talk about that, that we'll have some significant progress.  If

18   not, a complete resolution to it, fingers crossed.

19          MR. MINTZ:  Your Honor, with regards to that, we can

20   tell the Court offline some more information about why we

21   needed to continue that, but we did not want that in the

22   record.

23          THE COURT:  Okay.

24          MR. MINTZ:  We can talk about that issue.

25          THE COURT:  And that's fine.

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 14 of 207
Case 20-10846 Doc 1314 Filed 02/17/22 Entered 02/17/22 13:15:28 Main Document   Page 8 of
10

8

1          What we do, what I do want to mention, though, for the

2    parties is that, you know, I know that bankruptcy court,

3    bankruptcy law, bankruptcy practice generally moves very

4    quickly and I appreciate that.  That's why I like it and I'm

5    perfectly willing to accommodate the parties, when I can.  The

6    -- the -- the motion to compel was taken off at the last

7    minute, which I have no problem with.

8          What we've also got at the same time, as everyone in

9    this room knows, and probably on the call as well, is that the

10   debtor has filed its own motion to compel.  I was told by my

11   law clerk that next Thursday, that the parties also wanted to

12   have a status conference on the motion to compel.  However, I'm

13   not sure that that was well thought out because we're not going

14   to have a conversation regarding the sealed motion on the

15   record.

16         So I drafted, I modified the order -- and I'm not sure

17   if you've seen it or not -- but we'll have the status

18   conference/hearing on the UCC motion to compel.  It'll be in

19   open court, you know, pursuant to the General Orders that have

20   been issued regarding in-person versus telephonic and, you

21   know, access to the building.

22         After that hearing closes, though, we will have an in-

23   camera meeting, status conference, on the debtor's motion to

24   compel that was recently filed under seal.  And when I say "in

25   camera," that means in person only.  There's going to be no

1   telephonic participation and all parties will have to forfeit

2   their phones and other devices in Chambers, just to let you

3   know, okay?

4           So if anybody that is practicing out of state and

5   wishes to participate in that conference, they need to come

6   here to do that, okay?

7           All right.  Is there anything else before the Court

8   before we adjourn?

9           MS. OPPENHEIM:  No, your Honor.  That -- I believe --

10  or -- I believe that is all unless Mr. Mintz --

11          THE COURT:  Okay.

12          MS. OPPENHEIM:  -- has something to add.

13          MR. MINTZ:  No.  I was going to say, your Honor, other

14  than that, and then a private matter that I need to talk to you

15  about --

16          THE COURT:  Okay.

17          MR. MINTZ:  -- with the issue.

18          THE COURT:  All right.

19          As far as the omnibus hearing day goes, we are

20  adjourned and we can go off the record.  We will be in recess

21  until 4:00 p.m.

22          MS. OPPENHEIM:  Thank you.

23          THE COURT:  All right.

24      (Proceedings concluded at 1:37 p.m.)

25

1                        <u>CERTIFICATE</u>

2            I, court approved transcriber, certify that the

3    foregoing is a correct transcript from the official electronic

4    sound recording of the proceedings in the above-entitled

5    matter.

6    /s/ *Janice Russell*                    February 17, 2022

7    Janice Russell, Transcriber                Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

```
 1                      UNITED STATES BANKRUPTCY COURT
                         EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:                      :      Case No. 20-10846

 4   THE ROMAN CATHOLIC CHURCH   :      Chapter 11
     FOR THE ARCHDIOCESE OF NEW
 5   ORLEANS,                    :      New Orleans, Louisiana
                                        Thursday, March 17, 2022
 6       Debtor.                 :      1:31 p.m.

 7   : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

 8
                            TRANSCRIPT OF PROCEEDINGS
 9             BEFORE THE HONORABLE MEREDITH S. GRABILL,
                      UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For the Debtor:            Jones Walker LLP
                                BY:  MARK A. MINTZ, ESQ.
13                                   EDWARD DIRK WEGMANN, ESQ.
                                     SAMANTHA OPPENHEIM, ESQ.
14                              201 St. Charles Ave., 51st Floor
                                New Orleans, LA  70170
15
     For Official Committee of  Locke Lord LLP
16   Unsecured Creditors:       BY:  BRADLEY C. KNAPP, ESQ.
                                     OMER F. KUEBEL, III, ESQ.
17                              601 Poydras Street, Suite 2660
                                New Orleans, LA  70130-6036
18

19   Audio Operator:            JENNIFER NUNNERY

20
     Transcript prepared by:    JANICE RUSSELL TRANSCRIPTS
21                              1418 Red Fox Circle
                                Severance, CO  80550
22                              (757) 422-9089
                                trussell31@tdsmail.com
23

24   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
25
```

2

```
 1   APPEARANCES (continued):

 2   For Certain Survivors:        RICHARD C. TRAHANT, ESQ.
                                   2908 Hessmer Avenue
 3                                 Metairie, LA  70002

 4                                 Herman, Herman & Katz, LLC
                                   BY:  SOREN E. GISLESON, ESQ.
 5                                 820 O'Keefe Avenue
                                   New Orleans, LA 70113
 6
                                   Shearman-Denenea, L.L.C.
 7                                 BY:  JOHN H. DENENEA, JR., ESQ.
                                   4240 Canal Street
 8                                 New Orleans, LA  70119

 9   For Survivor-Plaintiffs in   Gainsburgh Benjamin
     CDC Case No. 19-11521:        BY:  BRITTANY WOLF-FREEDMAN, ESQ.
10                                      GERALD E. MEUNIER, ESQ.
                                   1100 Poydras St., Suite 2800
11                                 New Orleans, LA  70163

12
     ALSO PRESENT:                 JAMES ADAMS, Committee Chair
13                                 Official Committee of
                                    Unsecured Creditors
14
                                   PATRICIA MOODY, Committee Member
15

16   APPEARANCES (via telephone):

17   For the United States        Office of the U. S. Trustee
     Trustee:                      BY:  AMANDA B. GEORGE, ESQ.
18                                 400 Poydras Street, Suite 2110
                                   New Orleans, LA  70130
19
     For The Catholic Mutual      Bienvenu Foster
20   Relief Society of America:    BY:  DAVID E. WALLE, ESQ.
                                   1100 Poydras Street, Suite 2870
21                                 New Orleans, LA  70163

22

23

24

25
```

1                    P R O C E E D I N G S

2      (Call to Order of the Court)

3              THE COURT:  Good afternoon.  Be seated.

4              All right.  Good afternoon.  We're here in Case No.

5    20-10846, In re Roman Catholic Church of the Archdiocese of New

6    Orleans.

7              Let's take appearances, starting in the courtroom.

8              For the debtor?

9              MS. OPPENHEIM:  Good afternoon, your Honor.  Samantha

10   Oppenheim on behalf of the debtor as debtor in possession.  And

11   I have here with me Dirk Wegmann and Mark Mintz.

12             THE COURT:  All right, very good.

13             All right.

14             MR. KNAPP:  Good afternoon, your Honor.  For the

15   Official Committee of Unsecured Creditors you have Brad Knapp

16   and Rick Kuebel with Locke Lord.  Also in the courtroom are

17   Committee Chair James Adams and Committee Member Patricia

18   Moody.

19             THE COURT:  Okay.

20             MS. WOLF-FREEDMAN:  Good afternoon, your Honor.

21   Brittany Wolf-Freedman on behalf of myself and other state

22   court counsel members.  We have --

23             MR. MEUNIER:  Good morning, your Honor -- good

24   afternoon.  Jerry Meunier with --

25             THE COURT:  Uh-huh (indicating an affirmative

4

1    response).

2              MR. MEUNIER:  -- the same group.

3              MR. GISLESON:  Good afternoon, your Honor.  Soren

4    Gisleson.  I guess I'll just say on behalf of certain

5    survivors.  Thank you.

6              THE COURT:  Okay.

7              MR. DENENEA:  May it please the Court, John Denenea on

8    behalf of certain survivor.

9              MR. TRAHANT:  Good afternoon, your Honor.  Richard

10   Trahant on behalf of survivors.

11             THE COURT:  All right.  Do we have anybody from the,

12   the Commercial Creditors' Committee on the phone?

13      (No response)

14             THE COURT:  Okay.

15             The United States Trustee?

16             MS. GEORGE:  Good afternoon, your Honor.  Amanda

17   George on behalf of the U. S. Trustee.

18             THE COURT:  All right.

19             The pre-petition lender, Hancock Whitney?

20      (No response)

21             THE COURT:  All right.

22             The Apostolates?

23      (No response)

24             THE COURT:  All right.  Is there anyone else on the

25   line that wishes to make an appearance?

 1          MR. WALLE:  Judge, this is David Walle for Catholic

 2   Mutual.

 3          THE COURT:  Got it.  Thank you, Mr. Walle.

 4          All right.

 5          All right.  Ms. Oppenheim?

 6          MS. OPPENHEIM:  Thank you, your Honor.  Samantha

 7   Oppenheim on behalf of the debtor.

 8          So the debtor filed an agenda yesterday at ECF No.

 9   1356.  There's only one item on today's agenda --

10          THE COURT:  Uh-huh (indicating an affirmative

11   response).

12          MS. OPPENHEIM:  - and that is the tort committee

13   members' and state court counsel's motion to participate in

14   discovery.  That was filed under seal --

15          THE COURT:  Uh-huh (indicating an affirmative

16   response).

17          MS. OPPENHEIM:  -- at ECF No. 1320 and there is one

18   objection filed by the debtor at ECF No. 1349.

19          So I would --

20          THE COURT:  Okay.

21          MS. OPPENHEIM:  -- suggest that we just turn it over

22   to the tort committee members and their state court counsel.

23          THE COURT:  Okay.

24          And, and just to be clear before we get started, I

25   understand that all of, the content of these motions are filed

6

```
 1    under seal and we're just going to talk in general terms today.

 2    So just want everybody to be real cognizant of that.  This is a

 3    public hearing, all right?

 4              MS. OPPENHEIM:  Understood.

 5              THE COURT:  Okay.

 6              MS. OPPENHEIM:  Thank you.

 7              THE COURT:  All right.  So I do have -- I'll just

 8    start.  I've read -- as everybody in this room and probably on

 9    the phone is aware, the debtor has filed under seal a motion

10    for an entry of an order compelling the Tort Committee and its

11    counsel to answer identified questions and setting an

12    evidentiary hearing on sanctions for a potential violation of

13    the protective order that's, that governs the discovery in this

14    matter.  And to be clear, no evidentiary hearing has been set.

15    The parties -- I've met with the Tort, the Tort Committee

16    counsel and the debtor's counsel in Chambers and at this point

17    the discovery is very, very targeted and very limited and so

18    that's where we're at.

19              So I feel like the -- the committee members -- and

20    it's, it's not been filed by the Committee, I understand that.

21    It's -- it's -- the individual committee members, not the

22    Committee, and then the individual committee members' counsel

23    have filed this motion and I've read it and I understand it.

24    It may be a little premature at this point, but I'm, I'm

25    willing to hear -- I invited you all here.  I, you know, I know
```

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 23 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 7 of
35

7

 1   that this has been of great concern and so I'll go ahead and --

 2   and -- who's, who's going to be the spokesman for -- okay.

 3          Go ahead.

 4          MS. WOLF-FREEDMAN:  I am, your Honor.  Thank you.

 5          THE COURT:  Very good.  Come on up, then.

 6          MS. WOLF-FREEDMAN:  Thank you, your Honor.

 7          Good afternoon, your Honor.  My name is Brittany Wolf-

 8   Freedman.  I'm here representing the state court counsel for

 9   the individual committee members on the Official Committee of

10   Unsecured Creditors.  I'm going to refer to us collectively,

11   the individual state court counsel and the individual committee

12   members, as Movants here just for --

13          THE COURT:  Perfect, yeah.

14          MS. WOLF-FREEDMAN:  -- sake of brevity and, hopefully,

15   clarity.

16          Respectfully, your Honor, we're here simply to ask for

17   a seat at the table.  There has been a motion filed by the

18   debtor that implicates individual state court counsel and

19   individual committee members and while it's certainly true that

20   that motion does not pinpoint an individual, there is an

21   implication in that motion that it was someone on the Committee

22   or one of their state court counsel representatives that may

23   have violated the protective order.  We as movants have an

24   interest in getting to the bottom of this as much as the debtor

25   as much as any other interested party here and to this point we

1   have been barred from any type of meaningful participation in

2   the discovery process.

3         Now I understand that the Court's concern here is

4   making sure that this remains an orderly proceeding and I

5   understand that the Court's aim is to ensure efficiency and to

6   make sure that this does not become some sort of sideshow

7   litigation that detracts from the ultimate aim of this

8   bankruptcy and I can assure you that is the Movants' goal as

9   well.  And the fact of the matter is by us being excluded from

10  any type of participation our exclusion from this process is

11  running contrary to the goal of efficiency and economy and

12  getting to the bottom of these matters.

13        Briefly, your Honor, the debtor's objections suggest

14  that we don't have standing to participate in this.  Your Honor

15  has already raised the concern before I got up a moment ago

16  that this might be premature.  To this point, we, we submit

17  that it is not premature and that we do have standing.  And by

18  way of example, the Court has restricted our access to certain

19  documents which for nearly two years of this bankruptcy we have

20  had access to and it is critical that the individual state

21  court counsel and individual committee members remain with

22  access to these documents because there are state court counsel

23  who have litigated *ad nauseum* against the Archdiocese and who

24  have institutional knowledge based upon their previous dealings

25  with the Archdiocese that although our bankrupt, our committee

1   counsel, the bankruptcy attorneys with Pachulski Stang and with

2   Locke Lord are more than competent to represent the Committee's

3   interest as a whole, they lack that institutional knowledge

4   that state court counsel and the individual committee members

5   through their own personal dealings with the Archdiocese has.

6   And by way of example, there are certain documents that are,

7   perhaps, exchanges between an individual committee member and a

8   representative of the Archdiocese that have been marked

9   Confidential in this proceeding that should not have been

10  because in another capacity were made available to third

11  parties and should not be marked as confidential and bankruptcy

12  counsel representing the Tort Committee would have no way of

13  knowing that if it weren't for the individual committee members

14  and their state court counsel advising them, accordingly.

15          So all we're asking for is a seat at the table and we

16  are mindful that the Court does not want this to be blown into

17  some sort of harassment on, on the debtor.  That is not our aim

18  here.  We simply want to move forward and be able to

19  participate and, to the extent that the finger is being pointed

20  at any one of us, be able to properly and effectively represent

21  and defend ourselves against those allegations.

22          And I can go farther.  I'm happy to discuss some of

23  the case law that the debtor cited in its motion and explain to

24  you why I don't believe that it in any way suggests that we

25  don't have standing to participate here, but I guess for now I

1   should stop and --

2           THE COURT:  Uh-huh (indicating an affirmative

3   response).

4           MS. WOLF-FREEDMAN:  -- entertain any questions from

5   the Court.

6           THE COURT:  Well, I just have a couple of questions,

7   or comments.  I was led to believe by you that there was some

8   concern that individual committee members, you know, when we

9   talk about harassment, that, you know, the discovery process

10  that your, you raised the concern with the Court that the

11  individual committee members, if they had to sit through a

12  deposition and be grilled about this, that that would be

13  triggering, that would be, you know, harassing, that it'll be

14  traumatizing.  And so now I'm hearing something else.

15          MS. WOLF-FREEDMAN:  Respectfully, your Honor, I don't

16  think that the position that I took previously, which I still

17  maintain to this day, is antithetical to our request to

18  participate.  It has been our position all along that this

19  should be approached with a scalpel, not a sledgehammer.

20          THE COURT:  Uh-huh (indicating an affirmative

21  response).

22          MS. WOLF-FREEDMAN:  And our ability to participate is

23  not negated by that, by that notion.  We still don't think that

24  it's appropriate to, to take the deposition of every single

25  committee member.  We still don't think it's appropriate to

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 27 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 11 of 35

11

1  have a deposition or -- excuse me -- discovery propounded upon

2  committee members and, potentially, their state court counsel

3  as well without any reciprocal discovery going the other way.

4          THE COURT:  Uh-huh (indicating an affirmative

5  response).

6          MS. WOLF-FREEDMAN:  So I stand by everything that I

7  raised to you in my, in our initial meeting in a status

8  conference where I raised the concern that I want to protect

9  the integrity of our individual committee members and I don't

10  want them subjected, none of us want them subjected to needless

11  and harassing discovery, but we don't believe that our

12  participation in this discovery process negates that position

13  by any means.

14          THE COURT:  Uh-huh (indicating an affirmative

15  response).  Well, then we're on the same page.  Because I, too,

16  am trying to use a scalpel, rather than a sledgehammer.  And so

17  the fact is that discovery's been propounded against one, you

18  know, third party, not -- to my knowledge, no discovery's been

19  propounded against any committee members or their individual

20  counsel.  And I would agree that when that day, if that day

21  ever comes, then, of course, you know, discovery can come back

22  the other way.  But at this point in time I believe the Court

23  is and upon the suggestion, quite frankly, of the tort

24  committee's counsel the parties have decided that they're

25  trying to, to try to, you know, like I said, try to use the

12

1    scalpel, to use your analogy, in discovery rather than this.

2              So I, like I said, I -- I'll -- I'll go ahead and --

3    go ahead.  You can go ahead, but those are, those are my

4    initial comments.

5              MS. WOLF-FREEDMAN:  And they are well taken, your

6    Honor.  I can give you an example of ways in which we as

7    individual counsel and our individual committee members have

8    already been prejudiced besides the exclusion --

9              THE COURT:  Uh-huh (indicating an affirmative

10   response).

11             MS. WOLF-FREEDMAN:  -- of access and barring of access

12   of these documents.  For example, in the debtor's motion or --

13   excuse me -- in the debtor's objection the debtor states that

14   we -- and if I could find it here with the Court's indulgence

15   for just one moment.

16             THE COURT:  Okay.

17             MS. WOLF-FREEDMAN:  On page 5 of the debtor's

18   objection the debtor states in Paragraph 14, "This Court has

19   already stated that an accusation that the debtor leaked its

20   own documents 'is not productive.'"  This quote comes from a

21   transcript of a sealed status conference from February 11th of

22   2022 and that February 11, 2022 status conference, Mr. Gisleson

23   had e-mailed Chambers asking to participate in that conference

24   and it was very clear from the Court's order that state court

25   counsel was not permitted to participate.

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 29 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 13
of 35

13

1          So now what we have here in objection to our motion is

2    a quote from a transcript that we've never seen, that we are

3    not permitted access to from a sealed status conference that we

4    were not invited to intend and it puts us at a disadvantage

5    because how can we respond to something that we don't know the

6    nature or the context from which this came.  And that's just

7    one example.

8          But again, all of that is just part and parcel of this

9    overarching theme that efficiency would be served and economy

10   would be served if we had a seat at the table.  Because if we

11   were able to participate in these status conferences, if we

12   were able to understand the context from which this quote was

13   pulled, it would not be a problem for the debtor to be citing

14   that from a sealed transcript and divulging that information to

15   third parties that weren't party to that status conference.

16          THE COURT:  Okay.  All right.

17          MS. WOLF-FREEDMAN:  Thank you.

18          THE COURT:  Do you have anything else?

19          MS. WOLF-FREEDMAN:  Not at this time, Judge.

20          THE COURT:  Okay.

21          MS. WOLF-FREEDMAN:  Thank you.

22          THE COURT:  All right.

23          Ms. Oppenheim?

24          MS. OPPENHEIM:  Mr. Mintz will --

25          THE COURT:  It's Mr. Mintz.  All right.

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 30 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 14 of 35

14

 1          MR. MINTZ:  Your Honor, I, I think you're right that,

 2    of course, this is premature at this time because we have

 3    not -- at Ms. --as Ms. Wolf-Freedman did talk at the first

 4    status conference that was had and she was very worried about

 5    simply taking the depositions of everybody willy-nilly.  And

 6    that's not what we did.  We've worked with committee counsel to

 7    make sure that we are targeted and that we are doing this in an

 8    efficient and, you know, albeit slower than I think anyone

 9    would want, but an efficient process in order to target what we

10    need and when we need it.

11          This Court is well within its authority to limit

12    discovery, to control how discovery happens, and at this time

13    there is nothing, really, to participate in.  There is -- and,

14    and I think that's part of the problem that I'm having with the

15    argument that, the oral argument that I've heard today.  This

16    is a motion to participate in discovery.  That is what it

17    literally was called.  Now what I'm hearing is, "No, this is a

18    motion to participate in the whole process.  I don't like that

19    any of it is sealed.  I don't like that we're not a party to

20    it."  Well, the fact of the matter is they're not a party to

21    it, your Honor, and even it was out in the open, they have

22    counsel who are representing their interest as the Committee.

23          There has not been an accusation against any one of

24    the committee members.  There's not been an accusation against

25    any one of the state court counsel.  There's not been an

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 31 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 15 of 35

15

1   accusation made, we said very clearly -- and I know that they

2   have read it and I have no problem divulging this part of it --

3   but we said very clearly we do not know who did this.  I wish

4   we did.  It would make it much easier.  We could be straight of

5   the scalpel and figure it out.

6           The other thing that I think is interesting, your

7   Honor, is the scalpel approach that everyone says they want is

8   not what ends up being written.  In the motion, they

9   immediately started, immediately, "I want to have a seat at the

10  table in order to ask questions to the other side."  They even

11  said it here.  I'm not sure that's where we're starting at.

12  I'm not sure what standing they desperately have to do all that

13  but if we're going to move down that road, that's fine.  But

14  I'm mindful of what has happened.  And Mr. Stang mentioned this

15  in one of our numerous conversations specifically, that just

16  because one side asks a question doesn't mean the other side

17  does.  Just because we need to ask questions to look at a

18  targeted thing does not mean the other side looks at them as

19  well or asks the exact same questions of the other side just

20  because they can.  That's not the way discovery necessarily

21  should work.  That's not efficient.  That is not moving us to

22  where we are.

23          As an example of all of this, your Honor, let's just

24  look at, for example, the discovery that we are all sitting out

25  that we had -- the traveling -- the motion to compel from the

1   Official Committee has been pending since I don't know when.

2   We continue to travel it.  There has been zero discovery that

3   goes the other way, zero.

4        So to sit here and say that we are, you know, trying

5   to traumatize people, to sit here and say that we are trying to

6   be unfair, unprejudiced, we have shown throughout this case

7   that is what, that we are doing is targeted.  We are responding

8   to discovery and we're producing documents.

9        Now this issue about the protective order, your Honor,

10   there is a problem.  We know there's a problem.  We know what

11   happened.  We've talked about what happened.  I'm not going to

12   go through the specifics.  That is under seal.  I have said to

13   your Honor, I have said to the committee counsel, this is not a

14   good permanent solution for many of the reasons that Ms. Wolf-

15   Freedman just raised.  I don't know a better solution right

16   now.  I would like to have discussions about it.  We're trying

17   to come up with some discussions with the committee counsel

18   who, again, represent the Committee.

19        And that gets to my third point, your Honor.  I've

20   been practicing bankruptcy law a long time.  I know you have as

21   well.  It is an odd position to be in to be referring to every

22   member of the Committee and their counsel, but not the

23   Committee.  If committee counsel cannot speak for the

24   Committee, I don't know who I'm negotiating with at all.  I get

25   they don't represent them in the individual capacity.  I've

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 33 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 17 of 35

17

1    been committee counsel.  I understand that dichotomy, but this

2    is not what's happening here.  What's happening here is I'm

3    talking to the Committee, not with two counsel who are two very

4    good law firms -- and we've been doing this for a long time --

5    but I'm talking about it with six members, five or six law

6    firms.  I can't, I lost count.  That's not the way this is

7    supposed to work.  That, in and of itself, is what makes it

8    inefficient.  That, in and of itself, is what is, can destroy

9    the process.

10          Your Honor is right. Ms. Wolf-Freedman is right about

11   this, that we need to get through, not make this a sideshow,

12   not make this some sort of litigation that puts a halt to

13   everything.  I want to move forward with the mediation.  We

14   want to share documents as appropriate.  I think we need to get

15   through what we know so far, hopefully come to an answer, and

16   then we can proceed in the targeted method that we need to.

17   But threats, you know, about how the process is working, that

18   is not helpful, no matter who says it.

19          And so, your Honor, I think at this point if there's a

20   motion we need to file in order to state an accusation that I

21   can't make under Rule 11, I guess I can do that or try to

22   figure out a way to do it and make people parties, but that

23   doesn't seem efficient.  I filed a motion to set an evidentiary

24   hearing and to ask specific questions, some of which I, of the

25   Committee and the committee counsel, not of the individual

1   members, and your Honor has read the questions and she knows

2   they are not even directed at individual members.

3   Specifically, we then heard -- we asked for an evidentiary

4   hearing.  As your Honor has said, that evidentiary hearing has

5   not been set.  We're not ready for it to be set.  I don't even

6   know what that evidentiary hearing would say at the moment

7   'cause I don't know what I'm trying to prove.

8            And so, your Honor, at that point we think this is

9   premature.  Let us finish what we have done targeted and if we

10  need to move forward, then we can move forward with the

11  representatives who have been hired by this Committee to

12  represent them in this bankruptcy court.  Locke Lord and

13  Pachulski Stang have done an excellent job at that.

14  Unfortunately for me, that's now on the record, but they've

15  done an excellent job and they will continue to do so, but I

16  think at that point, your Honor, that's where we need to

17  proceed in this bankruptcy matter.

18           But, your Honor, the other final point that I need to

19  make is that, at best at this moment when they're talking about

20  accusations or implications or things, again we don't know

21  what's going to be said.  We don't know what's going to be

22  found out.  At best at this point, the Movants are witnesses.

23  Witnesses don't participate in discovery and the whole thing.

24  If they become a party, then that's fine.  When they become a

25  party, when it's time to do that, then they will have every

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 35 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 19
of 35

19

1   right to participate as needed and we can come to your Honor

2   and decide what needs to be done, what doesn't need to be done,

3   but today, we're not ready for that.

4          THE COURT:  All right.  Thank you, Mr. Mintz.

5          Ms. Wolf-Freedman?

6          MS. WOLF-FREEDMAN:  Yes.  Thank you, your Honor.

7   Briefly.

8          Your Honor, unlike the Court and Mr. Mintz, I have not

9   practiced bankruptcy for very long.  In fact, this is the first

10  occasion I've had to appear in a bankruptcy court, but I would

11  venture to guess that the situation in which we're in in which

12  there is an accusation of a violation of a protective order

13  without any particular individual identified as the culprit of

14  that leak is a somewhat unusual posture for a bankruptcy court

15  to find itself in.

16         So Mr. Mintz's point is well founded in that we are in

17  an odd situation, but the reason that we have to be in this

18  posture is because of the way that this allegation has been

19  lodged against the Committee as a whole and against the

20  individuals on the Committee and their state court counsel.

21         Now committee counsel has protected the Committee and

22  the Committee's interest by stating that it has been, to their

23  knowledge, that it is no one from the Pachulski firm, it is no

24  one from Locke Lord, and it was no official act of the

25  Committee and that to the extent that it was an individual

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 36 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 20 of 35

20

```
 1   committee member or to the extent that it was a state court

 2   counsel that violated the protective order, I believe I've

 3   heard Mr. Kuebel say it multiple times that it was an ultra

 4   vires act.  That puts us in a position of having to defend

 5   ourselves on an individual basis.

 6          Now the interest in a target and properly limited

 7   discovery proceeding, I agree.  That, that is not the issue.  I

 8   think that all of us, the debtor, the Committee, the individual

 9   members, and state court counsel, and certainly the Court, are

10   all on the same page with that.  The issue before the Court is

11   simply whether that interest is best served by allowing

12   participation of all the individuals who are implicated by the

13   debtor's motion and while Mr. Mintz has repeatedly suggested

14   that this is premature, there has already been an action taken

15   by the Court that has sanctioned the committee members and

16   their state court counsel and it has profoundly impacted the

17   way that the Committee can operate.

18          We have an interest in getting to the bottom of this.

19   Our Committee meets on a bi-weekly basis and there is

20   information that is shared in confidence and I know I can speak

21   on behalf of my individual client, who is here in the courtroom

22   today, that she would not feel comfortable speaking freely and

23   openly and I believe that the other state court counsel would

24   share that sentiment with respect to their clients, that they

25   would not be able to speak openly and freely if we believed
```

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 37 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 21
of 35

21

1  | that it was someone within our ranks that was the source of the

2  | violation of the protective order.  We have an interest in

3  | getting to the bottom of this.

4  |      To Mr. Mintz's point about us not having standing,

5  | which he spends multiple pages in their objection, that is, to

6  | put it plainly, ridiculous.  Frankly, the case law that

7  | Mr. Mintz cites in support of that is totally inapposite.  I'm

8  | happy to explain to the Court why if the Court is interested,

9  | but frankly, the individual members of this Committee are

10 | creditors in this case and we represent, we as state court

11 | counsel represent those creditors.  We have an interest in

12 | getting to the bottom of this.  The cases that are cited in

13 | their brief in no way, shape, or form suggest to the contrary

14 | and don't provide any support for the position that we don't

15 | have standing.  We have every right to have a seat at the table

16 | and because there has already been actions taken in this case

17 | which have restricted and hindered the ability of this

18 | Committee to do its job through the actions of the individual

19 | committee members and the state court counsel, we do believe

20 | that, to some extent, this issue is ripe for the Court's

21 | consideration at this time.

22 |      THE COURT:  Here's the Court's problem.  The Court's

23 | interest is in protecting the process and the Court also has an

24 | interest in -- part, part of that is that there's a protective

25 | order in place.  It's an order of this Court and from what I've

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 38 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 22
of 35

22

1  read, there's been a serious violation of that protective

2  order.  The risk of further discovery being produced that, you

3  know -- and let's be clear.  The, the content is sensitive, to

4  put it, to say the least.  It can be triggering.  It is, some

5  of it is, evokes a visceral response.  The risk that the

6  discovery coming out of the Archdiocese that's subject to a

7  protective order that all of the Movants have signed on behalf

8  of the Committee, in order to receive that discovery the risk

9  that it could be disclosed further is of particular concern to

10  the Court.  It's a risk that I'm not at this point willing to

11  take, frankly, in the effort to protect the process.

12        The parties are participating in a mediation now.  I

13  understand that in order to fully participate in the mediation

14  we've got to have some trust, you know, in the confidential

15  nature of some of, of the materials.  We've got to have trust

16  in one another in order to be able to mediate with one another,

17  but, like I said, that's, there's no easy way to figure this

18  out.

19        And my question to you is -- and I agree.  I agree

20  that when counsel for the Committee tells me, "Well," you know,

21  "it wasn't Pachulski and it, it wasn't Locke Lord, and any,"

22  you know, they don't, they don't deny that there was a breach

23  of the protective order, but, you know, while it was an *ultra*

24  *vires* act, well, frankly, from where I'm sitting, that's a

25  little unsatisfactory to the Court.

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 39 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 23
of 35

23

1          And what prohibits the Movants from working hand in

2     hand with Committee for the, counsel for the Committee in

3     trying to at least make sure, you know, our house is clean, you

4     know?  What prohibits the Movants from, from working -- 'cause

5     that's what I see.  I don't see -- when I see a committee --

6     when I see parties to a bankruptcy, we have the debtor, we have

7     two committees, we've got the UST, those are the parties to

8     this Committee, to this case, and I don't see the committee

9     individuals, individual counsel, to me that, that's not

10    helpful.  That's not helpful to resolving this.  When I see

11    committee counsel sort of, you know, working on behalf of the

12    Committee, the members are the Committee.  How can you separate

13    the interests of this -- of this, you know, fiction committee

14    from the actual participants on the Committee?  I, I don't

15    understand how that works.  And so I'm a little, I'm a little

16    frustrated, frankly, that, that committee counsel doesn't seem

17    to be able to investigate its own house.

18          So how can, how can the Movants help this?

19          MS. WOLF-FREEDMAN:  Your Honor, respectfully, I

20    believe that the committee counsel has done everything that

21    they can do.  At one point in time it was suggested that we'd

22    like to put forth evidence of our own testimony into the record

23    to support the fact that it, it was not any individual or state

24    court counsel member.  And we would still like the opportunity

25    to put that evidence into the record because we think it would

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 40 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 24 of 35

24

1    assist the Court and the debtor and the Committee and all

2    interested parties in the investigation here.

3            I, I don't have a great answer for you in terms of,

4    you know, how we can distinguish one between the two.  The

5    Committee as a whole is a juridical entity.  It's a fiction.

6            THE COURT:  Uh-huh (indicating an affirmative

7    response).

8            MS. WOLF-FREEDMAN:  And we need to be able to speak as

9    individuals to be able to explain our individual knowledge of

10   the facts and what happened and to this point we haven't had

11   the opportunity to do that and all we're asking for is the

12   opportunity to do that.

13           THE COURT:  Okay.  All right.

14           Mr. Kuebel or Mr. Knapp on behalf of the Committee?

15           MR. KUEBEL:  Good afternoon, your Honor.  Omer F.

16   Kuebel, III on behalf of the Committee.

17           A, a couple of points.  We work our way through and

18   first is really an opening salvo, that from our position and

19   our hope, our encouragement, quite frankly, was that the

20   primary parties to this today, the Movants and the debtor,

21   would be able to, at least in our view, there was sort of

22   what's wrong with today?  No. 1, this is a sealed motion

23   hearing on a rule day.

24           THE COURT:  Uh-huh (indicating an affirmative

25   response).

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 41 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 25
of 35

25

1          MR. KUEBEL: No. 2, there may or may not ultimately be

2    need for evidence and it's based on another motion where there

3    is not an evidentiary hearing set.

4          And 3 is based on our efforts to work with the debtor

5    to get discovery out to Brother Martin and we're waiting on

6    responses to this.  I thought the right answer was to bump this

7    hearing until --

8          THE COURT:  Uh-huh (indicating an affirmative

9    response).

10          MR. KUEBEL:  -- we get to a point where we get

11    responses and we get a little bit more of a firmed-up direction

12    on where the debtor's evidentiary hearing may be going.  And I

13    understood that there was some dialogue about moving this or

14    continuing it, but I, I don't know the specifics.  Counsel can

15    address it.  I was not part of the call.

16          THE COURT:  Uh-huh (indicating an affirmative

17    response).

18          MR. KUEBEL:  But I understand that the debtor declined

19    to move today's hearing.

20          So as an opening --

21          THE COURT:  Yeah.  Well, let me just --

22          MR. KUEBEL:  -- matter --

23          THE COURT:  -- clear that up.

24          MR. KUEBEL:  Yeah.

25          THE COURT:  I, I wanted this hearing to go forward and

1  I understand that it's, you know, this was, it ended up that

2  this was the only thing before the Court today on this omnibus

3  hearing day, but I did, you know, I have received the letters

4  from the Movants.  I've, you know, I've now got their, their

5  motion in front of me and I just thought it was important to

6  have a conversation.  Do I agree that it's still a bit

7  premature because we are waiting on that very, you know, very

8  targeted responses?  I, I feel like the Court needed just a

9  little bit more information before we, you know, took the next

10 step and if we needed to expand the discovery, we certainly

11 would.

12        But I thought it was important to have a conversation

13 with Ms. Wolf-Freedman and her colleagues about -- and, and for

14 the Court to just, to hear what they had to say to be able to

15 consider the arguments.  I still am of the opinion that,

16 sitting here right now today, it's premature, but that's not to

17 say that it will, won't become ripe sooner than later.

18        MR. KUEBEL:  And we think it's premature, your Honor,

19 and we think that, ultimately, this should be carried until

20 both the debtor's motion develops and the discovery that we're

21 trying to do collaboratively with the debtor develops further.

22        And, and with respect to that discovery, we, we don't

23 have answers, but it is out the door.  We know there will

24 probably be more inquiries, if not express discovery, with

25 respect to The Advocate issue.

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 43 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 27
of 35

27

 1          THE COURT:  Uh-huh (indicating an affirmative

 2   response).

 3          MR. KUEBEL:  I want to be clear -- and, and your Honor

 4   knows this.  You've heard me say this -- I mean, everyone's a

 5   suspect.  We -- if we knew who gave these documents to The

 6   Advocate, we wouldn't be here today.  We don't know.  We're in

 7   a process, a process where we're trying to do it

 8   collaboratively with the debtor.  We're in a process where we

 9   don't want to speculate.  Everyone's a suspect.  We don't want

10   to speculate.  We want to get the answers.  We want to get the

11   answers from the sources and that's what we're trying to do and

12   I think that the right path forward is to get the answers from

13   Brother Martin and any other sources on the Brother Martin side

14   and to work collaboratively with the debtor and the UST, as the

15   case may be, to try to get information as we can from The

16   Advocate and then understand, once we have that information,

17   where we are so we're not speculating, so we're making informed

18   decisions, and, quite frankly, the Court can fashion informed

19   remedies.

20          THE COURT:  All right.  All right.  Thank you,

21   Mr. Kuebel.

22          All right.  Ms. George from the United States

23   Trustee's Office, would you like to add anything to the

24   conversation?

25          MS. GEORGE:  Thank you, your Honor.  Amanda George

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 44 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 28 of 35

28

 1   from the U. S. Trustee.

 2           And I have nothing further to add.

 3           THE COURT:  All right.

 4           MS. GEORGE:  I appreciate the Court.

 5           THE COURT:  All right.  Thank you.

 6           All right.  Again, these are serious allegations and I

 7   can't underscore that enough.  It's not just an affront.  It's

 8   not, it's not a personal affront.  It's not an affront to the

 9   Court to, to assert a violation of a protective order.  The

10   affront is to this process, to what the goals of this process

11   are, to the trust, you know.  When folks put their name, sign

12   on the dotted line on a protective order, they agree to certain

13   things.  They -- and most of all, it's not just, you know, you

14   agree to, you know, keep private what is private, what is

15   confidential confidential, but it's an agreement that you're

16   going to participate in this process, okay, and you're going to

17   participate in good faith.  And that's what's concerning to the

18   Court.

19           And so because the risk going further, going into the

20   future is so great regarding the potential for disclosure that

21   should not be disclosed unilaterally or arbitrarily, at this

22   time, sitting here today right now, the Committee, the, the

23   Movants' request is premature.  That's not to say that it's not

24   going to become ripe sooner than later.  I need just a little

25   more information from Brother Martin and then, and then we'll

1   take the next steps.

2           It's unrealistic to expect, of course, that if any,

3   any of the Movants ever got served with discovery, then, of

4   course, you know, you're involved in the process now, but at

5   this, at this point the parties to this process are the debtor,

6   the Tort Committee, and the United States Trustee.  Because the

7   bankruptcy process itself is at risk, okay?  There's nothing

8   prohibiting -- and I would strongly encourage all of the

9   Movants, each and every one of you, to participate fully with

10  counsel for the Committee.  It's, you know, from what I

11  understand, if, if the allegations are true, something is

12  broken, okay, and we need to get it fixed.  And it's in the

13  interest of all of the unsecured creditors who are alleging

14  claims of abuse, it's in all of their best interests to get

15  what's broken fixed regarding this process.  And I can't, I

16  can't say it any more plainly.  If we're going to have any, if

17  the bankruptcy process is going to work, we're going to have

18  resolution, then we've, we've got to have, you know, some

19  modicum of trust with the information that's being presented,

20  that's coming out of the debtor.

21          That said, you know, as Ms. Wolf-Freedman pointed out,

22  there are no easy answers to this.  This is not -- this is a

23  tough -- the Court's just frustrated, believe it or not, as

24  anyone in this room, and I, I just want this to be fixed, but

25  how to do that is, you know, I don't have a magic wand.  I

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 46 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 30 of 35

30

1   don't have, you know, any more, any more answers at this point

2   than anyone else.

3          Mr. Meunier, did you have something?  I see you sort

4   of --

5          MR. MEUNIER:  Ms., Ms. Freedman will speak for us,

6   Judge.

7          THE COURT:  Okay.

8          MR. MEUNIER:  I just wanted to --

9          THE COURT:  All right.

10          MR. MEUNIER:  -- mention something to her.

11          THE COURT:  Okay.  That's fine.

12          All right.  Let me -- give me a second.

13      (Pause)

14          THE COURT:  I understand that discovery went out,

15   what, a couple of weeks ago, perhaps.  Maybe in a couple more

16   weeks we'll have some answers.  Let me just pull up something.

17      (Pause)

18          THE COURT:  I don't want to push this.

19          Mr. Mintz, do you have anything before I finish up?

20          MR. MINTZ:  One -- I was going to say this, your

21   Honor.

22          If, if the answer is going to be that we're going to

23   move this until we're in a different posture -- and the debtor

24   is supportive of that -- we would like it reset without

25   prejudice to continue negotiations.  I mean, what -- what --

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 47 of 207
Case 20-10846 Doc 1364 Filed 03/21/22 Entered 03/21/22 11:32:08 Main Document   Page 31 of 35

31

1  not negotiations -- but also responses.  In other words, we

2  would have the ability to do another response 'cause the

3  posture's going to be different and I think the posture on how

4  we would respond today is different if, how we would respond

5  next time, and I believe even Movants might say that, if a

6  posture is different, they might want to tailor the motion

7  based on your Honor's comments as well.

8        So I'm fine moving it if we want to continue to

9  discuss it, but I think both sides might want to update their

10  pleadings if we need, if we have to get to that point, if we

11  haven't reached agreement.

12        MR. WEGMANN:  The discovery went out, your Honor, on

13  March 9th.  And technically, they had 30 days.  They promised

14  to expedite it, but we have not received any further response.

15        THE COURT:  All right.

16        MS. WOLF-FREEDMAN:  Respectfully, your Honor, I would,

17  I would agree, actually.  I do agree with Mr. Mintz on this

18  point --

19        THE COURT:  Uh-huh (indicating an affirmative

20  response).

21        MS. WOLF-FREEDMAN:  -- here to the extent that we need

22  to move this hearing.  We would just ask that the Court hold,

23  hold in abeyance our motion and perhaps --

24        THE COURT:  Oh, of course.  Yeah.

25        MS. WOLF-FREEDMAN:  --  allow us to supplement our

 1   pleadings based upon newly obtained information.

 2            THE COURT:  Yeah.  Yeah.  I had no intention of

 3   denying the motion today.

 4            MS. WOLF-FREEDMAN:  Thank you.

 5            THE COURT:  That's, that's not happening.

 6            So let's, let's go ahead and, even though it's an

 7   omnibus hearing day, let's, just for, for, for our purposes

 8   today, let's push it to the 14th, April 14th.  By that time,

 9   the 30 days will have elapsed for Brother Martin to respond.

10            Now, you know -- well, let me look at the calendar.

11       (Pause)

12            THE COURT:  We'll go ahead and keep it on the 14th.

13   If we have other matters that are filed and are going to be

14   heard on the omnibus hearing day, then we can deal with those

15   and we can also, we can always move this particular issue into

16   a special setting occurring after the omnibus hearing day so

17   that we can take it off, you know, the main docket and just,

18   you know, and we can close it up a little bit.  Because, you

19   know, if we want to be able to talk specifics, we're going to

20   have to have a more limited venue.

21            But what I'll say is if you can just update,

22   supplement, and you can, you know, file it as a, you know, just

23   a supplement to what you've already filed.  You don't need to

24   file it as a whole new motion.  It won't require anything to be

25   set for hearing.  Just file it as a supplement to, you know,

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 49 of 207
Case 20-10846   Doc 1364   Filed 03/21/22   Entered 03/21/22 11:32:08   Main Document   Page 33 of 35

33

1    either the motion or the, the opposition.  And file it, get it

2    on file by the 13th, just the day before.  I'm going to be able

3    to read all of it and I'll be prepared to discuss.

4           But that should give you plenty of time to get the,

5    the very limited discovery that's been, that's out there right

6    now.  That'll come back.  You'll still have a week or so before

7    the hearing to talk among yourselves and, and decide if

8    anything's changed with, you know, with any information that we

9    get from Brother Martin.  I hope, I hope it's fruitful, put it

10   that way.

11          But if you'll just supplement whatever you want to

12   supplement and you already have my permission to file it under

13   seal.  So you don't need to file another motion to file under

14   seal.  You already have my permission to file it under seal.

15   File it by the 13th close of business and I'll read it before

16   the 14th at 1:30.

17          And like I said, depending, just be prepared.

18   Depending on what's in the papers and what you can agree upon

19   or what you can't agree upon, if we need to move it, just be

20   aware that we'll have to, you know, I'll issue an order the

21   very next day.  On the morning of the 14th, we'll have the

22   omnibus hearing day and then we may have something after that

23   just for more of a closed audience so that we can speak

24   frankly, okay?

25          MS. WOLF-FREEDMAN:  Thank you, your Honor.

34

1            MR. MEUNIER:  Thank you, Judge.

2            THE COURT:  All right.

3            MR. MINTZ:  And, and, your Honor, just -- and, and I

4    can't answer -- we do anticipate hearing this on the 14th, or

5    at least we anticipate motions that will be filed in the next

6    couple of weeks that will require the Court's attention, so.

7            THE COURT:  Okay.  All right.  Thank you for that.

8            All right.  Is there anything else, Ms. Oppenheim, for

9    today?

10            MS. OPPENHEIM:  No, your Honor.

11            THE COURT:  All right.

12            MR. OPPENHEIM:  Nothing for today.

13            THE COURT:  All right.  Thank you.

14            We're adjourned.

15            COURT SECURITY OFFICER:  All rise.

16        (Proceedings concluded at 2:18 p.m.)

17

18

19

20

21

22

23

24

25

```
1                          CERTIFICATE

2           I, court approved transcriber, certify that the

3   foregoing is a correct transcript from the official electronic

4   sound recording of the proceedings in the above-entitled

5   matter.

6   /s/ Janice Russell                      March 21, 2022

7   Janice Russell, Transcriber                    Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

1                    UNITED STATES BANKRUPTCY COURT
                      EASTERN DISTRICT OF LOUISIANA
2

3    IN RE:                        :     Case No. 20-10846

4    THE ROMAN CATHOLIC CHURCH     :     Chapter 11
     FOR THE ARCHDIOCESE OF NEW
5    ORLEANS,                      :     New Orleans, Louisiana
                                         March 28, 2022
6         Debtor.                  :     4:00 p.m.

7    : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

8
                        TRANSCRIPT OF PROCEEDINGS
9           BEFORE THE HONORABLE MEREDITH S. GRABILL,
                   UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES (via telephone):

12   For the Debtor:              Jones Walker LLP
                                  BY:  MARK A. MINTZ, ESQ.
13                                     SAMANTHA OPPENHEIM, ESQ.
                                  201 St. Charles Ave., 51st Floor
14                                New Orleans, LA  70170

15   For Official Committee of    Locke Lord LLP
     Unsecured Creditors:         BY:  OMER F. KUEBEL, III, ESQ.
16                                601 Poydras Street, Suite 2660
                                  New Orleans, LA  70130-6036
17

18   Audio Operator:             JENNIFER NUNNERY

19
     Transcript prepared by:     JANICE RUSSELL TRANSCRIPTS
20                               1418 Red Fox Circle
                                 Severance, CO  80550
21                               (757) 422-9089
                                 trussell31@tdsmail.com
22

23   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
24

25

2

 1  APPEARANCES (via telephone continued):

 2  For Official Committee of     Stewart Robbins
    Unsecured Commercial          BY:  WILLIAM S. ROBBINS, ESQ.
 3  Creditors:                    301 Main St., Suite 1640
                                  Baton Rouge, LA  70801-0016
 4
    For the United States         Office of the U. S. Trustee
 5  Trustee:                      BY:  AMANDA B. GEORGE, ESQ.
                                  400 Poydras Street, Suite 2110
 6                                New Orleans, LA  70130

 7  For the Apostolates:          Heller Draper
                                  BY:  DOUGLAS S. DRAPER, ESQ.
 8                                650 Poydras Street, Suite 2500
                                  New Orleans, LA  70130
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2            THE COURT:  Good afternoon.  This is Judge Grabill.

3            We're here in Case No. 20-10846, In re The Roman

4    Catholic Church of the Archdiocese of New Orleans.

5            Let's take appearances, starting with the debtor.

6            MR. MINTZ:  Thank you, your Honor.  Mark Mintz on

7    behalf of the debtor as debtor in possession.

8            THE COURT:  All right.

9            And the Office of the United States Trustee?

10           MS. GEORGE:  Good afternoon, your Honor.  Amanda

11   George on behalf of the U. S. Trustee.

12           THE COURT:  Okay.

13           The Official Committee of Unsecured Creditors?

14           MR. KUEBEL:  Good afternoon, your Honor.  Omer F.

15   Kuebel, III with Locke Lord on behalf of the Official Committee

16   of Unsecured Creditors.

17           THE COURT:  All right.

18           And the Official Committee of Unsecured Commercial

19   Creditors?

20           MR. ROBBINS:  Hello, your Honor.  It's Will Robbins on

21   behalf of the Commercial Committee.

22           THE COURT:  Okay.

23           Is anyone on the line for Hancock Whitney?

24       (No response)

25           THE COURT:  All right.
```

1           And how about the Apostolates?

2           MR. DRAPER:  Douglas Draper, your Honor.

3           THE COURT:  Okay.

4           Catholic Mutual Relief Society?

5      (No response)

6           THE COURT:  Employers' Liability Assurance Company?

7      (No response)

8           THE COURT:  All right.

9           All right, Mr. Mintz.  This is your motion.  We're

10  here on an expedited motion for entry of an order authorizing

11  the debtor to opt in to treatment as a participating chartered

12  organization under the BSA's chapter 11 plan.

13           MR. MINTZ:  That is correct, your Honor.  And let me

14  start by stating that we really appreciate the Court's

15  willingness to have granted the emergency treatment.

16           The Committee, the Official Committee of Unsecured

17  Creditors had filed an opposition, a limited opposition

18  questioning (a) the need for the expedited treatment and (b)

19  trying to get more information about claims that the debtor

20  might have related to, or claims that would be replicated by

21  the Boy Scout bankruptcy.  I think these are fair questions,

22  especially given what we have since learned after we had filed

23  it.

24           To that end, we have asked the Committee and the

25  Committee has agreed to a continuance of this motion to allow

```
 1  additional time to, to satisfy those concerns.  We would ask

 2  that it be reset for April 14th on the omnibus hearing date and

 3  all rights of the debtor and both sides -- and the Committee's

 4  obviously -- are preserved on that.

 5        But the concern from the debtor's point of view was

 6  that we had to get something on file and dealt with prior to

 7  the hearing being or prior to the Boy Scouts confirmation order

 8  being entered.  It turns out all we needed to do was actually

 9  tell Boy Scouts that we wished to opt in, however, it is

10  subject to bankruptcy court approval and that is good enough to

11  the, the proverbial secure our place in line while we give the

12  Committees in our case what we need to.

13        THE COURT:  Okay.  So does the -- do you need a new

14  objection deadline or you're just going to, I mean, should we

15  set one?

16        MR. MINTZ:  I -- we can, your Honor, if, if your Honor

17  wishes to do so.  I think that's certainly fine to do so, but

18  we can also go off this one.  I think that the, you know --

19  honestly, I'm, I'm good either way, but I think --

20        MR. ROBBINS:  Your Honor, this is -- this is --

21        MR. MINTZ:  -- that (talking simultaneously).

22        MR. ROBBINS:  This is Will Robbins.

23        I -- I -- I would ask for a new objection deadline, if

24  it's okay with everybody on the phone just because --

25        THE COURT:  All right.
```

6

1          MR. ROBBINS:  -- we didn't really have time to go

2    through it and we haven't really communicated any of this to

3    our committee members.

4          THE COURT:  Okay.

5          MR. MINTZ:  That is fine.

6          THE COURT:  All right.  So it's the 28th today.  Let's

7    see.  Let's set the --  how about -- let's see -- two weeks

8    from today, April 11th at 5:00 p.m., will be the new objection

9    deadline.  And that, that'll prepare us for the 14th.

10          All right.  Anything else for the Court?

11          MR. MINTZ:  Not today, your Honor.  Thank you for your

12    time.

13          THE COURT:  All right.

14          Mr. Mintz, can you have one of your associates draft a

15    quick order pushing this to the 14th with that objection

16    deadline on the 11th?

17          MR. MINTZ:  Certainly.

18          Ms. Oppenheim, are you on the phone?

19          MS. OPPENHEIM:  Yes.  I'm here.

20          THE COURT:  Okay.

21          MR. MINTZ:  Okay.  Will you please (indiscernible) to

22    that?

23          MS. OPPENHEIM:  I will do so.  Thank you.

24          THE COURT:  All right, perfect.  I appreciate it.

25          All right.  Thank you very much, everyone.

```
 1          MR. ROBBINS:  Thanks, your Honor.

 2          MR. MINTZ:  Thank you, your Honor.

 3          MS. GEORGE:  Thank you, your Honor.

 4          MS. OPPENHEIM:  Thank you.

 5      (Proceedings concluded at 4:05 p.m.)

 6

 7

 8

 9

10

11

12                    CERTIFICATE

13          I, court approved transcriber, certify that the

14  foregoing is a correct transcript from the official electronic

15  sound recording of the proceedings in the above-entitled

16  matter.

17  /s/ Janice Russell                April 11, 2022

18  Janice Russell, Transcriber                Date

19

20

21

22

23

24

25
```

1

```
 1              UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:                    :    Case No. 20-10846

 4   THE ROMAN CATHOLIC CHURCH :    Chapter 11
     FOR THE ARCHDIOCESE OF NEW
 5   ORLEANS,                  :    New Orleans, Louisiana
                                    March 31, 2022
 6       Debtor.              :    3:00 p.m.

 7   : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

 8
                     TRANSCRIPT OF PROCEEDINGS
 9          BEFORE THE HONORABLE MEREDITH S. GRABILL,
                 UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For the Debtor:          Jones Walker LLP
                              BY:  MARK A. MINTZ, ESQ.
13                                 SAMANTHA OPPENHEIM, ESQ.
                              201 St. Charles Ave., 51st Floor
14                            New Orleans, LA  70170

15   For Official Committee of  Stewart Robbins
     Unsecured Commercial       BY:  P. DOUGLAS STEWART, ESQ.
16   Creditors:                      WILLIAM S. ROBBINS, ESQ.
                                301 Main St., Suite 1640
17                              Baton Rouge, LA  70801-0016

18

19   Audio Operator:          SEAN McGINN

20
     Transcript prepared by:   JANICE RUSSELL TRANSCRIPTS
21                             1418 Red Fox Circle
                               Severance, CO  80550
22                             (757) 422-9089
                               trussell31@tdsmail.com
23

24   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
25
```

```
 1   APPEARANCES (via telephone):

 2   For Official Committee of      Locke Lord LLP
     Unsecured Creditors:           BY:  STEVEN BRYANT, ESQ.
 3                                  600 Congress Avenue, Suite 2200
                                    Austin, TX  78701
 4
     For The Catholic Mutual        Schiff Hardin LLP
 5   Relief Society of America:     BY:  J. MARK FISHER, ESQ.
                                    233 S. Wacker Drive, Suite 7100
 6                                  Chicago, IL  60606

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                      P R O C E E D I N G S

 2        (Call to Order of the Court)

 3             THE COURT:  Good afternoon.  Be seated.

 4             MR. MINTZ:  Good afternoon, your Honor.

 5             THE COURT:  All right.  We're here today in Case No.

 6    20-10846, In re The Roman Catholic Church of the Archdiocese of

 7    New Orleans.

 8             All right. Let's take appearances in the courtroom

 9    first, starting with the debtor.

10             MR. MINTZ:  Thank you, your Honor.  Mark Mintz,

11    Samantha Oppenheim on behalf of the debtor as debtor in

12    possession.

13             THE COURT:  Okay.

14             Go ahead.

15             MR. STEWART:  Good afternoon, your Honor.  Doug

16    Stewart and Will Robbins on behalf of the Commercial Committee.

17             THE COURT:  All right.

18             Do we have anyone on the phone from the Office of the

19    United States Trustee?

20        (No response)

21             THE COURT:  No.

22        The Official Committee of Unsecured Creditors?

23             MR. BRYANT:  Yes, your Honor.  This is Steven Bryant,

24    B-R-Y-A-N-T, on behalf of the Unsecured Creditors' Committee.

25             THE COURT:  Okay.
```

4

1          Hancock Whitney, are you on the line?

2     (No response)

3          THE COURT:  Let's see.  Anyone on the line from the

4   Apostolates?

5     (No response)

6          THE COURT:  Catholic Mutual Relief Society?

7     (No response)

8          THE COURT:  Or Employers' Liability Assurance Company?

9          Oh, go ahead.

10         MR. FISHER:  Mark -- Mark -- your Honor, Mark Fisher

11  on behalf of Catholic Mutual.

12         THE COURT:  All right, very good.

13         And Employers' Liability Assurance Company?

14    (No response)

15         THE COURT:  All right.

16         All right.  So I've got in front of me an expedited

17  motion to approve a tolling agreement.

18         MR. STEWART:  Good afternoon, again, your Honor.  Doug

19  Stewart on behalf of the Commercial Committee.

20         The Commercial Committee filed this motion jointly

21  with the debtors, the Official Committee, and the Apostolates

22  or affiliates.  As we near the two-year mark in this case, the

23  Official Committee and the Commercial Committee have been

24  investigating various causes of action that the debtor may have

25  against third parties and have negotiated a tolling agreement

5

1    with the debtor and those parties so that, the hope is that the

2    main constituents in this case can focus on the mediation

3    process going forward and not be distracted by, by these

4    matters.

5           We've put it before your, your Honor this, this

6    afternoon -- and we appreciate the, the expedited relief -- so

7    that we can be sure to get this entered and kind of out of the

8    way.  The response deadline, I believe, was yesterday at 5:00.

9           THE COURT:  Uh-huh (indicating an affirmative

10   response).

11          MR. STEWART:  We've received no response and we did

12   notice it as noted in our Certificate of Service on the parties

13   who are involved in the tolling agreement as well as the, the

14   normal mailing list in the case.

15          Unless your Honor has any questions, accordingly we

16   would ask that the tolling agreement and the order submitted

17   would be entered.

18          THE COURT:  Okay. Do you have any idea -- I know

19   you've been investigating this.  Do you have any idea of how

20   many or the, the value of these causes of action, like how

21   many, do we have any idea about that?

22          MR. STEWART:  Well, we do.

23          THE COURT:  You don't have to go into specifics

24   clearly, but just to get a ballpark idea.  And then how long

25   does the tolling agreement last?

1          MR. STEWART:  The tolling agreement, I believe, lasts

2    a year.

3          THE COURT:  Okay.

4          MR. STEWART:  And we had the involvement of the

5    mediator and, and kind of working through some of the details

6    and the --

7          THE COURT:  Okay, good.

8          MR. STEWART:  -- the length of time.  The amount at

9    issue, I guess, is less of an amount and is more of a single

10   business enterprise type claim --

11         THE COURT:  Okay.

12         MR. STEWART:  -- involving the, the estate and

13   affiliates.  Alternatively, substantive consolidation based

14   upon that and  Louisiana state law.  And then I believe there's

15   an alternative count of some avoidance-type claims that I

16   really can't quantify here in open court.

17         THE COURT:  Okay.

18         MR. STEWART:  And we were able to negotiate these

19   things without moving forward with a Louisiana Rolex position

20   letter and standing motion.  So we -- we would -- I don't think

21   I can really quantify further than that.  Now that's --

22         THE COURT:  Okay.

23         MR. STEWART:  -This is a joint effort with the

24   Commercial Committee and the committee.  So there is -- but the

25   piece that's before you this morning is only as to the

7

 1   affiliates.  So that is, I believe, the breadth of, of the

 2   scope of the tolling agreement.

 3           THE COURT:  Okay.

 4           MR. MINTZ:  And, your Honor --

 5           THE COURT:  Uh-huh (indicating an affirmative

 6   response).

 7           MR. MINTZ:  -- if I may -- and I think that that is --

 8   Mark Mintz on behalf of the debtor.

 9           And, and that was the point I really wanted to make

10   that I think is important about this.  Of course, it's a

11   tolling agreement to simply extend because we do want to

12   negotiate out of this.  It is not the debtor or any other party

13   agreeing that there is a cause of action, that it exists, that

14   it could exist, and I think --

15           THE COURT:  Okay.

16           MR. MINTZ:  -- all the rights are properly -- it's not

17   even giving anyone standing to do anything.  It's just simply

18   extending the deadline to, to proceed under the, the applicable

19   Rules.

20           The other thing that I think is incredibly important

21   here is what you're asked to approve, your Honor, is the

22   tolling agreement vis-à-vis the affiliates, the debtors, and --

23   or the -- I'm sorry-- the Apostolates or affiliates, as they're

24   alternatively called in here.  And we use that word "affiliate"

25   not to mean bankruptcy affiliate, but to mean a different word.

1          But the point is that we do not -- we are not asking

2    this Court to approve the tolling agreements that might exist

3    as to other true third parties that we're also getting tolling

4    agreements from as well, that there may be avoidance actions

5    for those types of, for those entities as well.  Those are

6    proceeding.  We can announce to the Court that at the request

7    of the Committees we have contacted those parties and asked

8    them to sign additional tolling agreements.  Some of them are.

9    Some of them are asking more questions, but we are working

10   through that to try to get that to happen, so.

11          But what you're asked to approve is simply the

12   entities that are signing this agreement as per the Exhibit, I

13   think, A that is on here.

14          THE COURT:  All right.

15          So let's put a pin in that one and I 'll come back.

16          Does anybody want to be heard on the, that's on the

17   phone today?

18          MR. BRYANT:  Your Honor, this is Steve Bryant on

19   behalf of the Official Committee.

20          THE COURT:  Uh-huh (indicating an affirmative

21   response).

22          MR. BRYANT:  I would just say that Mr. Stewart and

23   Mr. Mintz have correctly described what this motion is about

24   and what it's intended to accomplish and we support it,

25   obviously.

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 67 of 207
Case 20-10846 Doc 1422 Filed 04/11/22 Entered 04/11/22 15:20:23 Main Document   Page 9 of
12

9

 1          THE COURT:  Okay.

 2          All right.  I have no problem with granting the

 3  motion.  It's a joint motion and it's in, you know, best

 4  interest of everyone here in this room and on the phone.  And

 5  if the Apostolates have signed off on it, then great.

 6          So if you'll submit a proposed order.

 7          My question is for the non-Apostolate third parties

 8  that you just spoke of that you are negotiating tolling

 9  agreements with, am I to expect those in the next month?

10          MR. MINTZ:  I'm not sure, your Honor, that you

11  actually need to --

12          THE COURT:  Okay.

13          MR. MINTZ:  -- actually do anything with those.

14          THE COURT:  Okay.

15          MR. MINTZ:  Those can be agreements between the

16  parties and that don't necessarily need the Court's approval.

17          THE COURT:  Okay.

18          MR. MINTZ:  This one was a special case 'cause of how,

19  honestly, how Mr. Draper is signing for everyone's behalf and

20  everyone was more comfortable with having your Honor at that

21  point --

22          THE COURT:  Got it.

23          MR. MINTZ:  -- approve that that was okay.  So --

24          THE COURT:  Okay.

25          MR. MINTZ:  -- that's where we're going.

```
 1              THE COURT:  All right, perfect.  I understand now.

 2    Okay.

 3              Well, if you will submit a proposed order, I'll go

 4    ahead and get it entered.  And I'm assuming you need it sooner

 5    than later?

 6              MR. MINTZ:  Yeah.  I think --

 7              Has it been submitted, Doug?

 8              I think it has been, but, if it hasn't, we'll get it

 9    out.

10              THE COURT:  Okay.

11              MR. ROBBINS:  We --

12              MR. STEWART:  Your Honor, I will submit the order.

13    It's not, it's not an emergency that it happen today.

14              THE COURT:  Okay.

15              MR. STEWART:  But we will -- it's been signed off on.

16    It was attached, but I don't think it's been submitted.

17              THE COURT:  No.  I don't think I've received a Word

18    version of it --

19              MR. STEWART:  Right.

20              MR. MINTZ:  Okay..

21              THE COURT:  -- on my desk.

22              Okay.

23              MR. MINTZ:  We'll get it out.

24              MR. STEWART:  I'll call the office and tell them to do

25    it when we leave.
```

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 69 of 207
Case 20-10846 Doc 1422 Filed 04/11/22 Entered 04/11/22 15:20:23 Main Document   Page 11 of 12

11

1          THE COURT:  Okay, perfect.

2          MR. MINTZ:  All right.

3          THE COURT:  All right.  Thank you very much.

4          MR. MINTZ:  Thank you, your Honor.

5          MR. STEWART:  Thank you.

6          THE COURT:  We're --

7          MR. ROBBINS:  Thank you, your Honor.

8          THE COURT:  We're in recess until 4:00.

9          MR. BRYANT:  Thank you, your Honor.

10         THE COURTROOM DEPUTY:  All rise.

11      (Proceedings concluded at 3:08 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, court approved transcriber, certify that the

foregoing is a correct transcript from the official electronic

sound recording of the proceedings in the above-entitled

matter.

/s/ *Janice Russell*_____     _____April 11, 2022_____

Janice Russell, Transcriber                          Date

1

```
 1                    UNITED STATES BANKRUPTCY COURT
                      EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:                      :     Case No. 20-10846

 4   THE ROMAN CATHOLIC CHURCH   :     Chapter 11
     FOR THE ARCHDIOCESE OF NEW
 5   ORLEANS,                    :     New Orleans, Louisiana
                                       April 14, 2022
 6        Debtor.               :     1:31.m.

 7   : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

 8
                            TRANSCRIPT OF PROCEEDINGS
 9            BEFORE THE HONORABLE MEREDITH S. GRABILL,
                      UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For the Debtor:            Jones Walker LLP
                                BY:  MARK A. MINTZ, ESQ.
13                                   SAMANTHA OPPENHEIM, ESQ.
                                     EDWARD DIRK WEGMANN, ESQ.
14                                   ALLISON KINGSMILL, ESQ.
                                201 St. Charles Ave., 51st Floor
15                              New Orleans, LA  70170

16   For Official Committee of  Locke Lord LLP
     Unsecured Creditors:       BY:  OMER F. KUEBEL, III, ESQ.
17                                   BRADLEY C. KNAPP, ESQ.
                                601 Poydras Street, Suite 2660
18                              New Orleans, LA  70130-6036

19
     Audio Operator:            JENNIFER NUNNERY
20

21   Transcript prepared by:    JANICE RUSSELL TRANSCRIPTS
                                1418 Red Fox Circle
22                              Severance, CO  80550
                                (757) 422-9089
23                              trussell31@tdsmail.com

24
     Proceedings recorded by electronic sound recording; transcript
25   produced by transcription service.
```

2

```
 1   APPEARANCES (continued):

 2   For the United States          Office of the U. S. Trustee
     Trustee:                       BY:  AMANDA B. GEORGE, ESQ.
 3                                  400 Poydras Street, Suite 2110
                                    New Orleans, LA  70130
 4
     For the Apostolates:           Heller Draper
 5                                  BY:  DOUGLAS S. DRAPER, ESQ.
                                    650 Poydras Street, Suite 2500
 6                                  New Orleans, LA  70130

 7   For The Catholic Mutual        Bienvenu Foster
     Relief Society of America:     BY:  DAVID E. WALLE, ESQ.
 8                                  1100 Poydras Street, Suite 2870
                                    New Orleans, LA  70163
 9
     For Certain Survivors:         RICHARD C. TRAHANT, ESQ.
10                                  2908 Hessmer Avenue
                                    Metairie, LA  70002
11
                                    Herman, Herman & Katz, LLC
12                                  BY:  SOREN E. GISLESON, ESQ.
                                    820 O'Keefe Avenue
13                                  New Orleans, LA 70113

14                                  Shearman-Denenea, L.L.C.
                                    BY:  JOHN H. DENENEA, JR., ESQ.
15                                  4240 Canal Street
                                    New Orleans, LA  70119
16
     For Patricia Moody:            Gainsburgh Benjamin
17                                  BY:  BRITTANY WOLF-FREEDMAN, ESQ.
                                    1100 Poydras St., Suite 2800
18                                  New Orleans, LA  70163

19
     ALSO PRESENT:                  PATRICIA MOODY, Committee Member
20
                                    JACK BERTHELOT, Committee Member
21
     APPEARANCES (via telephone):
22

23   For Official Committee of      Pachulski Stang
     Unsecured Creditors:           BY:  ANDREW W. CAINE, ESQ.
24                                  10100 Santa Monica Blvd., 13 Flr.
                                    Los Angeles, CA  90067
25
```

3

```
 1    APPEARANCES (via telephone continued):

 2    For Official Committee of      Stewart Robbins
      Unsecured Commercial           BY:  WILLIAM S. ROBBINS, ESQ.
 3    Creditors:                     301 Main St., Suite 1640
                                     Baton Rouge, LA  70801-0016
 4
      For Hancock Whitney Bank:      Carver Darden
 5                                   BY:  DAVID F. WAGUESPACK, ESQ.
                                     1100 Poydras Street, suite 3100
 6                                   New Orleans, LA  70163

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 74 of 207
Case 20-10846 Doc 1472 Filed 04/26/22 Entered 04/26/22 14:40:06 Main Document   Page 4 of 42

4

1                     P R O C E E D I N G S

2        (Call to Order of the Court)

3             THE COURT:  Good afternoon.  Be seated.

4        (Counsel greet the Court)

5             THE COURT:  All right.  We're here in Case No. 20-

6    10846, In re The Roman Catholic Church of the Archdiocese of

7    New Orleans.

8             Let's take appearances, starting with the debtor.

9             MR. MINTZ:  Thank you, your Honor.  Mark Mintz,

10   Samantha Oppenheim, Dirk Wegmann, and Allison Kingsmill on

11   behalf of the debtor as debtor in possession.

12            THE COURT:  All right.

13            And the Official Committee of Unsecured Creditors?

14            MR. KUEBEL:  Good afternoon, your Honor.  Omer F.

15   Kuebel III with Locke Lord, my partner, Brad Knapp, on behalf

16   of the Official Committee of Unsecured Creditors.  I believe

17   that Andy Caine with the Pachulski firm will be participating

18   telephonically in part of the hearings today, specifically the

19   carried motion to compel hearing.

20            THE COURT:  Okay.

21            MR. KUEBEL:  And would introduce your Honor to two

22   members of our Committee who are in the court today, Patricia

23   Moody and Jack Berthelot.

24            THE COURT:  Okay, very good.

25            And, Mr. Caine, are you on the line?

5

1          MR. CAINE:  Yes, I am.  Good afternoon, your Honor.

2          THE COURT:  All right, very good.

3          Is anyone on the line for the Official Committee of

4   Commercial Creditors?

5          MR. ROBBINS:  Yes, your Honor.  Good afternoon.  It's

6   Will Robbins on behalf of the Commercial Committee.

7          THE COURT:  Okay.

8          And the United States Trustee?

9          MS. GEORGE:  Good afternoon, your Honor.  Amanda

10  George on behalf of the U. S. Trustee.

11         THE COURT:  Okay.

12         And the Apostolates?

13         MR. DRAPER:  Your Honor, Douglas Draper here for the

14  Apostolates.

15         THE COURT:  All right.

16         Is there anyone else that wishes to make an

17  appearance?

18         MR. WAGUESPACK:  Good afternoon, your Honor.  David

19  Waguespack on the phone for Hancock Whitney Bank.

20         THE COURT:  Okay.

21         MR. GISLESON:  Good afternoon, your Honor.  Soren

22  Gisleson on behalf of Certain Abuse Survivors.

23         THE COURT:  Okay, very good.

24         MR. WALLE:  Your Honor, David Walle for Catholic

25  Mutual.

1          THE COURT:  Very good.

2          MS. WOLF-FREEDMAN:  Good afternoon, your Honor.

3  Brittany Wolf-Freedman on behalf of Patricia Moody.

4          THE COURT:  Okay.

5          MR. TRAHANT:  Good afternoon, your Honor.  Richard

6  Trahant on behalf of four members of the Committee and myself.

7          THE COURT:  Okay.

8          MR. DENENEA:  Good afternoon, your Honor.  May it

9  please the Court, John Denenea on behalf of Certain Abuse

10  Survivors.

11          THE COURT:  All right, very good.

12          All right.  So I've got your Agenda.  Mr. Mintz, why

13  don't you go ahead.

14          MR. MINTZ:  Thank you, your Honor.  Mark Mintz on

15  behalf of the debtor.

16          Your Honor, we filed an Agenda yesterday and then late

17  last night filed an Amended Agenda after things have continued

18  to come off of it and moving things to Uncontested Matters.  So

19  while it looks awful, I think we can move through it quickly.

20  We do -- even though there are things on the uncontested

21  docket, we do need to make some statements about them just to

22  give your Honor, the record, hopefully, to say a couple of

23  things about them.  So --

24          THE COURT:  Okay.

25          MR. MINTZ:  --I would like to move through in that

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 77 of 207
Case 20-10846 Doc 1472 Filed 04/26/22 Entered 04/26/22 14:40:06 Main Document   Page 7 of
42

7

1  order and then we can do the status conferences, if that's

2  okay.

3          THE COURT:  Okay.

4          MR. MINTZ:  Thank you, your Honor.

5          The first matter on the Agenda was the Debtor's

6  Expedited Motion to Enter into -- I'm not going to read the

7  entire title --

8          THE COURT:  Uh-huh (indicating an affirmative

9  response).

10         MR. MINTZ:  -- but to opt in to the Boy Scout, as a

11 participating entity in the Boy Scout bankruptcy.  Your Honor,

12 we originally filed this and we had a hearing in which -- why

13 it was filed expedited, we had an initial hearing.  We decided

14 to continue it in order to provide additional notice to

15 claimants who may be affected by this motion and that was at

16 the suggestion of the Official Committee of Unsecured Creditors

17 -- and we accepted it -- to do so.  The -- at that point we did

18 send notice out -- and we can discuss -- we went through the

19 proof of claim index and information in there, tried to

20 determine which of these claims would have Boy Scouts-related

21 material in it and which ones wouldn't.  We identified, I

22 believe, 12.  It's 11 or 12 that had some information that

23 would lead us to believe boy scouting might be implicated.  We

24 sort of divided the notice, your Honor, about four or five of

25 those -- and Mr. Kuebel can say the exact numbers -- were sent

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 78 of 207
Case 20-10846 Doc 1472 Filed 04/26/22 Entered 04/26/22 14:40:06 Main Document   Page 8 of 42

8

1  were of claimants who did not have counsel.

2        THE COURT:  Uh-huh (indicating an affirmative

3  response).

4        MR. MINTZ:  And so a letter was sent from the Locke

5  Lord firm advising them of the motion and giving them the

6  deadline to respond and none of those filed a, any response to

7  the motion by the extended deadline of, I believe, earlier this

8  week.

9        The others were, we, we sent to lawyers -- and those

10  were sent by the Jones Walker firm -- to people who were

11  represented by counsel to their counsel at the addresses that

12  were on the proofs of claim provided.  We did get a response

13  filed by the Frank Lamothe Law Firm and Kristi Schubert on

14  behalf of certain abuse survivors that she named and --

15        THE COURT:  Uh-huh (indicating an affirmative

16  response).

17        MR. MINTZ:  -- I think there was accidentally putting

18  names in the record, which the Court has since redacted.

19        Mr. Kuebel and I had discussions with Ms. Schubert

20  regarding her objection and I think Mr. Kuebel had additional

21  discussions with her and after those discussions she agreed to,

22  the way she put it and this is what I'm reporting --

23        THE COURT:  Uh-huh (indicating an affirmative

24  response).

25        MR. MINTZ:  -- is no longer prosecuting her objection.

1          THE COURT:  Okay.

2          MR. MINTZ:  At this point, your Honor, we think we

3    have made a sufficient record based on the withdrawal of that

4    objection.  Based on the matters in the pleading itself and no

5    more objection from the Official Committee that this is in the

6    best interest of the estate to give the estate the ability to

7    opt in to the settlement, to the extent necessary, moving

8    forward.

9          THE COURT:  All right.

10          Mr. Kuebel, do you want to be heard on this?

11          MR. KUEBEL:  Yes.  Thank you, your Honor.  Omer F.

12    Kuebel III on behalf of the Official Committee of Unsecured

13    Creditors.

14          Your Honor, when we saw this motion I think we

15    understood initially why the debtor believes that opting in to

16    the Boy Scouts settlement was in the best interest of the

17    estate.  Our concern was really a procedural concern or

18    procedural due process concern --

19          THE COURT:  Uh-huh (indicating an affirmative

20    response).

21          MR. KUEBEL:  -- particularly for claimants in the

22    Archdiocese case that may have either a mixed claim or an

23    overlapping claim with Boy Scouts.

24          So we worked with the debtor.  We identified a number

25    of proof of claims that looked like they could have Boy Scouts

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 80 of 207
Case 20-10846  Doc 1472  Filed 04/26/22  Entered 04/26/22 14:40:06  Main Document   Page 10
of 42

10

1   characteristics.  I think our general split on the division of

2   labor was we, we drafted a notice letter, shared it with the

3   Archdiocese.  Jones Walker took the laboring oar on the

4   claimants that were represented by counsel and we sent notice

5   to those *pro se* claimants who were not represented by counsel.

6           THE COURT:  Okay.

7           MR. KUEBEL:  So I, I think we got the notices out.  I

8   think we accomplished our due process concerns.  Obviously,

9   there were issues surrounding the Boy Scouts, the Boy Scouts

10  claims on the one hand.  The Boy Scouts settlement is

11  incredibly complex, but, on the other hand, there may be real

12  legitimate questions, comments, or concerns that some of those

13  joint or mixed claimants may have.

14          So we wanted to make sure that they got notice.  I can

15  report to the Court that at least with respect to the

16  individual claimants that we contacted we did not get any

17  response.  We saw that there was only one objection filed.  We

18  did talk to the objector.  Kristi Schubert with Frank Lamothe's

19  office --

20          THE COURT:  Uh-huh (indicating an affirmative

21  response).

22          MR. KUEBEL:  -- had some particular suggestions about

23  how they may want to revisit their individual claims.  I think

24  they'll, they may or may not act on those suggestions, but at

25  least for purposes of this specific hearing I understand that

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 81 of 207
Case 20-10846 Doc 1472 Filed 04/26/22 Entered 04/26/22 14:40:06 Main Document   Page 11 of 42

11

1   that group of claimants does not want to move forward with any

2   challenge to whether the question of the opt in was in the best

3   interest of the estate or not.

4           THE COURT:  Okay.  All right.

5           And is Ms. Schubert on the phone at all today?  I

6   don't know.

7           MR. MINTZ:  Your Honor, and we were told that she

8   would not be attending.

9           THE COURT:  Okay.

10          All right.  Well, the Court reviewed the motion when

11  it first came up and, of course, we, we continued it to, to

12  make sure that we had notice that was sufficient and proper,

13  given the circumstances here, and it sounds like we

14  accomplished that.

15          So like I said, I've, I reviewed the, the motion.

16  I'll accept the withdrawal of the Certain Abuse Victims'

17  objection to that motion -- it's ECF Doc. 1423 -- and I'll find

18  that the notice was sufficient and proper under the

19  circumstances and it's also in the best interest of the estate

20  to enter into the opt -- opt -- opt in or opt out?

21          MR. MINTZ:  It's opt in, your Honor.  But --

22          THE COURT:  Yeah.

23          MR. MINTZ:  -- thank you.

24          THE COURT:  All right.

25          MR. MINTZ:  Thank you, your Honor.  Mark Mintz on

1    behalf of the debtor.

2            The next thing on the Agenda -- that's loud.

3            The next thing on the Agenda is the Rock Creek

4    Advisors' fee application.  I believe at the time we

5    reported -- last night we reported that the, no further

6    objections have been pending and the matter had been resolved.

7    And I believe the Court has now entered an order.

8            So we can move past that.

9            THE COURT:  We did.  Thank you.

10           MR. MINTZ:  Item No. 3, your Honor, is the debtor's

11   application for an entry of an order authorizing the retention

12   of BRG [sic] Energy Advisors.  There was one objection filed

13   and a non-objection comment made by the Official Committee of

14   Unsecured Creditors.  The debtor has circulated a proposed

15   order that I believe all parties now consent to and with that

16   proposed order that, hopefully, has been sent in -- if it has

17   not been sent in, we will send it in -- we will be ready to

18   have that entered as well.

19           THE COURT:  All right.

20           Ms. George, it was your limited objection.  Can you

21   tell me how it was resolved?

22           MS. GEORGE:  Oh, sure, your Honor.

23           THE COURT:  I haven't seen the proposed order yet.

24           MS. GEORGE:  Oh, absolutely.

25           So the U. S. Trustee had objected on just a couple of

13

1   grounds, the first being we wanted an affirmative statement

2   stating why BRT needed to be employed as an energy advisor and

3   linking that to how this would assist the debtor --

4            THE COURT:  Uh-huh (indicating an affirmative

5   response).

6            MS. GEORGE: -- in its chapter 11 core duties.

7            THE COURT:  Uh-huh (indicating an affirmative

8   response).

9            MS. GEORGE:  And so the debtor has supplemented the

10  order to, to, I guess, more fully --

11           THE COURT:  More -- flesh out --

12           MS. GEORGE:  -- comply --

13           THE COURT:  Okay.

14           MS. GEORGE:  -- with, with the requirements of the

15  Code and you'll see that, your Honor, in the order.  I can't

16  remember the exact language that they use, but it has to do

17  with, you know, exploring opportunities to generate funds for

18  possible use in a plan.

19           MR. MINTZ:  That's almost exactly what it says.

20           MS. GEORGE:  Okay.

21           THE COURT:  Okay.

22           MS. GEORGE:  Great.  Good.

23           THE COURT:  All right, very good.

24           MS. GEORGE:  And then the other objection we had, your

25  Honor, had to do with a reference to a third party -- I believe

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 84 of 207
Case 20-10846 Doc 1472 Filed 04/26/22 Entered 04/26/22 14:40:06 Main Document   Page 14
of 42

14

1   it was Berks Energy  -- that was included in the engagement

2   agreement and we just didn't know who this was and they were

3   sharing in the fees and the new engagement agreement takes them

4   out --

5               THE COURT:  Okay.

6               MS. GEORGE:  -- completely.  So we don't have to worry

7   about that.

8               And then the third, I believe our third objection was

9   clarifying that any eventual oil and gas lease or, you know,

10  any, any contract that came from this work by BRT would be put

11  before the Court for approval and, and that was confirmed in

12  the proposed order language.

13              So all of, all three of our objections have now been

14  satisfied, your Honor.

15              THE COURT:  Okay.  All right.

16              So I reviewed the, the first motion that was filed and

17  I saw the UST's objection.  So I, I confess.  I have not seen

18  the proposed order, but as long as it's got the language in it

19  regarding the scope and purpose, I -- I -- you know, then I'm

20  fine with that.

21              I, I assume the new engagement letter's been filed

22  into the record?

23              MR. MINTZ:  If it hasn't, it will be.

24              THE COURT:  Okay.  All right.

25              So with the new engagement letter and then if, you

15

1  know, express language that BRT understands that its fees have

2  to be court approved, then I'm okay granting that motion, or

3  the application.

4          MR. MINTZ:  Thank you, your Honor.

5          So that's moved us through the uncontested docket.

6          The contested docket which we previewed for you

7  earlier may not be as contested as it once was is ECF No. 1381,

8  the Committee's motion to issue a *subpoena* for a 2004 to the

9  Apostolates.

10          And I don't know who's -- I guess Mr. Knapp's going.

11          THE COURT:  Okay.

12          MR. KNAPP:  Good afternoon, your Honor.  Brad Knapp

13  with Locke Lord for the Official Committee of Unsecured

14  Creditors.

15          The Committee and the Apostolates have been in an

16  informal discovery process for well over a year --

17          THE COURT:  Uh-huh (indicating an affirmative

18  response).

19          MR. KNAPP:  -- now, you know.  Mr. Draper's clients

20  have provided documents and information from time to time.  We

21  reviewed, refined requests.  We reached a point, finally, where

22  we need more structure to the discovery.  And so, ultimately,

23  we filed the motion for a Rule 2004 examination so that we

24  could have the authority to issue a *subpoena* with written

25  requests and move forward with a more formal process.  Of

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 86 of 207
Case 20-10846 Doc 1472 Filed 04/26/22 Entered 04/26/22 14:40:06 Main Document   Page 16 of 42

16

1    course, the goal of this process is to get the Committee the

2    information it needs so we can go intelligently into a

3    mediation where we anticipate the Apostolates will be parties

4    and as they have been frank with us and with the Court, they

5    will be requesting the benefit of a channeling injunction.

6            THE COURT:  Uh-huh (indicating an affirmative

7    response).

8            MR. KNAPP:  So we need to go in with eyes open.

9            We've had a productive discussion with counsel for the

10   Apostolates as late as yesterday.  In fact, yesterday we

11   received a supplemental document production about Apostolate

12   real estate interests, which was useful, and we made, we made

13   some agreements.  We agreed to refine our requests further.

14   The requests that are currently attached to our motion are a

15   little broad in ways that the Apostolates' counsel made clear.

16           There's also some more, you know, analysis or fact

17   finding that needs to happen within their client group about

18   certain records that were collected, particularly how were

19   abuse records collected, reported, where are they now.  That's

20   going to be a coordinated effort between the Apostolates and

21   counsel for the Archdiocese.

22           THE COURT:  Okay.

23           MR. KNAPP:  So at this time what we're requesting is

24   we'd like the authority to issue a *subpoena*.  We've committed

25   that we will provide Mr. Draper a draft of the *subpoena* before

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 87 of 207
Case 20-10846 Doc 1472 Filed 04/26/22 Entered 04/26/22 14:40:06 Main Document   Page 17 of 42

17

1   we serve it so that we're not immediately in some sort of

2   motion to quash practice.  So the idea is to continue to obtain

3   the documents we need, but we're going to continue to work

4   collaboratively to try and avoid having to come back to court.

5          But as of today, we would like an order authorizing us

6   to issue a *subpoena*.

7          THE COURT:  All right.

8          Mr. Draper.

9          MR. DRAPER:  Thank you, your Honor.

10          As you can tell, we were taken aback by the breadth of

11   the request.  It sort of fell in, to quote the Rolling Stones,

12   "You can't always get what you want, but I'm willing to give

13   you what you need."

14          So we had a discussion yesterday.  I think the process

15   will be they will refine the request in the *subpoenas* they

16   issue.  There will be guardrails put on it and then I reserve

17   all rights to object to any item that they have there --

18          THE COURT:  Uh-huh (indicating an affirmative

19   response).

20          MR. DRAPER:  -- and hopefully, you'll never see us

21   again with respect to these issues.  But again --

22          THE COURT:  Okay.

23          MR. DRAPER:  -- it, it's really a matter of process

24   today of --- I, I don't think I could get up here and say they

25   can't issue a *subpoena*.

Case 2:22-cv-01740-BWA-DPC  Document 33-3  Filed 09/02/22  Page 88 of 207
Case 20-10846 Doc 1472 Filed 04/26/22 Entered 04/26/22 14:40:06 Main Document  Page 18 of 42

18

1          THE COURT:  Right.

2          MR. DRAPER:  When we get to the specific points, then

3    we'll deal with it --

4          THE COURT:  Yeah.

5          MR. DRAPER:  -- and deal with it, accordingly.

6          THE COURT:  Yeah.  I mean, I, I reviewed the, the

7    document requests and the, the topics of examination and, you

8    know, from our prior conversations in other cases guardrails

9    are absolutely necessary.

10          So I'm prepared to go line item-by-line item when you

11    need me to.

12          MR. DRAPER:  No, I -- no, I understand and that's why

13    I sued the term "guardrails."

14          THE COURT:  Yes.  All right.

15          So I'll grant the motion.  You have the authority to

16    issue a *subpoena* based on the consent that I hear that we're

17    going to set up some parameters and make them, make the request

18    a little tighter.  All right.

19          MR. KNAPP:  Thank you, your Honor.

20          MR. MINTZ:  Thank you, your Honor.  As promised, we

21    are moving quickly through this.

22          So, your Honor, the next up are the two status

23    conferences which do not need to be taken in either order.  So

24    it's dealer's choice at this point, your Honor, as to which

25    order you want to take them in.

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 89 of 207
Case 20-10846 Doc 1472 Filed 04/26/22 Entered 04/26/22 14:40:06 Main Document   Page 19
of 42

19

 1             THE COURT:  All right.

 2             MR. MINTZ:  I, I suggest doing the motion to compel.

 3   Again, in the interest of keeping things short, the motion to

 4   compel, the traveling motion if you will --

 5             THE COURT:  Okay.

 6             MR. MINTZ:  -- I would suggest taking that before, out

 7   of order, before --

 8             THE COURT:  Okay.

 9             MR. MINTZ:  -- we do the motion to participate status

10   conference.

11             And Ms. Kingsmill and Mr. Caine -- and I'm not sure --

12             THE COURT:  All right.

13             Mr. Caine?

14             MR. MINTZ:  -- can handle that.

15             THE COURT:  Let's take the --

16             MR. CAINE:  Thank you, your Honor.

17             THE COURT:  -- discovery motion first.

18             MR. CAINE:  Thank you.

19             When we last met on this issue there were three

20   categories of information that your Honor had ordered the

21   Archdiocese to continue with.  One was a privilege log, which I

22   reported I had been working with Jones Walker to resolve, and

23   at this point we believe that we have resolved all of the items

24   that we contested on their privilege log and a couple of days

25   ago the debtor produced the documents as to which privilege was

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 90 of 207
Case 20-10846 Doc 1472 Filed 04/26/22 Entered 04/26/22 14:40:06 Main Document   Page 20 of 42

20

1    withdrawn.  We haven't had an opportunity to review those yet,

2    but I believe, at least tentatively, that that category is now

3    complete.

4            The second category was documents, hard copy or

5    electronic forms of documents, including those personnel files

6    of certain priests as well as some other documents.  The debtor

7    has been producing them in a serial fashion.  We got more this

8    week and I got an e-mail from Ms. Kingsmill recently -- I think

9    this morning or late last night -- that they, they should be

10   producing the balance fairly soon.

11           So again, we haven't had an opportunity to go through

12   all those yet.  It's, it's a lot of documents, but that

13   production is being handled by the debtor sort of on the timing

14   expected.

15           And then the last category is search terms for

16   electronically stored information.  We have gone back and forth

17   on search terms and results and revisions and that process is

18   not yet complete, but we are continuing to have some

19   communications and subject to any comments by the debtor's

20   counsel, I'm certainly hoping that that, all of that will have

21   been produced in time for us to have reviewed it before the

22   next omnibus hearing.

23           THE COURT:  All right.

24           All right.  Ms. Kingsmill, why don't we start with No.

25   3, the ESI or the search terms, rather.

21

1          MS. KINGSMILL:  The search terms?

2          THE COURT:  Yeah.

3          MS. KINGSMILL:  So I just wanted to clarify that the

4   Court's order at the last status conference only related to

5   text messages.

6          THE COURT:  Uh-huh (indicating an affirmative

7   response).

8          MS. KINGSMILL:  And so we agreed to negotiate search

9   terms for text messages, which we have been doing.  It -- it --

10  quite frankly, we went from 10 search terms to 500 search terms

11  and they were complex, you know, combinations with connectors

12  and things like that.  So we had to re-upload, you know, all of

13  our cellphone backups to a different software to apply the

14  search terms, which took some time.

15         THE COURT:  Uh-huh (indicating an affirmative

16  response).

17         MS. KINGSMILL:  So we expect, you know, soon, in the

18  next week or so, to, you know, understand how many search hits

19  we're getting on the cellphones after we apply the search terms

20  and then, you know, we'll negotiate if we need to.

21         With respect to ESI, like e-mails in general, we did,

22  even though that was not subject to the Court's order, we

23  agreed, you know, informally to negotiate search terms for e-

24  mails.  You know, we ran these 500 search terms, you know,

25  initially to the e-mails and came up with 600,000 hits.  So

 1   we're just still in the process of --

 2           THE COURT:  Uh-huh (indicating an affirmative

 3   response).

 4           MS. KINGSMILL:  -- fine tuning those search terms to,

 5   you know, reduce the universe of documents that we have to

 6   review.

 7           THE COURT:  Okay.  All right.  And so when do --

 8   let's, let's just touch real base -- excuse me -- touch briefly

 9   on the hard copies and the edocs on the personnel files.  I

10   understand you're producing those on a rolling basis.  Do you

11   have an end date in mind?

12           MS. KINGSMILL:  So I'll just kind of recap really

13   quick.

14           THE COURT:  Uh-huh (indicating an affirmative

15   response).

16           MS. KINGSMILL:  There was three categories of

17   documents you instructed the debtor to produce.  One was

18   documents relating to the Independent Review Board --

19           THE COURT:  Uh-huh (indicating an affirmative

20   response).

21           MS. KINGSMILL:  -- which was produced in March.  The

22   next category was personnel files for the 37 individuals on the

23   Archdiocese's published list of accused, but those people who

24   were not in a proof of claim.  We finished that production

25   early this week.

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 93 of 207
Case 20-10846 Doc 1472 Filed 04/26/22 Entered 04/26/22 14:40:06 Main Document   Page 23 of 42

23

1          THE COURT:  Okay.

2          MS. KINGSMILL:  The next category was personnel files

3   for the five clergy specifically identified by the Tort

4   Committee.  That production was completed in March.

5          And so, really, the only outstanding category of paper

6   files is this category that relates to documents of accusations

7   in the last ten years.  And we, we have those documents and we

8   just started reviewing those and, as I told Mr. Caine

9   yesterday, I think we expect to, you know, start a rolling

10   production within the next two weeks.

11          THE COURT:  Okay.

12          And then -- this will go to Mr. Caine as well -- going

13   back to the search terms -- I know that you're whittling it

14   down -- but any idea about timeline for, for that process?  I

15   know it's, it's involved.

16          MS. KINGSMILL:  So we have all of the cellphone data

17   processed.  We have just started applying the search terms.  I

18   think we'll be able to get back to Mr. Caine within a week --

19          THE COURT:  Uh-huh (indicating an affirmative

20   response).

21          MS. KINGSMILL:  -- you know, to say whether those

22   don't work and we need to add some more connectors.  You know,

23   text messages are a little bit different --

24          THE COURT:  Uh-huh (indicating an affirmative

25   response).

1           MS. KINGSMILL:  -- than e-mails because you've got a

2    hit on a text message, but then you have to look at the

3    conversation and the context of that text message.

4           So, you know, a hit number isn't as, you know,

5    representative of how much documents you have to review like e-

6    mails.

7           THE COURT:  Uh-huh (indicating an affirmative

8    response).

9           MS. KINGSMILL:  So I, I think we can promise within

10   the next week to get back to him on, you know, whether we need

11   to refine those search terms.

12          THE COURT:  Okay.

13          And I guess my last question is -- congratulations on

14   resolving the privilege issues.  That's one of the most

15   difficult things to do.  So I'm, color me surprised.

16          But do you anticipate further -- you're, you're

17   producing a lot of documents.  Are you going to add and

18   supplement your priv log?

19          MS. KINGSMILL:  Yes, yes.

20          THE COURT:  Okay.

21          MS. KINGSMILL:  We will.

22          THE COURT:  So it might still be out there?

23          MS. KINGSMILL:  It might change.

24          THE COURT:  Okay.  All right.

25          Mr. Caine, do you have anything to add?

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 95 of 207
Case 20-10846 Doc 1472 Filed 04/26/22 Entered 04/26/22 14:40:06 Main Document   Page 25 of 42

25

1          MR. CAINE:  Yes, your Honor, just a couple of things.

2          We had a disagreement as to whether or not anything

3    beyond texts was included, but the debtors agreed to include e-

4    mails in the search terms -- and we appreciate that -- rather

5    than having to come to your Honor to fight about it.

6          And then the second item I think we mentioned before

7    and that is the members of the Committee really don't like the

8    term "Tort Committee."  These are all --

9          THE COURT:  Okay.

10         MR. CAINE:  -- victims of sexual abuse, which they

11   believe is, let's say, reduced in some type of, you know, form

12   by using the, the simple term "tort."  And so we would

13   appreciate the use of the term "Official Committee" or

14   "Official Committee of Unsecured Creditors" when dealing with

15   the name of the Committee.

16         THE COURT:  Okay.  Okay.

17         All right.  So what would you like to do -- and the

18   Court appreciates those comments.  I, I completely understand.

19         What would you like to do with this particular motion?

20   Do you want to push it to the next omnibus hearing date and

21   just see how we're doing?  I, I took it -- I inferred that

22   because I didn't get a spreadsheet like I usually get that we

23   were making progress there.  So, you know, do you think we need

24   to continue this out one time, or what would you suggest?

25         MR. CAINE:  This is Andrew Caine, your Honor.

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 96 of 207
Case 20-10846 Doc 1472 Filed 04/26/22 Entered 04/26/22 14:40:06 Main Document   Page 26 of 42

26

1          I would like to move it to the next omnibus hearing in

2    May --

3          THE COURT:  Okay.

4          MR. CAINE:  -- just to sort of keep the, keep the

5    debtor to the timeline that Ms. Kingsmill indicated that it, it

6    would.

7          And I apologize if your Honor was expecting a chart.

8    We can certainly do that or file some type of status report

9    pleading --

10          THE COURT:  Uh-huh (indicating an affirmative

11   response).

12          MR. CAINE:  -- ahead of time, if you would like.

13          THE COURT:  Well, I do find that, you know, especially

14   when we had multiple issues, multiple requests, multiple

15   issues, I found it very helpful.  The, the, the chart was

16   incredibly helpful for the Court to really distill down what's

17   going on.  Now, for example, we don't need a chart.  We only

18   had three, three issues.

19          So if, you know, it's, it's up to you, whatever you

20   think is, is helpful.  Like I said, when there's multiple

21   issues, I thought your charts were very helpful, so.

22          MR. CAINE:  Well, we'll be happy to file a status

23   report before the hearing so your Honor knows what's coming.

24          THE COURT:  Okay.  That's perfect.

25          All right.  Well, we'll see you back then on May 19th,

 1   which is our next omnibus hearing date.

 2           MS. KINGSMILL:  Okay.  Thank you.

 3           MR. CAINE:  Thank you, your Honor.

 4           MR. MINTZ:  Thank you, your Honor.  Mark Mintz on

 5   behalf of the debtor.

 6           So that leads us to the matter we took out of order or

 7   moved, which is the status conference on the motion to

 8   participate.  From a procedural standpoint, your Honor -- of

 9   course, we had this last, set at the last omnibus.  Parties

10   argued.  Your Honor, of course, continued it --

11           THE COURT:  Uh-huh (indicating an affirmative

12   response).

13           MR. MINTZ:  -- to this omnibus.

14           After discussions with the parties and referring to

15   matters that are not necessarily in the record and maybe are

16   going to be, but your Honor will discuss, I'm sure, we have

17   decided to convert that to a status conference to allow the

18   parties to speak.  So --

19           THE COURT:  Okay.

20           MR. MINTZ:  -- I'm going to sit down and let others

21   talk.

22           THE COURT:  Okay.

23           All right.  Welcome, Ms. Wolf-Freedman.

24           MS. WOLF-FREEDMAN:  Thank you, Judge.

25           THE COURT:  It's good to see you.

1          MS. WOLF-FREEDMAN:  Likewise.

2          Good afternoon, your Honor.  Brittany Wolf-Freedman on

3  behalf of the movants on the motion to participate in

4  discovery.

5          THE COURT:  Uh-huh (indicating an affirmative

6  response).

7          MS. WOLF-FREEDMAN:  Briefly speaking, your Honor, on

8  January 19th of this year the debtor filed a motion for entry

9  of an order compelling the Unsecured Creditors' Committee

10  and/or its counsel to answer identified questions and setting

11  an evidentiary hearing on sanctions for a protective order

12  violation.  That is Record Document 1256.

13          On February 22nd, the movants collectively filed a

14  motion to participate in discovery -- and that's Record

15  Document 1320 -- and the debtor filed an objection, which is

16  Record Document 1349.  A hearing was held at the last omnibus

17  hearing date last month and since that time I think that the

18  landscape has changed quite a bit, given the receipt of the

19  Brother Martin discovery responses --

20          THE COURT:  Uh-huh (indicating an affirmative

21  response).

22          MS. WOLF-FREEDMAN:  -- and given the Official

23  Committee's filing of declarations, which were filed under seal

24  into the record yesterday.

25          It's a little bit of an awkward posture for me to be

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 99 of 207
Case 20-10846 Doc 1472 Filed 04/26/22 Entered 04/26/22 14:40:06 Main Document   Page 29 of 42

29

1   up here speaking first because our motion to participate in

2   many ways was predicated on the underlying motion that was

3   filed back on January 19th and based upon my conversations with

4   Mr. Mintz, I think that the complexion of that motion has

5   probably changed at length -- and I'm certainly not trying to

6   put any words in his mouth and I'm sure he'll speak to that in

7   a moment when I sit down -- but once he advises you of the

8   debtor's position with respect to that motion, I think that

9   will inform our position on the motion to participate in

10  discovery.

11         I will note, however, that even if the debtor takes

12  the position that their motion for an entry of an order is

13  largely moot, we as all of the state court counsel have a

14  collective interest in the resolution of the issues implicated

15  by the Brother Martin discovery responses.

16         So I know that we're in open court.  I know we're not

17  under seal and also I know that much of what I'm going to say

18  to you here is predicated on what Mr. Mintz is about to say.

19         So I think --

20         THE COURT:  Okay.

21         MS. WOLF-FREEDMAN:  -- at this point I should probably

22  sit down unless you have any questions for me at this time.

23         And I would also note for your Honor that it might be

24  beneficial for the Court to hear from some of the other counsel

25  who are signatories to this motion because they have some

1    information that might be beneficial for the Court to hear.

2              THE COURT:  Okay, perfect.

3              Mr. Mintz?

4              MR. MINTZ:  Thank you, your Honor.  And it's a bit

5    awkward, given where we are with what's been placed under seal,

6    what hasn't, what can be --

7              THE COURT:  Uh-huh (indicating an affirmative

8    response).

9              MR. MINTZ:  -- talked about, and what can't be, but I

10   think what -- and so, of course, yes.  What we have is Brother

11   Martin has responded.  Your Honor has seen the responses.  I

12   believe and have no reason to doubt that the state court

13   counsel and movants have also seen the responses at some point.

14   I know that when Mr. Knapp asked me if we could, did it, I

15   delayed for a minute, but, yes, we did say that it should go to

16   them.  And, and so they should have seen them.

17             And so we're all clear on this, the responses

18   identified a specific person who did contact Brother Martin and

19   that specific person was identified as a, one of the state

20   court counsel who is one of the movants.

21             In additional status conferences that we've had -- I'm

22   sorry.  After that, your Honor, of course, filed yesterday

23   afternoon by the Official Committee were a series of

24   declarations from many of the movants, not all of the movants,

25   and some counsel as well from the, counsel for the Committee as

1  well.

2        And, your Honor, there, there's really hard -- well,

3  let me, let me add one thing.  One of those declarations is of

4  the same individual who contacted Brother Martin, acknowledges

5  that contacts were made, denying that it was a violation of any

6  protective order, but that's an issue I'm not -- just simply

7  stating, acknowledging the contacts were made at that point.

8        So, your Honor, what's, I think, difficult in all of

9  this is, No. 1, it has been awkward for us to conduct the

10  investigation that we needed to conduct, given (a) our position

11  as a debtor; (b) our position as wanting to move this case

12  forward as we have said numerous times and not make this, and

13  the term that we have used several times is "the sideshow," and

14  try to be able to move forward.

15        I'm happy to report to your Honor based on that that

16  we have reached at least an agreement to start a mediation on

17  certain dates in early June.  I know that is still being

18  communicated amongst the parties on how that's going to be

19  exactly, what does that mediation entail.  The first, this

20  first meeting, we, we still don't know, but we're starting.

21        THE COURT:  Uh-huh (indicating an affirmative

22  response).

23        MR. MINTZ:  And so that's good.

24        Based on that and, you know, this morning, your Honor,

25  we had a status conference on the debtor's motion.  We

1    discussed many things.  One of the things the debtor asked for

2    was that it might be appropriate for the United States Trustee

3    to start an investigation and it might be time for a court to

4    enter an order to show cause in order to move this beyond the

5    debtor and the debtor's motion.  At this point the debtor's

6    motion is, you know, I'm not sure I would use the word "moot,"

7    but at least I think your Honor used the word this morning

8    "stable" --

9            THE COURT:  Uh-huh (indicating an affirmative

10   response).

11           MR. MINTZ:  -- and I think that's an appropriate -- we

12   would have to revise it, update it.  There's a lot that, you

13   know, is not in there.  We didn't know at the time.

14           And so, your Honor, at this point that is what we had

15   suggested.  I know your Honor can speak to what your Honor

16   would like to do -- and I don't want to put words in your

17   Honor's --

18           THE COURT:  Uh-huh (indicating an affirmative

19   response).

20           MR. MINTZ:  -- mouth either, but, to be clear for the

21   record, where we are at this point is if there's going to be an

22   order to show cause, the debtor would be interested in

23   withdrawing its motion, letting the United States Trustee

24   prosecute the order, and the Committee and the debtor can

25   participate as, as needed.

1          THE COURT:  Uh-huh (indicating an affirmative

2     response).

3          MR. MINTZ:  One word that is -- to address where

4     Ms. Wolf-Freedman is and I think this is also what's awkward,

5     which is a committee is made up of individuals represented by

6     their lawyers.  And their lawyers, the Committee's lawyers, are

7     Pachulski and, the Pachulski law firm and the Locke Lord law

8     firm and that's -- I don't think there's, you know, a

9     significant difference between them on what they can get, what

10    they can't, how it works.  I mean, they, they operate as a

11    committee and it's --

12         THE COURT:  Uh-huh (indicating an affirmative

13    response).

14         MR. MINTZ:  -- just, it's extremely, extremely rare --

15    and "upsetting" isn't the word -- but it's just as a bankruptcy

16    professional a little upsetting to see a, whether it's a

17    disagreement or a, a bifurcation between what committee counsel

18    is doing and who it's negotiating for and what the members of

19    the Committee and their counsel are doing and what they are

20    negotiating for and I think that's the point, your Honor.

21         This motion to participate like this actually really

22    informs our request for the United States Trustee to look at

23    this.  Because that's the issue, also, is the functioning of

24    the Committee and that is what a U. S. Trustee really looks at.

25    And I'm not making an accusation when I say that.  I'm really

1   not.  What I'm saying is understanding how this Committee is

2   actually working, who's doing what for who, when, where, is

3   what the U. S. Trustee is supposed to help tell us.

4          So we have an allegation that inappropriate contacts

5   were made by a certain person, that that needs to be

6   investigated.  I think it's appropriate for an order to show

7   cause.  We have motions that explained that the, whatever the

8   differences between state court counsel are and Committee

9   counsel that can help be explored as well with regards to that

10  motion and the U. S. Trustee can also investigate that as well.

11         So that's what the, we asked your Honor for in the

12  status conference this morning.  I know your Honor made some

13  comments then, but I assumed she was going to make some more

14  today.

15         THE COURT:  Uh-huh (indicating an affirmative

16  response).  Well, that's true.  And, and I would agree with

17  both sets of comments.  I think that the, at this point -- and

18  it, and it's really a testament to the collaborative discovery

19  efforts between the Official Committee of Unsecured Creditors

20  and the debtor that we're where we're at now.

21         And I have seen the discovery responses from Brother

22  Martin.  I have not seen the, the declarations that were filed

23  with the Court.  I was traveling yesterday for a long time and

24  just haven't, they haven't made their way up here.  So I just

25  haven't had a chance to look at those.

1          But what I can tell you is what I've seen from the

2    Brother Martin discovery responses tells me that -- and I

3    haven't drafted it yet -- but issuing an order to show cause is

4    the right vehicle to get to the bottom of this.  Because the

5    Court is concerned and this isn't the first time that we've

6    examined the functioning of this Committee and here we are,

7    completely different issue, but it goes (1) was there violation

8    of this Court's protective order, but the bigger issue is the

9    functioning of the Committee, how it's represented its

10   constituency and, and that's why I would, I think it's the

11   proper vehicle to issue an order to show cause and ask the

12   United States Trustee as an independent investigator to look at

13   the discovery that's been collected so far and to do its own

14   independent investigation.  Because I'm in full agreement.  And

15   the word I used was "stale."  The motion that's before the

16   Court is stale.  It's just not, it's not on point anymore based

17   on the progress that we, that these parties have made.

18          So I, I would accept the debtor's withdrawal of that

19   motion.  I'll issue an order to show cause within the week and

20   we'll spell out exactly what the scope of the United States

21   Trustee's investigation should be.

22          But I think it's, this is the purview of the United

23   States Trustee.  The United States Trustee appoints the

24   committees, to a certain extent oversees the functioning of

25   these committees.  And so that's, that's always been the

1   Court's concern, is, you know, I value and appreciate the work

2   that all of the individual committee members do.  You represent

3   a significant constituency in this case, particularly, but all

4   committees do these, do this work *pro bono*, essentially.  I

5   mean, you're not getting paid.  It's a, it's a huge time

6   commitment and it's such important work.  And so I, I value

7   that and in order for this process to work all of the parties

8   in interest needs to be functioning at their best.  It doesn't

9   -- the -- the -- the negotiation process, the litigation

10  process, you know, there's carrots and sticks, there's, there's

11  a lot of movement, bankruptcy, the process.  Because we're

12  marshaling all of the claims in one place, all of the players

13  in one place.  In order for it to work like it's intended,

14  there has to be good faith participation in the process.

15  There's got to be transparency.  We've got, you know, we've got

16  to have a certain level of trust among the parties, frankly, in

17  order to be able to see the other side, see the other person's

18  point of view, make some concessions where you can, you know,

19  go to mat where it's important.

20          But that's how the bankruptcy process works and so

21  that's why this is a very serious issue and I've only, like I

22  said, I've only seen the Brother Martin discovery so far, but

23  the implications are serious and that's why I'm inviting the

24  U. S. Trustee to the table at this point.

25          So I'll issue that order to show cause and we'll move

1   forward from there.  Now once that's issued, then that office

2   will be in charge of the investigation and I can guarantee that

3   she's going to want full participation.  And I'll, I'll leave

4   that to her.  That's, that's her bailiwick, okay?

5          Does anybody else want to be heard on that at this

6   point, or do you just want to reserve rights to be heard later?

7          MR. KUEBEL:  Is that a, is that a looking-at-me

8   question, your Honor?

9          THE COURT:  Well, I kind of default to you.

10          MR. KUEBEL:  Well, I'll -- I'll -- how about I'll

11   start?

12          THE COURT:  Okay.

13          MR. KUEBEL:  Thank you, your Honor.  Omer F. Kuebel

14   III on behalf of the Official Committee of Unsecured Creditors.

15          As your Honor knows, part of our job in this is to

16   work with a committee that's been put in a very difficult

17   situation.  These are very, very difficult issues.  These are

18   very difficult issues for the committee members to relive in

19   many instances.  They've been on this Committee for two years.

20   They've been through one set of attacks with the TMI issues

21   and, quite frankly, as, as your Honor knows my view, this

22   Committee has been functioning properly.  The committee members

23   are doing their level best.  They are invested in this process.

24   They want to continue this process and they want to get this

25   process to fruition and they want to do it the right way.

1          And as, as we've said before, whatever these issues

2     are with the alleged violations of the protective order were

3     not official sanctioned acts of this Committee and I think at

4     this point the, the committee members themselves, you know,

5     they, they've been through an awful lot, including, but not

6     limited to, us asking them --

7          THE COURT:  Uh-huh (indicating an affirmative

8     response).

9          MR. KUEBEL:  -- investigating this process and asking

10    them to do declarations.  And I think that's significant.  I

11    think that the, what we have done, both with respect to the

12    discovery that we've -- that we've -- we've, quite frankly,

13    tried to do collaboratively and have done collaboratively has

14    got us to where we are.  I think that the declarations that we

15    have started to submit and will continue to submit will further

16    narrow this set of issues and I think at the end of the day

17    this is not a question about our Committee's function.

18          But I'll be happy to turn it over to anyone else who

19    would like to discuss it.

20          THE COURT:  Okay.

21          Well, and, Ms. Wolf-Freedman, I wouldn't ask you to

22    withdraw your motion or the, your cohorts' motion just yet.  If

23    you want to maintain it and see how it folds in, we can roll it

24    in with the order to show cause with the United States Trustee.

25    I have accepted the debtor's withdrawal of that motion just

39

```
 1   because it's just not -- it's not -- it's not the right

 2   vehicle.  But --

 3           MS. WOLF-FREEDMAN:  May I speak from --

 4           THE COURT:  Yeah.

 5           MS. WOLF-FREEDMAN:  -- here, your Honor?

 6           THE COURT:  Absolutely, yeah.

 7           MS. WOLF-FREEDMAN:  Thank you.

 8           I, I think at this time we will leave our motion --

 9           THE COURT:  Uh-huh (indicating an affirmative

10   response).

11           MS. WOLF-FREEDMAN:  -- on table and certainly be

12   amenable to withdrawing it or modifying it as necessary.  I

13   think we have full faith --

14           THE COURT:  Uh-huh (indicating an affirmative

15   response).

16           MS. WOLF-FREEDMAN:  -- in the Trustee's ability to

17   conduct a fair and open investigation and look forward to

18   participating in it.

19           I also just want to briefly address -- and I think

20   that Mr. Kuebel just did -- but to echo his sentiments.  This

21   Committee and its individual members, its counsel, its

22   bankruptcy counsel representatives, and the state court counsel

23   all very much have aligned goals and --

24           THE COURT:  Uh-huh (indicating an affirmative

25   response).
```

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 110 of 207
Case 20-10846 Doc 1472 Filed 04/26/22 Entered 04/26/22 14:40:06 Main Document   Page 40
of 42

40

 1          MS. WOLF-FREEDMAN:   -- we each play a very different

 2   role here.   The bankruptcy counsel brings the bankruptcy

 3   expertise because they are the only ones that have the

 4   foundational and institutional knowledge of bankruptcy law.   My

 5   co-counsel that are state court counsel have a very unique

 6   perspective here, just in the same way that many of the

 7   individual committee members have perspective based upon their

 8   dealings either in prior litigation or their personal

 9   experience with the Court.

10          So to the extent that at any time it has appeared to

11   this Court that there are competing interests or competing

12   factions within the Committee, I think that that is probably

13   attributed to very passionate individuals who want to see the

14   right thing happen here and not because there are competing or

15   antithetical interests within our own ranks.   And I just wanted

16   to state that for the record.

17          THE COURT:   Okay.   I appreciate that.

18          Does anybody else want to be heard?

19      (No response)

20          THE COURT:   Okay.

21          All right.   Well, I will, I'll commit to getting the

22   OSC done by, probably, the end of next week.   I just want to

23   make sure I get the, the scope correct.

24          MR. MINTZ:   And, and I appreciate that, your Honor.

25   And recognizing, of course, that the debtor's motion will need

1    to be withdrawn, we would prefer that it not be withdrawn until

2    the OSC is entered --

3            THE COURT:  Yeah.

4            MR. MINTZ:  -- just to keep matters with some version

5    of a procedural issue.

6            THE COURT:  I think that's right.

7            MR. MINTZ:  Thank you, your Honor.

8            THE COURT:  Okay.

9            All right.  Do we have anything else on the Agenda for

10   today?

11           MR. MINTZ:  No, your Honor.

12           THE COURT:  Okay.

13           As far as looking forward, we're, everybody's good

14   with the 19th.  And I understand we've already got some, some

15   things that are set on that day and I --

16           MR. MINTZ:  Your Honor, there are already some things

17   set on the 19th and there are even things that have been set

18   and resolved from that day at this point.  So we're --

19           THE COURT:  Okay.

20           MR. MINTZ:  -- we're doing well.

21           THE COURT:  Okay.

22           And then looking forward into the summertime, we're

23   look at June 16 and, and then July 14th.  And I will say that

24   that July 14th date, the Court will be conducting that hearing

25   remotely.  So you can come, but, here, but I won't be here.

42

1   So, so just put that on your calendar, that you don't need to

2   come down here, but we'll still have the hearing.  It'll just,

3   everyone will be remote, okay?

4           All right.  Thank you very much.

5           We're adjourned.

6           MR. MINTZ:  Thank you, your Honor.

7           THE COURTROOM DEPUTY:  All rise.

8       (Proceedings concluded at 2:17 p.m.)

9

10

11

12                        CERTIFICATE

13           I, court approved transcriber, certify that the

14   foregoing is a correct transcript from the official electronic

15   sound recording of the proceedings in the above-entitled

16   matter.

17   /s/ *Janice Russell*                    April 26, 2022

18   Janice Russell, Transcriber                Date

19

20

21

22

23

24

25

1

```
 1                   UNITED STATES BANKRUPTCY COURT
                      EASTERN DISTRICT OF LOUISIANA
 2

 3    IN RE:                        :     Case No. 20-10846

 4    THE ROMAN CATHOLIC CHURCH     :     Chapter 11
      FOR THE ARCHDIOCESE OF NEW
 5    ORLEANS,                      :     New Orleans, Louisiana
                                          Monday, April 25, 2022
 6        Debtor.                   :     10:00 a.m.

 7    : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

 8
                          TRANSCRIPT OF PROCEEDINGS
 9              BEFORE THE HONORABLE MEREDITH S. GRABILL,
                      UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES (via telephone):

12    For the Debtor:              Jones Walker LLP
                                   BY:  MARK A. MINTZ, ESQ.
13                                       SAMANTHA OPPENHEIM, ESQ.
                                   201 St. Charles Ave., 51st Floor
14                                 New Orleans, LA  70170

15    For the United States        Office of the U. S. Trustee
      Trustee:                     BY:  AMANDA B. GEORGE, ESQ.
16                                 400 Poydras Street, Suite 2110
                                   New Orleans, LA  70130
17


18
      Audio Operator:             JENNIFER NUNNERY
19

20    Transcript prepared by:      JANICE RUSSELL TRANSCRIPTS
                                   1418 Red Fox Circle
21                                 Severance, CO  80550
                                   (757) 422-9089
22                                 trussell31@tdsmail.com

23
      Proceedings recorded by electronic sound recording; transcript
24    produced by transcription service.

25
```

2

 1   APPEARANCES (via telephone continued):

 2   For Official Committee of        Locke Lord LLP
     Unsecured Creditors:             BY:  BRADLEY C. KNAPP, ESQ.
 3                                    601 Poydras Street, Suite 2660
                                      New Orleans, LA  70130-6036
 4
                                      Locke Lord LLP
 5                                    BY:  STEVEN BRYANT, ESQ.
                                      600 Congress Avenue, Suite 2200
 6   For Official Committee of        Austin, TX  78701

 7   For Official Committee of        Stewart Robbins
     Unsecured Commercial             BY:  WILLIAM S. ROBBINS, ESQ.
 8   Creditors:                       301 Main St., Suite 1640
                                      Baton Rouge, LA  70801-0016
 9
     For Hancock Whitney Bank:        Carver Darden
10                                    BY:  DAVID F. WAGUESPACK, ESQ.
                                      1100 Poydras Street, suite 3100
11                                    New Orleans, LA  70163

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Good morning.  This Judge Grabill.

3            We're here in Case No. 20-10846, In re The Roman

4  Catholic Church of the Archdiocese of New Orleans.

5            Let's take appearances, starting with the debtor.

6            MR. MINTZ:  Thank you, your Honor.  Mark Mintz on

7  behalf of the debtor as debtor in possession.  I believe

8  Samantha Oppenheim is on the line.

9            THE COURT:  Okay.

10           And --

11           MS. OPPENHEIM:  I am here.

12           THE COURT:  All right, very good.

13           And the Office of the United States Trustee?

14           MS. GEORGE:  Good morning, your Honor.  Amanda George

15  on behalf of the U. S. Trustee.

16           THE COURT:  All right.

17           The Official Committee of Unsecured Creditors?

18           MR. BRYANT:  Good morning, your Honor.  This is Steven

19  Bryant on behalf of the Official Committee of Unsecured

20  Creditors.  And I believe my colleague, Brad Knapp, is also on

21  the line.

22           THE COURT:  Okay.

23           MR. KNAPP:  That's correct.  Good morning, your Honor.

24           THE COURT:  All right.  Good morning.

25           And the Official Committee of Unsecured Commercial

4

1    Creditors?

2            MR. ROBBINS:  Good morning, your Honor.  Will Robbins

3    on behalf of the Commercial Committee.

4            THE COURT:  Okay.

5            The pre-petition lender, Hancock Whitney?

6            MR. WAGUESPACK:  Good morning, your Honor.  David

7    Waguespack on the phone for Hancock Whitney Bank.

8            THE COURT:  All right.

9            Anyone on the phone for the Apostolates?

10       (No response)

11           THE COURT:  All right.

12           Catholic Mutual Relief Society?

13       (No response)

14           THE COURT:  Employers' Liability Assurance Company?

15       (No response)

16           THE COURT:  All right.

17           Anyone else on the phone wish to make an appearance?

18       (No response)

19           THE COURT:  All right.

20           Mr. Mintz, this is your motion.

21           MR. MINTZ:  It is and I thank you, your Honor.  And I

22    thank your Honor and all the parties for indulging with us as

23    we work through this.

24           I did send an e-mail to the law clerk just about an

25    hour ago advising him that the reason you're not seeing any of

1  us, or one of the reasons is because I think we reached an

2  agreement on everything.

3          THE COURT:  Okay.

4          MR. MINTZ:  And we are still working through some

5  language or just finalizing the versions of the language that

6  we need to get there.  This was worked on over the weekend and

7  then through a, well, quite frankly, your Honor, at Jones

8  Walker this is the weekend Jones Walker decided to update its

9  document management system.  So it hampered some of our

10  abilities to turn documents.  And so we are finalizing that

11  now.

12          But let me, if I can, go through the highlights of

13  what we've been able to agree to, the way we envision the

14  process working.  And I think everybody has an agreement and

15  they can tell me when I've said something wrong, hopefully.

16          THE COURT:  All right.

17          MR. MINTZ:  So, your Honor, this is for the sale of

18  the Howard Avenue property, which is that building that is

19  basically at the corner of Howard Avenue and Loyola Avenue at

20  the edge of downtown New Orleans across the street from Plaza

21  Tower and across the street from the train station/bus station,

22  that, that area, just to get the Court's mental picture of what

23  we're talking about.

24          For the bid procedures themselves, we went through an

25  extensive marketing process.  We have an affidavit that we will

1    be uploading from the real estate agent.  Your Honor will

2    recall that we hired The McEnery Company as a real estate agent

3    in order to market this.  He will have an affidavit that will

4    be submitted that says everything that he did to market it, but

5    it was an extensive marketing process.  Sent over 4,000 e-mails

6    out, got numerous people interested, took them through the

7    property, and was able to achieve some initial bids that were

8    extremely low and then some later bids in March that were much

9    higher.  We have agreed that those three bids can go to an

10   auction process.  One of them will be designated a stalking

11   horse bidder and I'll take you through that process.

12          So we received three bids by March 31st, which was a

13   deadline that we just kind of created in the marketing process.

14   The initial qualified, the initial bids came from an entity

15   known as Kachina Properties or Kachina, K-A-C-H-I-N-A, BPC

16   Development, and Hair Shunnarah Trial Attorneys.  One of those

17   has now, has since notified us that it wishes to drop out, but

18   all three of those have given us letters of intent.  One of

19   them, Kachina Properties, was the highest amount and we have

20   suggested that they become the stalking horse bidder.  That

21   amount, their stalking horse bid will be $10,000,050.  They

22   have agreed to a stalking horse protection, subject, of course,

23   to this Court's approval, of $350,000.  That is a total

24   aggregate amount that combines the break-up fee and expense

25   reimbursements.  So there's not additional amounts that, that

1    come out of this.

2         There is a due diligence period that the stalking

3    horse wants and, to still get out of this.  To be very clear --

4    and we've put this everywhere we can and everyone agrees to

5    this -- that period -- or he -- if the stalking horse backs out

6    prior to the due, the end of the due diligence period, then he

7    obviously does not get the break-up fee and we put language in

8    here to be clear about that.

9         The -- so our proposed procedures at this point will

10   be that by May 13th the due, the due diligence period is over.

11   On May 16th, we would need to receive supplemental bids.  They

12   can come from the initial qualified -- the initial people who

13   gave us the letters of intent are allowed to bid.  They will be

14   deemed qualified bidders at that point.  We have abilities to

15   qualify additional bidders if they want to come in.  The

16   initial bid price or the overbid price, if you will, will have

17   to be $10,410,000 which accounts for the increase of $10,000

18   bid, bid amounts and another 350,000 for the -- for -- for the

19   break-up fee.  And we have a procedure that we have agreed to

20   for qualifying additional bidders.

21        We will then, you know, we can look at those

22   additional bids that come in, deem, if we need to, deem them

23   qualified by May 18th.  We will do so and then hold an auction

24   on May 20th at Jones Walker.  Qualified bidders would be, and

25   the Committees would be the ones that could attend that

8

1   auction.  We will have, announce a winning bidder and a back-up

2   bidder.  In order to be qualified, you have to agree to be a

3   back-up bidder.  The -- and then go through that process,

4   return deposits, etc., etc.

5           The parties have agreed based on where we are that the

6   closing for the bidder would have to occur by July 19th, I

7   believe is the date that we have agreed to.  We suspect it

8   would be earlier, but that's just to give everyone the

9   additional time that they need to get all the other documents

10  in order.

11          The last thing that we would have to do, your Honor,

12  of course, is we would want to put in here when a sale hearing

13  would be.  Our suggestion, of course, was noticing, you know --

14  obviously, Court's schedule is paramount on this -- but our

15  suggestion was May 25th with objections due on May 24th, but

16  that is, of course, up to the Court and we'll be looking for

17  the Court to tell us a date that it would be available.

18          But that's pretty much where we are in the nut, a

19  nutshell.  This is, again, to approve the bid procedures and

20  to, the stalking horse objections to the sale and the sale

21  itself would be reserved for the sale hearing.

22          THE COURT:  All right.  Before I give you a date for

23  the sale hearing, does anybody else want to be heard?

24          MR. ROBBINS:  Your Honor, this is Will Robbins.

25          I think the -- the -- Mr. Mintz's recitation addresses

1  all our concerns and we appreciate his willingness to work with

2  us and, and also the other Committee.

3          THE COURT:  All right, very good.

4          MR. BRYANT:  Your Honor, this is, this is Steve Bryant

5  as well.

6          THE COURT:  Judge

7          MR. BRYANT:  And I would echo what Mr. Robbins just,

8  just said.

9          THE COURT:  All right.  Excellent.

10          All right.  So you're talking May, Wednesday, May

11  25th, for the sale hearing?

12          MR. MINTZ:  That was our suggestion, your Honor.

13          THE COURT:  Okay.  That's a motion day.  So I, I can

14  give you -- let's see.  Do you want to aim for 3:30 that day?

15          MR. MINTZ:  That's fine.

16          THE COURT:  Okay.  And then oppositions can be due the

17  day before by 5:00 p.m.

18          MR. MINTZ:  We'll put those in the order and upload

19  them.

20          THE COURT:  All right, very good.

21          Thank you very much.

22          MR. MINTZ:  Thank you, your Honor.

23          MR. ROBBINS:  Thank you, your Honor.

24      (Proceedings concluded at 10:09 a.m.)

25

1                        CERTIFICATE

2            I, court approved transcriber, certify that the

3     foregoing is a correct transcript from the official electronic

4     sound recording of the proceedings in the above-entitled

5     matter.

6     /s/ *Janice Russell*                    May 9, 2022

7     Janice Russell, Transcriber                Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

```
 1                      UNITED STATES BANKRUPTCY COURT
                        EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:                          :     Case No. 20-10846

 4   THE ROMAN CATHOLIC CHURCH       :     Chapter 11
     FOR THE ARCHDIOCESE OF NEW
 5   ORLEANS,                        :     New Orleans, Louisiana
                                           Thursday, May 19, 2022
 6        Debtor.                    :     1:30 p.m.

 7   : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

 8
                          TRANSCRIPT OF PROCEEDINGS
 9              BEFORE THE HONORABLE MEREDITH S. GRABILL,
                     UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For the Debtor:               Jones Walker LLP
                                   BY:  MARK A. MINTZ, ESQ.
13                                      SAMANTHA OPPENHEIM, ESQ.
                                        ALLISON KINGSMILL, ESQ.
14                                 201 St. Charles Ave., 51st Floor
                                   New Orleans, LA  70170
15
     For Official Committee of     Stewart Robbins
16   Unsecured Commercial          BY: P. DOUGLAS STEWART, JR., ESQ.
     Creditors:                    301 Main St., Suite 1640
17                                 Baton Rouge, LA  70801-0016

18

19   Audio Operator:               JENNIFER NUNNERY

20
     Transcript prepared by:       JANICE RUSSELL TRANSCRIPTS
21                                 1418 Red Fox Circle
                                   Severance, CO  80550
22                                 (757) 422-9089
                                   trussell31@tdsmail.com
23

24   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
25
```

2

```
 1   APPEARANCES:

 2   For Official Committee of      Locke Lord LLP
     Unsecured Creditors:           BY:  BRADLEY C. KNAPP, ESQ.
 3                                  601 Poydras Street, Suite 2660
                                    New Orleans, LA  70130-6036
 4
     For the Apostolates:           Heller Draper
 5                                  BY:  DOUGLAS S. DRAPER, ESQ.
                                    650 Poydras Street, Suite 2500
 6                                  New Orleans, LA  70130

 7
     APPEARANCES (via telephone):
 8
     For the United States          Office of the U. S. Trustee
 9   Trustee:                       BY:  AMANDA B. GEORGE, ESQ.
                                    400 Poydras Street, Suite 2110
10                                  New Orleans, LA  70130

11   For Official Committee of      Pachulski Stang
     Unsecured Creditors:           BY:  ANDREW W. CAINE, ESQ.
12                                       JAMES I. STANG, ESQ.
                                    10100 Santa Monica Blvd., 13 Flr.
13                                  Los Angeles, CA  90067

14   For The Catholic Mutual        Bienvenu Foster
     Relief Society of America:     BY:  DAVID E. WALLE, ESQ.
15                                  1100 Poydras Street, Suite 2870
                                    New Orleans, LA  70163
16
     For State Court Counsel:       Gainsburgh Benjamin
17                                  BY:  BRITTANY WOLF-FREEDMAN, ESQ.
                                    1100 Poydras St., Suite 2800
18                                  New Orleans, LA  70163

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S

 2       (Call to Order of the Court)

 3              THE COURT:  Good afternoon.  Be seated.

 4              All right.  Good afternoon.  We're here in Case No.

 5   20-10846, In re The Roman Catholic Church of the Archdiocese of

 6   New Orleans.

 7              Let's take appearances in the courtroom, starting with

 8   the debtor.

 9              MR. MINTZ:  Thank you, your Honor.  Mark Mintz,

10   Allison Kingsmill, and Samantha Oppenheim on behalf of the

11   debtor as debtor in possession.

12              THE COURT:  All right.

13              And do we have the United States Trustee on the phone?

14              MS. GEORGE:  Yes, your Honor.  Good afternoon.  Amanda

15   George on behalf of the U. S. Trustee.

16              THE COURT:  All right.

17              The Official Committee of Unsecured Creditors?

18              MR. KNAPP:  Good afternoon, your Honor.  Brad Knapp

19   with Locke Lord for the Official Committee of Unsecured

20   Creditors.  On the phone with me are my co-counsel, Jim Stang

21   and Andrew Caine.

22              THE COURT:  Okay.

23              THE COURT:  And the Official Committee of Unsecured

24   Commercial Creditors?

25              MR. STEWART:  Good afternoon, your Honor.  Doug
```

4

1    Stewart on behalf of the Commercial Committee.

2              THE COURT:  Okay.

3              The pre-petition lender, Hancock Whitney?

4       (No response)

5              THE COURT:  No.

6              All right.  How about the Apostolates?

7              MR. DRAPER:  Douglas Draper here for the Apostolates,

8    your Honor.

9              THE COURT:  All right.

10             Anyone here for the Catholic Mutual Relief Society?

11             MR. WALLE:  Yes, Judge.  David Walle.

12             THE COURT:  Okay.

13             And for Employers' Liability Assurance Company?

14      (No response)

15             THE COURT:  All right.

16             Anyone else on the line wishing to make an appearance?

17             All right.

18             MS. WOLF-FREEDMAN:  Good afternoon, your Honor.  This

19   is Brittany Wolf Freedman, individually and also on behalf of

20   certain state court counsel for the individual members of the

21   Unsecured Creditors' Committee.

22             THE COURT:  Okay.

23             All right.  So, Mr. Mintz, I have the Notice of Agenda

24   that was filed into the record yesterday.  I, I would note that

25   some of the uncontested matters have come off.

1          So I'll just turn it over to you.

2          MR. MINTZ:  Thank you, your Honor.  Mark Mintz on

3    behalf of the debtor.

4          And yes, your Honor's correct.  We filed an agenda at

5    Docket 1549.  Most, if not all, of the uncontested matters have

6    gone, have come off.  I do want to make a statement, if we can,

7    about Item No. 1, which was the application of Locke Lord --

8          THE COURT:  Uh-huh (indicating an affirmative

9    response).

10         MR. MINTZ:  -- and just explain a little bit of where

11   we are and how we agreed to move it off the docket --

12         THE COURT:  Okay.

13         MR. MINTZ:  -- and just be able to, to talk about

14   that.

15         The issue that we had had was -- and this relates to

16   the investigation that the United States Trustee is currently

17   conducting regarding unauthorized use of information related to

18   the protective order that your Honor has entered and that

19   ongoing investigation.  The debtor had questions about Locke

20   Lord's bill relating to that.  We have made an agreement that

21   Locke Lord will provide Locke Lord's calculation of total fees

22   and expenses that it has occurred [sic] in connection with

23   alleged protective order violations.  It will provide that

24   calculation of fees and expenses occurred through April 30,

25   2022 and I believe they will provide that to us by June 1st.

1   Jones Walker will also provide the same information and the

2   debtor will inform the other estate-retained professionals that

3   they must provide it as well.  And that is what -- we have done

4   so in an e-mail and now we are stating it on the record for

5   people that they must do that.

6          THE COURT:  Okay.

7          MR. MINTZ:  We are asking people, starting with this

8   month's, or next month's billing cycle, wherever they are as

9   they can do it in their billing cycle, to, for all estate-

10  retained professionals to include an additional paragraph in

11  their monthly interim fee statements that identifies the amount

12  spent in connection with the protective order issue for that

13  month and professionals will include that additional

14  calculation in every month's statement thereafter until the

15  protective order issue is fully and finally resolved.

16         So based on that, those agreements and the idea that

17  everyone is going to now separately categorize and put to the

18  side what those payments are.  We're not saying we're not

19  paying them in all of this, your Honor.  We're separately

20  categorizing it so that we can figure out if there's an

21  appropriate person or entity to get those recouped when this is

22  over so that we at least know the amounts that they are.

23         THE COURT:  Okay.

24         MR. MINTZ:  So with that, we did not have an objection

25  to Locke Lord's fee application and ask that it be approved.

1          THE COURT:  Okay.

2          All right.  So I, I believe that Chambers has entered

3   memos to record on everything that was approved.  The Court had

4   reviewed those and, and didn't get any objections, so.

5          So if I haven't received your proposed orders, send

6   those in.

7          MR. MINTZ:  And so -- well, to be clear, your Honor, I

8   think -- yeah.  All of the rest of them do have proposed orders

9   and I think --

10          THE COURT:  Okay.

11          MR. MINTZ:  -- you have, you have put in what you had.

12   We wanted to read that agreement into the record just to say --

13          THE COURT:  Okay.

14          MR. MINTZ:  -- and make that announcement to

15   everybody.  We're not asking for it to be part of an order

16   right now.

17          THE COURT:  Okay.

18          MR. MINTZ:  We're simply agreeing.

19          THE COURT:  All right, very good.

20          All right.  As far as the contested matters go, I'd

21   like to do them in a little, little different order than what

22   they are on the agenda.  Can we handle the, No. 1410 first?

23          MR. MINTZ:  No. 1410, yes.  That is the Commercial

24   Committee's Motion for Entry of an Order Authorizing and

25   Requiring the Official Committee to Share Discovery Produced by

1   the Apostolates?

2            THE COURT:  Yes.

3            MR. MINTZ:  Okay.

4            THE COURT:  All right.

5            MR. MINTZ:  Mr. Stewart, I assume.

6            MR. STEWART:  Afternoon again, your Honor.  Doug

7   Stewart on behalf of the Commercial Committee.

8            Your Honor, it is certainly true that the two

9   Committees in this case have often divergent interests.

10  Sometimes, they will not be divergent, but they often will be

11  and sometimes, they will be sharply divergent.  However, the

12  possible divergence of interests doesn't lead to the conclusion

13  that we should have divergent production under Rule 2004.  Rule

14  2004 governs production in this case and largely relates to

15  issues that are available to everyone and the Commercial

16  Committee, at least, thinks it's important to guard against

17  siloed information between the two Committees.  That is one of

18  our primary purposes for being here this morning, is to try to

19  guard against siloed information.

20           Additionally, both Committees in this case have been

21  admonished multiple times to work together and in concert and

22  to be efficient wherever they can be and the two Committees

23  have been and continue to work together, to the extent they

24  can, along those lines.  There was a significant amount of work

25  done recently regarding what the Committees considered to be

1    potential estate causes of action that resulted in this Court

2    entering an order tolling estate causes of action.  That was

3    jointly agreed to by the Commercial Committee, the Committee,

4    the debtor, and the Apostolates.

5           Along those lines, some of the issues that the

6    Committees have found that they can work together on is

7    obtaining data because that data is applicable to the interests

8    of both Committees  and I think there's a general, or at least

9    I'll speak for our Committee, that we wish for, where possible,

10   the Committees to have the same data subject to a series of

11   protective orders issued by this Court, including a, an oral

12   ruling on February 18th of this year, as well as the bar date

13   orders which do for privacy concerns preclude the Commercial

14   Committee at present from seeing certain data.

15          The -- as, as the Court is aware, the Committees are

16   investigating estate causes of action.  The Committees are

17   investigating the debtor's claims against the Apostolates.  The

18   Committees are investigating the Apostolates' claims against

19   the debtor.  The Committees are investigating sexual abuse

20   claims against the Apostolates and the debtor and we are all

21   participants in a mediation that we are trying to move forward

22   to resolve the case.

23          The request before the Court that's been opposed by

24   the Apostolates has ten information requests.  The first four

25   of those, we understand the Apostolates are willing to allow

1    the Commercial Committee to be provided.  The second two of

2    those, we understand that the, the protective orders and the

3    bar date order make providing those to us, I'll use the word

4    "complicated," and until we have some clarification on that we

5    are willing to pretermit production of those two.

6              So what we're really left with is the final four

7    requests which we've reviewed and believe are relevant for a

8    number of purposes under 2004.

9              The Apostolates oppose the motion on the grounds that

10    there is some kind of dichotomy between data available under

11    2004 that would be available to the Committee and that

12    available to the Commercial Committee.  They start by opposing

13    that based on the channeling injunction and the plan which we

14    point out are at this point, to our knowledge, hypothetical.

15    We aren't aware of a plan, much less a channeling injunction,

16    in this case.  It certainly hasn't been shared with the

17    Commercial Committee.  To our knowledge, it hasn't been shared

18    with the Committee and we assume that it is somewhere on a

19    server with the debtor and the Apostolates.

20              So at this point I think it's, it's not proper for us

21    to respond to a hypothetical plan and channeling injunction but

22    even if there were a channeling injunction, that only affected

23    the sex abuse claimants.  That channeling injunction is, is

24    part and parcel of the claims between those parties, the claims

25    of the sexual abuse claimants against the debtor and the

1    Apostolates and the many claims back and forth between the

2    debtor and the Apostolates.  As a result of those claims, that

3    will be modified according to the amounts that are contributed

4    by the parties.  All of that is certainly fair game under Rule

5    2004.

6          And we would like to point out a few issues with which

7    we take, that, that we disagree with in their objection.  The

8    Apostolates on Page 3 of their objection indicate that:

9               "The channeling injunction provision of the plan

10              solely relates to the abuse claimants and does not

11              impact the recovery of the commercial claimants.  The

12              simple truth is that the Commercial Committee has no

13              standing to assert objections based on another party's

14              claims."

15         I think that is legally incorrect.  I think a

16   committee or another creditor has the ability to object to

17   another party's claims against and that affect the debtor,

18   certainly the claims of the Apostolates against the debtor that

19   arise from contribution and indemnity and vice versa.  The

20   Commercial Committee has just as much standing as the Committee

21   to assert estate causes of action, such as single business

22   enterprise and substantive consolidation against the debtor and

23   the Apostolates which have been tolled.

24         And in support of that statement they cite In re Delta

25   Underground Storage noting that "Ranger is not entitled to

1   object to a settlement arrangement relating to claims and

2   actions between other parties before the Court."  Ranger was

3   not a creditor in the case.  Ranger was not a party in

4   interest.

5        So no, it doesn't have the ability to object to a

6   compromise and no, it wouldn't have the ability to object to

7   claims in a case.  That case relied, in part, upon the, the

8   very statute that says committees have the ability to appear

9   and be heard on any issue in a case.

10        So I think that case is completely inapposite, does

11   not stand for in any way, shape, or form the proposition that a

12   party doesn't have, that the Commercial Committee has no

13   standing to object to the claims of the sexual abuse creditors

14   or the Apostolates, for example.

15        The Apostolates in making the argument that the

16   discovery that's being provided to the Committee should be

17   siloed and not made available to the Commercial Committee rely

18   in great part upon the Church of Diocese of Gallup decision.

19   It's cited several times in the response.  And we would point

20   out that the Diocese of Gallup case has nothing to do between

21   the scope of 2004 between two committees.  And in that case a

22   committee was seeking discovery not from apostolates or

23   parishes or churches, they were seeking discovery from another

24   diocese that the committee alleged had, I guess the, the word

25   would be "sheltered" priests or that priests had been moved

1   between the different diocese and they were seeking pretty

2   significant data from that potential target and the court noted

3   that what they were seeking was within the scope of Rule 2004,

4   but that it was going to, I believe the, the metaphor was to

5   "tie up the net for the fishing expedition a bit" and didn't

6   give the committee everything that they were asking for.

7         I think it, it bears mentioning in this case that the

8   Apostolates are, are very, very different from a, another

9   separate diocese.  I mean, these are, these have substantial

10  identities of interest with the debtor.  We believe and have

11  tolled the estate's causes of action to consolidate them with

12  the debtor and I think those issues are, are well known and I

13  believe that that has a lot of bearing on the scope of a Rule

14  2004.

15        But bear in mind that we're not arguing that the order

16  you recently issued allowing the Committee to go forward with a

17  Rule 2004 request, we're not arguing the merits of the request.

18  All we're arguing is that we be provided whatever is provided

19  the Committee.  So if, if your Honor was to rule that one of

20  these requests that's listed out in their objection is, is not

21  within the scope of, of Rule 2004, then we would not, it would

22  not be produced to the Committee and, therefore, not produced

23  to us.

24        So the, the central thrust of our argument is that

25  there is no justification for siloing data between the

1    Committees.  The four elements that we're fighting over, 7

2    through 10, relate to accounting information, information on

3    the, the debts of the particular Apostolates information, all

4    of which fits well within a, the 15 or 16 factors of the single

5    business enterprise test.  And, you know, bear in mind that,

6    that one Committee may one day stand before you and have to

7    argue that the debtor unreasonably refused to bring one of

8    those estate causes of action and to do that they're going to

9    have to state a claim under 12(b)(6) in a complaint before you,

10   all of which these requests would fit into, and they're going

11   to have to show that the debtor unreasonably refused to bring

12   it, which means they have to show you what would, what would

13   come from the complaint?  What is the *quantum*?  What are the

14   affiliates worth?  And if they have debts that affect the

15   capital structure or, or other agreements between them that may

16   cause contribution and indemnity claims, that, those

17   calculations will certainly be used against either me or one of

18   my, another lawyer for one of the Committees who didn't have

19   that information.

20          So we believe it a bit premature to argue over the

21   particular factors of Rule 2004, only that they are -- we see

22   no, no request here that would be available to the Committee

23   and to the Commercial Committee and we believe that, just

24   eyeballing the requests, they're all clearly within 2004 as to

25   our Committee.

1          THE COURT:  Okay.  So --

2          MR. STEWART:  Thank you, your Honor.

3          THE COURT:  So you said that -- I'm -- there's

4    basically ten requests.  Four, you've agreed to.  Two are put

5    on hold because of the protective order and the bar date

6    issues.  The remaining four, they're described, generally, in

7    general terms, in the opposition.

8          But do you have those in front of you, the specific

9    requests?

10          MR. STEWART:  I have them in front of me.  No. 7 is --

11   I only have one copy, but I could, I could bring it to your

12   Honor or I could read, whichever you prefer.

13          THE COURT:  Just read it, yeah.

14          MR. STEWART:  No. 7 is:

15          "Other than the Parish Service Agreements, all

16          documents concerning any agreements between the ANO on

17          the one hand, the Catholic Community Foundation,

18          parishes, apostolates, and any other participant on

19          the other hand."

20          No. 8:

21          "All electronic account systems and data, including,

22          but not limited to, to FIMS data maintained by CCF."

23          No. 9:

24          "All agreements, contracts, notes, reciprocal debt

25          obligations, or similar documents that evidence any

1          business, trust, agency, debtor-creditor, or other

2          beneficial arrangement or relationship between the

3          parishes or any parish and any other apostolate as a,

4          as are the counterparty."

5          No. 10:

6          "Any documents related to donor restrictions for any

7          accounts maintained by the Apostolates."

8          THE COURT:  Okay.

9          All right.  So let me ask you this.  So in April the

10  Official Committee of Unsecured Creditors filed an adversary

11  against the Apostolates and essentially, they're looking for,

12  it's a, a declaration regarding what's property of the estate,

13  essentially.

14          Does -- at this -- standing here today, will your

15  Committee be joining in this or intervening or anything having

16  to do with this one?

17          MR. STEWART:  We don't know.

18          THE COURT:  Okay.  How -- how do -- how does this

19  lawsuit relate -- does it relate at all -- does it have any

20  bearing on the requests that you just read out?

21          MR. STEWART:  In other words, if the Rule 2004

22  *subpoena* was litigated, would the active lawsuit exception to

23  Rule 2004 preclude production?  Might it preclude production?

24          THE COURT:  Might it.

25          MR. STEWART:  I believe that it might as to certain of

1    the requests.  And again, all we're asking for is whatever is

2    eventually produced.

3              THE COURT:  Okay.  And do you know that the

4    Apostolates have already produced the information through 2004?

5    I'm assuming -- the, the motion was filed and there was a 2004

6    exam that had, was scheduled, but now that date's passed.  I

7    don't know if it's actually occurred or not.

8              But what was the timing between -- was the -- the

9    stuff requested by the Official Committee of Unsecured

10   Creditors, was that produced, already, to them?  They have it

11   and you're just asking for it or are we still waiting on some

12   of the things from the Apostolates?

13             MR. STEWART:  It's my understanding -- and I, I think

14   Mr. Draper or the Committee can answer this better than I --

15   but that some materials have been produced, some are rolling,

16   and, and some are still being negotiated.  That's my

17   paraphrasing of what I've been told.

18             THE COURT:  Okay.

19             Mr. Knapp, can you clear, clear some of this up?

20   What's the timing of all of it?

21             MR. KNAPP:  Yeah.  Your, your Honor, that report is

22   accurate.  I mean, we have sort of multiple buckets of

23   discovery going on with the --

24             THE COURT:  Uh-huh (indicating an affirmative

25   response).

1          MR. KNAPP:  There's, there's discovery that will be

2    relevant to the adversary.  We're in discussions with

3    Mr. Draper about how to proceed with that in sort of an

4    informal and efficient fashion.

5          THE COURT:  Uh-huh (indicating an affirmative

6    response).

7          MR. KNAPP:  I expect that that will take a little bit

8    of time to work through and then meanwhile, we've been in

9    discussion about what I'll call the, the "abuse record" sort

10   piece, which is kind of what is left in the Rule 2004 bucket.

11         We have been produced documents by the Apostolates

12   over time, most recently a summary of the Apostolates' real

13   estate interests, for example, and -- but those discussions

14   keep, are, are ongoing on a regular basis.  In fact, we owe

15   Mr. Draper a letter that's on my desk right now, so.

16         THE COURT:  Okay.

17         All right.  Okay.  And the things that you've agreed

18   to, how are they different from the four that, that are

19   outstanding?

20         MR. STEWART:  I don't believe that they are.  I, I

21   think --

22         THE COURT:  It's all --

23         MR. STEWART:  To draw a finer line on it, they are

24   more particularized.  They're very, very narrowly drafted --

25         THE COURT:  Uh-huh (indicating an affirmative

 1   response).

 2          MR. STEWART:  -- by the Committee and, you know, are

 3   more, more in-depth questions related to financial condition of

 4   the debtor.

 5          THE COURT:  Okay.  All right.

 6          Mr. Draper?

 7      (Extraneous talking on the telephone)

 8          THE COURT:  I'd like to remind everybody on the phone

 9   to mute your line.  Otherwise, you are being broadcast in the

10   courtroom and on the record.

11          MR. DRAPER:  Your Honor, let me start with the

12   proposition I am not a debtor.  I am a third party --

13          THE COURT:  Uh-huh (indicating an affirmative

14   response).

15          MR. DRAPER:  -- in this case.  I may have filed proofs

16   of claim, which I didn't really want to.  I have claims that

17   exist, but I am certainly not a debtor and, and I cannot be

18   treated as one.

19          Throughout the course of this, there's been an

20   exchange of information between my group and the Unsecured

21   Creditors' Committee.  The, the depth of information I've given

22   them transcends the ten reports that the debtor in -- in -- in

23   the request for information that they're asking for.  For

24   example, they have gotten the financial information and what

25   I'm talking about, the cashflow information for apartment

1    complexes.  They've gotten information as to what each parish

2    generates for two years rolling.  And so we've given them

3    information, but all of that has been designed to get to a

4    point that we can have a meaningful mediation.

5         I have not been silent in terms of what I'm looking

6    for in, in this case and that is, really, a channeling

7    injunction.  That is not in a plan yet, but, quite frankly,

8    everybody knows when we get before Judge Zive there are going

9    to be issues and, and there are things I'm going to have to

10   show that the case law requires.

11        So my motivation for giving information to the party

12   I'm asking the channeling injunction from is completely

13   different than my motivation in giving information to the

14   Unsecured Creditors, the Commercial Creditors' Committee, who I

15   don't need a channeling injunction from and I don't need

16   anything in, in that sense.  I am willing to give them -- and

17   it's very clear -- I'm willing to give them the real estate

18   that I own, along with valuations.  And there's, there's a

19   whole chart that deals with that.  I'm willing to give them the

20   assets that we have in Portfolio A and Portfolio B that

21   addressed what the Apostolates own in those things.  And, and I

22   understand that's contested.  We'll deal with that at a later

23   point.

24        Now let's talk about the pending proceeding issue that

25   I have with some of the requests.  And the Court asked a very

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 143 of 207
Case 20-10846   Doc 1566   Filed 05/23/22   Entered 05/23/22 15:38:44   Main Document   Page 21
of 85

21

1    good question.  There may be reasons that I have for a

2    mediation that I provide the information to the, to the

3    Unsecured Creditors' Committee that I don't need to give to the

4    Commercial Creditors' Committee because it relates solely to

5    the contribution that I will be making in exchange for the

6    channeling injunction.  And so there, there, there are things

7    that if I have to give it to both parties, it's more likely to

8    shut down than allow a free-flowing discourse of information

9    going to the party that -- that -- who I really have to deal

10   with.

11          And so that -- that's -- that's the issue.  For

12   example, they have information for -- I'll use a ridiculous

13   example -- but they have information for like St Leo's third

14   grade cookie jar cake sale.  That type of information they have

15   for each one of the parishes.  There, there are 185 of them.

16          So this request has no guardrails.  It has no, no, no

17   limitation on it.  Just think about it.  If, in fact -- I

18   represent the Clarion Herald and I represent the, and a parish.

19   If a parish places an ad in the Clarion Herald, that, that

20   request asks, seeks that information.

21          THE COURT:  Okay.  Well, let me, let me back up.

22          So when you talk about request now, Mr. Stewart, you

23   didn't -- has the Commercial Committee actually issued

24   discovery or are  you just piggybacking on the, the UCC's?

25          MR. STEWART:  No.  We're attempting to piggyback on

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 144 of 207
Case 20-10846   Doc 1566   Filed 05/23/22   Entered 05/23/22 15:38:44   Main Document   Page 22
of 85

22

 1   the UCC's --

 2            THE COURT:  Right.

 3            MR. STEWART:  -- so to not have a parallel process.

 4            THE COURT:  Right.  And I assume that the 2004 order

 5   that went out was a consent order --

 6            MR. DRAPER:  Right.

 7            THE COURT:  --- correct?

 8            So when you're talking about, you know, being

 9   overbroad, no guardrails, well, that's what you agreed to as

10   far as, vis-à-vis the Committee.

11            MR. DRAPER:  No, I did not.  Let's -- let's -- let's

12   be --

13            THE COURT:  Or else I would not have -- I would have

14   had a hearing --

15            MR. DRAPER:  No.

16            THE COURT:  ---- and I wouldn't have signed the order.

17            MR. DRAPER:  What we did is we deferred Item 6, 7 --

18   7, 8, 9, and 10 for a later date.  And, and part of what I'm

19   attempting to, to deal with and, and, and have, have sent them

20   a letter and trying, is to give them information in 7, 8, 9,

21   and 10 that relates to my request.  And what I'm saying to you

22   is if you order me to --- if, I have to turn over to them what

23   I'm, I'm willing to turn over to the Unsecured Creditors'

24   Committee, it changes my, my dynamic and it has an adverse

25   impact on the mediation.

1          Again, I -- when you look at the channeling

2   injunctions, what I have to do is I have to show them that I'm

3   making a meaningful contribution and -- and --

4          THE COURT:  Well, let me be clear.  You don't have to

5   just show the Committee.  You have to show the debtor.

6          MR. DRAPER:  Right, I under --

7          THE COURT:  You have to show the Court.

8          MR. DRAPER:  Right.

9          THE COURT:  It's -- it's -- it's not a, an individual

10  agreement --

11         MR. DRAPER:  It -- it --

12         THE COURT:  -- with the Committee.

13         MR. DRAPER:  It --

14         THE COURT:  It  goes into a plan.

15         MR. DRAPER:  It absolutely does, but, but it is part

16  of a mediation that's going to be taking place.

17         THE COURT:  Uh-huh (indicating an affirmative

18  response).

19         MR. DRAPER:  And so I don't -- my, my motivation to

20  reaching a deal with the Unsecured Creditors' Committee is

21  different than my supplying information to -- to the -- to the

22  Commercial Creditors' Committee.  Their -- their -- their roles

23  are different.  There's not siloed information that affects

24  them at all.

25         And again, I am not a debtor and what you're

1    functionally doing is if I have to turn over --

2         THE COURT:  Well, you're not the debtor, but you want

3    the same protections that the debtor's going to get --

4         MR. DRAPER:  If -- if --

5         THE COURT:  -- regarding a channeling --

6         MR. DRAPER:  If --

7         THE COURT:  -- injunction.

8         MR. DRAPER:  If I pay for it.

9         THE COURT:  Yes.  And in order to pay for it and how

10   we know that what you're paying is fair, wouldn't the other

11   constituents involved who are also voting on the plan want to

12   know if the price is right?

13        MR. DRAPER:  Well, the -- the -- again, there's going

14   to be a number that the Archdiocese is going to pay.  How it's

15   carved up between my group in terms of the contribution we make

16   or not, but they don't have a right to object to my channeling

17   injunction.  They're not going to be parties to it and they're

18   not going to be part of it.  They can object to the plan when

19   it's put forth before the Court.  And, and quite frankly, the

20   request for information right now is premature.

21        I don't know what they want and it, as I said, it has

22   no guardrails on it.  It is, it is basically every piece of

23   paper that I have.  For example, I have been reticent and, and

24   will not -- we have an issue as to giving information as to who

25   the donors are to, let's say, St. Leo's.  That -- that -- that

 1   -- that's not part of this.

 2           THE COURT:  Uh-huh (indicating an affirmative

 3   response).  Well, that's two separate issues, though.

 4           MR. DRAPER:  It -- it --

 5           THE COURT:  If you're saying that the requests from

 6   the UCC are overbroad, that is one thing --

 7           MR. DRAPER:  Right.

 8           THE COURT:  - you know.  You've deferred 7, 8, 9, and

 9   10.  You've --

10           MR. DRAPER:  Yeah, exactly.

11           THE COURT  You know, it's a consent order at this

12   point, but I have a feeling it's no longer going to be that,

13   perhaps, after today.  So -- but that's a different issue --

14           MR. DRAPER:  Right.

15           THE COURT:  -- than whether or not Mr. Stewart and his

16   Committee can, can get at least what you've given so far, which

17   you --

18           MR. DRAPER:  Well --

19           THE COURT:  -- which I don't hear are overbroad.  I

20   mean, we're deferring the overbroad.  You've already given some

21   things, but you don't want to give them even the first batch.

22           MR. DRAPER:  No, I've give -- no.  I have offered.  If

23   you look at 1 through 4, all right, that's there.  I have no

24   issue with, with that.  One of them is a real estate chart that

25   I've, I've offered to them.  One is the information as to who

 1   owns what in Portfolio A and B with respect to the Apostolates.

 2   There are third parties who own property in, in Portfolio A and

 3   B that I'm not willing to give them that invest through the

 4   Catholic, through the Catholic Foundation and that's an issue

 5   that we're going to, we're going to grapple with.

 6          But, but again, it's -- it's -- it's really as to who,

 7   who has what and what I'm going to give them and my motivation

 8   for giving them, giving willingly, is different for each one of

 9   the two entities.

10          THE COURT:  Okay.

11          So it sounds like -- okay.  And I recognize the fact

12   that the, the first four, you've agreed to.  You've offered it.

13   I assume you're going to produce it --

14          MR. DRAPER:  Right.

15          THE COURT:  -- if you haven't already.

16          All right.  The, the next two, again totally different

17   issue, abuse related.  The last four --

18          MR. DRAPER:  Right.

19          THE COURT:  -- -- it, it sounds like the better, the

20   better question is what are the, what's the scope of the last

21   four?  And this would be a conversation for Mr. Knapp.

22          So come on up.

23          Is No. 4 wrapped up in this?  Those last four, that's

24   what you're talking about here?

25          MR. DRAPER:  And, your Honor, let me make one other

1    point that I think's important

2              The mediation has siloed information in it.  The

3    mediation has its own protocol for producing information and

4    certain groups get certain things.  And that, that's how Judge

5    Zive is going to be working.  And quite frankly, as I said, I'm

6    going to work in the context of Judge Zive to make sure that

7    the mediation works in, in terms of that and then if, if at

8    that point if there's a deal that's reached, then, and the

9    information is fair game, it's fair game.

10             But the, the information I turn over in the context of

11   the mediation is siloed.

12             THE COURT:  All right.

13             Mr. Knapp, why don't you --

14             MR. KNAPP:  So the adversary proceeding focuses on,

15   really, the Portfolio A which is one of the larger assets --

16             THE COURT:  Uh-huh (indicating an affirmative

17   response).

18             MR. KNAPP:  -- kind of at play in the estate and it's

19   a cash fund where a number of Apostolate entities claim certain

20   interests and there are other third parties that claim

21   interests and that's whether in the form of, you know, those

22   funds are actually held for them directly, whether there are

23   donor restrictions.  I mean, we're still really trying to

24   understand the full scope of that because we have some

25   documentation about it, but we're trying to get more.  We've

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 150 of 207
Case 20-10846 Doc 1566 Filed 05/23/22 Entered 05/23/22 15:38:44 Main Document   Page 28 of 85

28

1   been in discussions with Mr. Draper to try and get some more

2   direct access to their system's record, what kind of parameters

3   may go on that because we understand they have concerns about

4   what information is produced.

5          The adversary is there because, you know, if we need

6   to get into adversary-type discovery on that issue, we'll have

7   a procedural framework for doing it.  We're still working with

8   them cooperatively to try and get that information.

9          We agree.  It's going to be central in this, in this

10  case.  I mean, at some point someone is going to have to make a

11  case for confirmation and, and the --

12         THE COURT:  Right.

13         MR. KNAPP: -- -- assets are going to be laid out on

14  the table.  So we think we'll get there.

15         I understand Mr. Draper wants to, you know, have a

16  certain process heading into the mediation, but ultimately, we

17  think this information is going to be relevant in any sort of

18  confirmation proceeding, for sure.

19         THE COURT:  Uh-huh (indicating an affirmative

20  response).

21         All right, Mr. Stewart.

22         MR. STEWART:  I'd like to add two points.  One, the

23  Apostolates' motivations for producing documents pursuant to

24  Rule 2004 doesn't govern the scope of who receives it.

25  Secondly, we understand, recognize, and use ourselves the

1    mediation privilege from the mediation order and if -- but that

2    mediation order also makes clear that it does not protect data

3    which is otherwise discoverable.  It's not going to act as a

4    shield against documents that should be produced under 2004.

5          So if, if the Apostolates want to produce something to

6    the Committee or some other party in the mediation that is

7    outside of the scope of, of the 2004 request and they want to

8    consider that privileged under the mediation rules, we have no

9    problem with that.  But you can't take information that should

10   be produced under 2004 and protect it using the mediation

11   order.  'Cause there's a specific provision that deals with

12   that.

13         THE COURT:  Uh-huh (indicating an affirmative

14   response).  All right.

15         Mr. Draper, is your contention that these, 7, 8, 9,

16   and 10 are not relevant under 2004?

17         MR. DRAPER:  Some of them are not relevant.  Some of

18   them deal with information that I don't have to give and -- for

19   example --

20         THE COURT:  When you say "don't have to give," what

21   does that mean?

22         MR. DRAPER:  Let me put it this way.  I have third

23   parties out there.

24         THE COURT:  Uh-huh (indicating an affirmative

25   response).

1    MR. DRAPER:  The way 7, 8, 9, and 10 are written, if

2  Brad makes a donation to St. Leo's, I have to turn that

3  information over.  That -- that -- that -- that's the way these

4  things are written.

5    THE COURT:  Well, again, there's two separate issues

6  as far as I'm concerned, is the, the scope, the burden, the --

7    MR. DRAPER:  Right.

8    THE COURT:  -- you know, you know, all of that, you

9  know, the, the guardrails, if you will, is our favorite catch

10  phrase here.  That is a different issue than whether or not the

11  Commercial Committee can have it under 2004.  And, and 2004,

12  the examination of an entity under this Rule --

13    MR. DRAPER:  The -- the -- the --

14    THE COURT:  -- you know, relates to, you know,

15  liabilities and financial condition of the debtor or to any

16  matter which may affect the administration of the debtor's

17  estate.

18    MR. DRAPER:  I agree with you.

19    THE COURT:  That is very, very broad.

20    MR. DRAPER:  It is broad, but it is not, it is not a,

21  a, a road that you can just run --

22    THE COURT:  Yeah.

23    MR. DRAPER:  -- rampant through.

24    THE COURT:  And I -- well, what I'd say is you might

25  have a stronger case if these were complete strangers to the

 1 | bankruptcy, but they're not.  You filed proofs of claim.  You

 2 | definitely have telegraphed your desire to have a channeling

 3 | injunction through the plan.  Your clients are in it.

 4 |         MR. DRAPER:  I, I agree with you.  The point I'm

 5 | making to you, though, is there's information that I have that

 6 | I don't have to turn over to them and I don't have to turn over

 7 | to you.

 8 |         THE COURT:  That's a different story.  That goes to

 9 | the scope of the --

10 |         MR. DRAPER:  Right.

11 |         THE COURT:  -- questions and that.

12 |         MR. DRAPER:  Right.

13 |         THE COURT:  So here's the ruling.  I'm going to grant

14 | the motion.  You can have, you know, you're already getting the

15 | first four.  You've put on ice the second two, but the last

16 | four, you can have.  Whatever he gets, you can have, but we're

17 | going to have to have a separate conversation about, it sounds

18 | like, the limits on what's been requested.  Because what you're

19 | telling me is -- and I haven't, I don't have them in front of

20 | me -- but you're telling -- and that's not before the Court

21 | today -- but you're telling me that they're overbroad, they're

22 | burdensome, they're confidential, sensitive, whatever they are.

23 |         MR. DRAPER:  Right.

24 |         THE COURT:  And so that is a different question.  So,

25 | you know, it, it doesn't sound like you're giving any of those

1  things at this point to the UCC, anyway, until someone tees it

2  up in front of the Court, correct?

3        But for now, whatever you give to the UCC, you also

4  have to give to the Commercial Creditors.

5        MR. DRAPER:  But it's only with respect to the

6  documentation that is with respect to an official 2004 request.

7        THE COURT:  Okay.  Well, you know, trying to say --

8  what I understood and that's why I asked the question had, had

9  the Commercial Committee issued their own requests --

10        MR. DRAPER:  No.

11        THE COURT:  -- and, no, they haven't.  But again,

12  we're trying to save money.  You're -- are you asking for

13  anything that's outside of what's already been asked?

14        MR. STEWART:  What we've asked for is anything that's

15  been produced.  Because we understood that there were things

16  that have been produced.  And, and we are not aware of whether

17  the ten requests would be inclusive of everything that has been

18  produced.  That's just beyond the scope of what --

19        THE COURT:  Okay.

20        MR. STEWART:  -- we know.  We, we think it's financial

21  records that relate to those things but if it's been something

22  outside of that, we're not aware of it, only that it's been

23  produced to the other Committee.

24        THE COURT:  All right.  Well, there's --

25        MR. DRAPER:  And, and some --

1          THE COURT:  There's not -- I mean, you know, if, if

2     he's just volunteering information.  I mean, what I'm saying is

3     and what I understood the request was is the UCC had put out

4     ten requests.  You got some documents pertaining to, you know,

5     relevant and responsive to those requests.  That's what you

6     want.  If he's, you know, if you have additional requests or

7     you think that, you know, he's voluntarily giving them things

8     that they haven't asked for, I'm not sure, I'm not sure what I,

9     I can, I can do with that at this point.

10          MR. STEWART:  Well, I, I think that's fair.  I mean,

11    I'm asking for a very broad -- I am suggesting --

12          THE COURT:  Right.

13          MR. STEWART:  -- a very broad statement that what's --

14          THE COURT:  Right.

15          MR. STEWART:  -- good for one committee is good for

16    the other --

17          THE COURT:  Yeah.

18          MR. STEWART:  -- and in a vacuum I can see how a court

19    would be a bit reticent to --

20          THE COURT:  Right.

21          MR. STEWART:  -- bless that.

22          So we're willing to confine the order to the, the ten

23    categories in --

24          THE COURT:  Uh-huh (indicating an affirmative

25    response).

 1          MR. STEWART:  -- in the 2004 and we may request a, a

 2    log of whatever might be outside of that from the Committee to,

 3    to address at a later date.

 4          THE COURT:  Okay.  I appreciate that.

 5          MR. STEWART:  Thank you, your Honor.

 6          THE COURT:  All right.

 7          All right, Mr. Mintz.  Where we at on the agenda?

 8          MR. MINTZ:  Again, however -- so we were under the

 9    contested matters, which moves to No. 5, unless your Honor

10    wants to do the status conferences before we do No. 5.

11          THE COURT:  Yeah.  Let's do the status conference.

12          MR. MINTZ:  The --

13          THE COURT:  That, that may be shorter than --

14          MR. MINTZ:  It, hopefully, should be, your Honor.

15          Samantha, is the only status conference, is it the --

16          THE COURT:  Yeah.  It takes up, it takes up about four

17    pages.

18          MR. MINTZ:  Okay.

19          THE COURT:  But it's just one.

20          MR. MINTZ:  But don't we have the other one?

21    Technically, it was continued over, right?

22          Okay.  So let met ask this question, your Honor.

23          THE COURT:  Okay.

24          MR. MINTZ:  It's not on the agenda.  I seem to have a

25    recollection of speaking to Mr. Knapp, but I'm not a hundred

 1 | percent sure and Ms. Freedman showing up on the line reminded

 2 | me that this might be the case.

 3 |       The motion to participate in discovery, I think, was

 4 | technically continued to now.  I don't think we put it --

 5 |       THE COURT:  Okay.

 6 |       MR. MINTZ:  -- on the agenda 'cause I, well, forgot

 7 | about it.  So I don't know if we need to talk about that or

 8 | what we want to do with it.

 9 |       THE COURT:  Well, I believe -- and I would have to go

10 | back and look at the order that this Court entered requesting

11 | the United States Trustee conduct an independent investigation

12 | -- but I believe that that motion was wrapped up in that order.

13 |       MR. MINTZ:  Okay.  That's --

14 |       THE COURT:  And so it will travel with that whole

15 | process that she's doing.

16 |       MR. MINTZ:  That's perfectly fine with me, your Honor.

17 |       THE COURT:  Okay.

18 |       MR. MINTZ:  I just simply, if that wasn't clear, I

19 | wanted to make it clear for people.

20 |       THE COURT:  Okay.

21 |       MR. MINTZ:  So that's -- and I have no reason to doubt

22 | that.  I'm just --

23 |       THE COURT:  Okay.

24 |       MR. MINTZ:  -- making sure.

25 |       THE COURT:  I, I'll go back and check.

1            MR. MINTZ:  All right.  So that, your Honor, that

2     leaves the status conference on the traveling motion to compel,

3     as, as we have taken to call it.  There is a status report that

4     was filed and Ms. Kingsmill and Mr. Caine are here.

5            THE COURT:  Okay.

6            All right.  Let me, before you start, Mr., or

7     Ms. Kingsmill, let me turn it over to Mr. Caine.  This is the

8     Committee's motion.

9            MR. CAINE:  Thank you, your Honor.  Andrew Caine for

10    the Official Committee of Unsecured Creditors.

11            Ms. Kingsmill and I worked together to prepare the

12    joint status report.  As you can see, with respect to the hard-

13    copy documents that your Honor ordered on March 2nd the debtor

14    has stated that most of those have been produced.  There is

15    still one category.  That is the more recent abuse claim

16    documents for which it was still gathering, reviewing, and will

17    produce additional documents.  The most recent production of

18    that was Monday.  So we haven't had a chance to go through that

19    yet.

20            What's left is the electronically stored information.

21    Everything in the status report is accurate.  What's not there

22    is that the Committee is frustrated by the relatively slow

23    pace, as we view it.  We started this conversation as to search

24    terms on March 2nd.  There has been agreement on search with

25    texts.  I understand that debtor's counsel is reviewing these

1    texts.  There are quite a few.  I'm, I'm truly confident that

2    Ms. Kingsmill is working overtime, but Jones Walker is a pretty

3    big law firm.  We still haven't gotten any of these text

4    messages.

5              With respect to e-mails, it's accurate we're currently

6    discussing and refining the search terms.  We've had several e-

7    mails back and forth this week, which I appreciate, but from my

8    perspective the last comment I gave on refining search terms

9    was in an e-mail on April 7th and I didn't get a report back on

10   that until May 17 and there's maybe more refining to do, but

11   the Committee is frustrated by how long it's taking to get this

12   process going.

13             THE COURT:  All right.

14             Ms. Kingsmill.

15             MS. KINGSMILL:  Good afternoon, your Honor.  Allison

16   Kingsmill on behalf of the debtor.

17             So I'd like to give some context to where these e-mail

18   searches came up.  Back in October we were given about ten

19   search terms.  Searched and reviewed 40,000 e-mails and

20   finished that production.  Then at some point in February the

21   Committee brought up a couple of issues that we fully briefed

22   before the Court and the Court ordered us to produce very

23   specific things and as Mr. Caine just mentioned, most of those

24   things have been produced.

25             So we have produced all IRB files; all personnel files

1    for the 37 clergy from 2018 list who were not identified by the

2    Committee but were named in a proof of claim; all personnel

3    files for the six clergy identified by the Committee in the

4    sealed supplemental brief; all personnel files for the debtor,

5    personnel accused within the last ten years.  That's the one

6    sort of outstanding category where earlier this week we

7    produced about 4,000 pages of personnel files.  And we told the

8    Committee that we expect to complete that production within the

9    next two weeks.

10          The last thing on the Court's March 2nd order was for

11   the parties to sit down and, and agree on search terms, the

12   search, search terms for text messages specifically.  And, you

13   know, we went back and forth a little bit for the text

14   messages.  We were given 500 plus search combinations.  We

15   finally agreed as, with respect to text messages even though we

16   think that there's going to be a lot of false positives.  We

17   whittled it down to a manageable amount.  And so since April

18   2nd when we agreed to those search terms we have been reviewing

19   about 7,000 text messages.  And as we stated in the joint

20   report, we expect to start a rolling production of those within

21   a week.  Really, the only outstanding, I guess, issue that we

22   haven't quite finalized and agreed on is the e-mail search

23   terms which was not part of the, the Court's March 2nd order.

24          So we've, you know, made sure to give priority to

25   these other things that were part of the order, which were the

1    things that the Committee specifically briefed and requested

2    that the Court ordered us to do.  We've been negotiating the

3    search terms for the e-mails.  Obviously, when you apply

4    search, 500 search terms to e-mails as opposed to text messages

5    you're going to come up with a lot more results.

6         So Mr. Caine yesterday asked for a, you know, detailed

7    search report, you know, hit count by word to help, you know,

8    move this negotiation process a little faster and I sent him,

9    sent that to him yesterday and I think that we can, you know,

10   start moving this process faster and, and get to terms that we

11   can both agree on.

12        THE COURT:  All right.  So with the text messages, you

13   said you got 7,000 hits and you're reviewing those and you're

14   going to get those this week, within a week?

15        MS. KINGSMILL:  Within a week.

16        THE COURT:  Okay.  And will they come in one batch?

17        MS. KINGSMILL:  I said in the report a rolling

18   production, but I suspect that there's going to be so few that

19   we might complete the production by next week.

20        THE COURT:  Okay.  And so then we're turning to just,

21   well, not just the e-mails, but can you tell me, you or

22   Mr. Caine, what, what e-mails are we talking about?  Because

23   I'm not, I don't have a recollection.  You said that that

24   wasn't one of the things we talked about in February and March,

25   correct?

40

1              MS. KINGSMILL:  Right.  That --

2              THE COURT:  These are just like an additional --

3              MS. KINGSMILL:  The ESI issue --

4              THE COURT:  Uh-huh (indicating an affirmative

5     response).

6              MS. KINGSMILL:  -- that we briefed in February was

7     specifically whether we should be instructed to run additional

8     search terms on text messages.  Because --

9              THE COURT:  Right.

10             MS. KINGSMILL:  -- the text message issue coincided

11    with the forensic examination issue, whether we had to find

12    deleted text messages.

13             THE COURT:  Right.

14             MS. KINGSMILL:  It was never part of that discussion

15    that we should have to do a whole 'nother review of e-mails

16    after we had already done so in October --

17             THE COURT:  Right.

18             MS. KINGSMILL:  -- and, and reviewed 40,000 e-mails.

19             THE COURT:  So this, this e-mail issue is just by the

20    agreement of the parties?

21             Or, Mr. Caine, did you have new information that you

22    wanted to go back and, and take another look at the e-mails?

23             MR. CAINE:  Your Honor, after the March 2nd order when

24    we started talking about search terms we had a disagreement as

25    to whether or not the discussions in the beginning of the year

1    concerned e-mails and the Committee feels strongly that there

2    wasn't a full e-mail production because so much was missing.

3    You might recall --

4              THE COURT:  Got it.

5              MR. CAINE:  -- that was one of the arguments that we

6    made.  And so rather than come back to your Honor and fight

7    about it, we agreed that the debtor would search e-mails with

8    those terms and, and those are the terms that, that

9    Ms. Kingsmill has mentioned.

10             And I, I agree that we've had productive discussions

11   about the search terms and trying to refine them and they give

12   results and then we offer some further refinement.  That

13   process has been smooth.  It's just taking so long to get from

14   one to the next.  And I understand they have a lot to do, but

15   the sooner we get this information the sooner we can be fully

16   prepared for mediation sessions.

17             THE COURT:  Okay.  All right.

18             So you've got the search terms now.  You've negotiated

19   those.  You've gone back and forth.  You're, you've been

20   looking at how many hits you're getting per each term so that

21   you're refining them down.

22             MS. KINGSMILL:  Well --

23             THE COURT:  So what, what are you now?  So we're going

24   to get the text messages within a week, probably in one batch.

25   What's your vision for these new productions of e-mails using

1   these new search terms that have been negotiated?

2          MS. KINGSMILL:  So I think what we just did recently,

3   which we, we haven't been doing previously when we, we've been

4   refining these search terms, is we provided a full report of

5   the number of hits for each of these 500 terms.  So that

6   instead of tweaking one or two words and it only reduces it to,

7   you know, a couple thousand when you're starting with, you

8   know, 200,000, I think by giving the Committee the report they

9   will be able to, you know, hopefully, add more context or

10   limiters to certain words so we can actually get them what they

11   want, you know.  We suggested that, you know, there's so many

12   terms, so many generic names, and they've limited them a little

13   bit, but, you know, the, the fear is that it's capturing way

14   more than they're actually looking for.  You know, if they

15   could, you know, certain terms, could you say, you know, "This,

16   we only want these terms applied within this time frame with

17   these custodian e-mails," or, you know, things like that,

18   giving context to certain search terms, I think, would be

19   really helpful instead of blanketly applying these to the

20   universe of e-mails.

21          THE COURT:  Okay.

22          So, Mr. Caine, are - I don't want to get into the

23   weeds and enter into the negotiation of search terms, certainly

24   -- but there are, really, only so many custodians, correct,

25   that we can deal with, is that --

1          MR. CAINE:  That's correct, your Honor.

2          THE COURT:  Okay.

3          MR. CAINE:  We've limited -- we're -- we've suggested

4    that the search be limited to certain specified custodians.

5          THE COURT:  Okay.  All right.

6          All right.  So how can I help, Mr. Caine?  I know that

7    you're frustrated.  We're going to get text messages probably,

8    you know, in one, in one production within a week.  And then

9    what are you thinking?  What's your request regarding the

10   rolling productions of e-mails?

11         MR. CAINE:  Well, I will respond to the report that

12   Ms. Kingsmill provided probably by end of day tomorrow.

13         THE COURT:  Okay.

14         MR. CAINE:  And then we ask that we get these things

15   finalized.  They, I don't think it takes very long for them to

16   run a search to know if there's been any meaningful reduction

17   in the hits, but once we've reached agreement, which I'm

18   confident we can, then we were, we're hoping that they can

19   start producing them in the fairly short term.

20         THE COURT:  Okay.  All right.  So if you're going to

21   turn around your request to her by, you know, tomorrow, we'll

22   say -- where are we now?

23         If you get his request, you can, you can run the

24   search terms per his request and, perhaps, have another report

25   for him by Friday afternoon?  Is that realistic?

1           MS. KINGSMILL:  Yes.  That works.

2           THE COURT:  All right.

3           So hopefully, that'll be the last round and, and you

4   can agree.  But once you can agree, let's say you take some

5   time and agree by Tuesday on, on what the, the final final list

6   is of search terms -- I know that you guys, I know that

7   everyone in this case is going to be busy the second week of

8   June -- once you get the search terms run and you know the

9   world of documents you're, you're looking at, what's, what kind

10  of manpower do you have to go through the, to go through them?

11          MS. KINGSMILL:  I mean, we can, we can do the same

12  thing that we did back in October where we put a team together

13  to help reviewing e-mails.  I, I don't know off the top of my

14  head how long that took.

15          THE COURT:  Yeah.

16          MS. KINGSMILL:  But -- and also, it, it just depends,

17  you know --

18          THE COURT:  Right.

19          MS. KINGSMILL:  -- when we get to these search terms

20  how many e-mails we're dealing with.

21          THE COURT:  Yeah.

22          MS. KINGSMILL:  Last time, we were dealing with --

23          THE COURT:  Right.

24          MS. KINGSMILL:  -- 40,000, so.

25          THE COURT:  How many?

1          MS. KINGSMILL:  Forty thousand.

2          THE COURT:  Okay.  All right.

3          Well, what I would suggest is that, you know, if you

4  can agree -- like I said, let's just say you agree on Tuesday

5  what the final list of search terms is.  You run, you know, use

6  your vendor and internal in-house people to, to run the, the

7  list, then you put your team together.  They're prepped.

8  They're going to go forward.  I would suggest that you make

9  productions every two days on a rolling basis and get them

10  something, you know.  And so as your team is going through it,

11  every 48 hours you can make a production.  And hopefully, you

12  know, let's say, just, you know, hypothesize that you're going

13  to have 40,000, depending on how many associates you've got,

14  you know.  I don't miss those days.  I'm going to be honest

15  with you.  I do not miss them one bit.

16          But if you can do a rolling basis every 48 hours, that

17  way he knows what to expect, you know, and we'll just -- it --

18  after that, it just takes as long as it takes, you know.

19          MS. KINGSMILL:  Okay.

20          THE COURT:  But I -- but I know that -- I mean, our

21  goal is to have everybody as prepared as we possibly can have

22  them prepared.  And I understand that, you know, things aren't

23  perfect and we're, you know, we are -- everybody doesn't have

24  the information they would have liked to have had walking on,

25  into June 6th, but we're at where we're at.

1          So whatever we can do in the next two weeks to bring

2     everybody up to speed and, and get them as educated as

3     possible, I would appreciate it, okay?

4               MS. KINGSMILL:  Okay.

5               THE COURT:  All right.  So, Mr. Caine, do you have

6     anything else to add on the status report for the motion to

7     compel?

8               MR. CAINE:  No.  Thank you, your Honor.

9               THE COURT:  All right.

10          So we'll see how that works.  Let's go ahead and push

11     this one again and have another status conference in June at

12     our omnibus, which I think is on June 16th and we'll just see

13     where we're at, okay?

14               MS. KINGSMILL:  Thank you, your Honor.

15               THE COURT:  All right.  Thank you.

16               MR. MINTZ:  Okay, your Honor.

17               THE COURT:  All right.  So the last item?

18               MR. MINTZ:  Yes, your Honor.  Mark Mintz on behalf of

19     the debtor.

20          Last item is the Unsecured Creditors' Committee's

21     motion to compel the debtor to terminate pension benefits to

22     credibly accused persons, Docket No. 1389, redacted and

23     partially filed under seal.

24               THE COURT:  All right.  So who's handling the

25     Committee's motion today?

1          MR. STANG:  Good afternoon, your Honor.  James Stang.

2     I'll be handling it.

3          THE COURT:  Okay, very good.  I'll turn it over to

4     you, then.

5          MR. STANG:  Thank you, your Honor.

6          Your Honor, this is a motion that seeks to prohibit

7     the debtor from paying pre-petition pension benefits to men who

8     hurt children and young adults.  The conclusion that these men

9     hurt kids and young people is based on findings of the

10    Archdiocese's own Internal Review Board.  The motion does not

11    seek an injunction to compel Archbishop Aymond to put these men

12    on the Archdiocese's credibly accused list.  We believe he

13    should do that, but that is not the relief that we are seeking

14    today.

15         The conclusion that the Committee has reached is

16    supported by the IRB, the Internal Review Board's, findings

17    concerning conduct that according to the Archdiocese's own

18    Pastoral Handbook is "sinful, reprehensible, intolerable, and

19    illegal."  The Pastoral Handbook goes on to say that "such

20    conduct is contrary to the employment and ministry within the

21    Church."  The exhibits that you have do not go into a great

22    deal of detail about what these men did, but one of them does

23    and that's the conduct described in Exhibit B to Mr. Caine's

24    declaration.  That conduct included pseudo religious healing

25    sacraments performed for the sexual gratification of the

1    priest.  This priest's conduct could not even be fully explored

2    by the IRB because one of the complainants committed suicide

3    before the investigation could be completed.

4           Your Honor, the Internal Review Board is a board that

5    is hand picked by the Archbishop.  Its members must be,

6    according to the rules of the Archdiocese, of outstanding

7    integrity, they must have good judgment, and they must be in

8    "full communion with the Church."  The purpose of the Board is

9    to act as a consultative body.  It consults with the Archbishop

10   on addressing allegations of sexual abuse and the eligibility

11   of people for being a minister.  This is not the group of

12   people who are out to get the Church.  From the exhibits that

13   you have had the opportunity to review, you can see they spend

14   hours, probably, for their job, tens, possibly hundreds of

15   hours a year performing their responsibilities to the

16   Archdiocese.  That is the basis for the Committee's motion to

17   stop the pre-petition payments to these men.

18          Your Honor, I think it's important to review how we

19   got to this motion because it goes back to the earliest days of

20   the case.  The debtor filed what is called the wage motion.  It

21   is at Docket No. 7.  In Docket No. 7 at Paragraph 44 the

22   Diocese asks the permission to continue the operation of its

23   401(k) plan.  That plan covers lay employees -- it does not

24   cover priests -- and affiliated employees.  It is defined in

25   the motion as the "401(k) Plan" in bold.  It's a defined term.

1    In that paragraph the debtor describes its priest plan defined

2    as, in bold, "the Plan."  The motion asks for approval of

3    Paragraph 45 of the 401(k) Plan and programs and related costs

4    associated with the 401(k) Plan.  It did not seek approval of

5    payments under the defined term, Plan, the priest plan.  It

6    justified the payment of these pre-petition obligations at

7    Paragraph 63 by saying it needed to maintain the loyalty and

8    trust of the employees, it couldn't have them leave, and it

9    needed their support for a successful reorganization.  That was

10   their motion.

11        My firm came in with Locke Lord.  We were not going to

12   be counsel at the time and we objected and we gave redlines of

13   every order that we objected to, including the wage order.  Our

14   redline provided language that said -- and I'm paraphrasing a

15   little bit -- that, basically, anyone who was the subject of

16   credible or substantiated abuse claims should not get paid

17   their retirement benefits.  And as an exhibit to that redline

18   we attached the order from The Diocese of Buffalo case where,

19   where we were committee counsel, or are committee counsel.  And

20   in that attachment which we gave to you to show you as

21   precedent it does tie the retirement benefits to, or the

22   nonpayment of retirement benefits is a better way of putting

23   it, to the person's name on that diocese's credibly accused

24   list.

25        You expressed concern about our proposed language.

Case 2:22-cv-01740-BWA-DPC   Document 33-3   Filed 09/02/22   Page 172 of 207
Case 20-10846 Doc 1566 Filed 05/23/22 Entered 05/23/22 15:38:44 Main Document   Page 50
of 85

50

1  You didn't say exactly what the problem was, but you said, "I

2  have some problems with that."  And then an attorney for a

3  group of plaintiffs said, "What about the New York, the Buffalo

4  language," and the Court used that language and the debtor

5  jumped on that, said, "Yes, we'll, we'll do that," and the

6  Court entered an order containing, in effect, the language that

7  was similar to the Buffalo order.

8        There was then a motion for reconsideration filed and

9  you, there were pleadings filed in connection with that motion

10  for reconsideration.  There was a letter from the priest and

11  you deemed it appropriately a motion for reconsideration.  At

12  Docket 89, which is the Diocese's, Archdiocese's response to

13  that motion for reconsideration, at Paragraph 12 the debtor

14  agreed that the payment of the retirement obligations was a

15  pre-petition obligation and notably, one of the plaintiffs'

16  counsel filed a pleading in connection with the motion for

17  reconsideration.  And this is at, it's Docket No. 85, Paragraph

18  10.  And I must say that counsel was a bit prescient.

19  Paragraph 10 and Paragraph 28 said, "There are other known

20  abusers who didn't make it on to the New Orleans credibly

21  accused list and we reserve our rights regarding those folks."

22  It also noted that the wage motion did not include relief

23  sought in connection with the priest retirement plan.

24        So the Court at Docket No. 100 entered the order

25  following the motion for reconsideration that was, in effect,

 1   much like the original order.

 2           I'd like to make, just note at this point, Judge, that

 3   the documents that we relied on in connection with the IRB

 4   findings or recommendations were produced -- I have the

 5   specific dates when they were produced -- by priests, months

 6   and months and months after the original wage motion and the

 7   motion for reconsideration, I think in one case more than a

 8   year.  And as you just experienced or heard from our side and

 9   you've been having enumerable status conferences about

10   discovery, it's been a, I would call it, a tortuous process to

11   get these documents.

12           So we had an exchange with the Archdiocese about this

13   motion.  Mr. Mintz's and Mr. Caine's e-mail exchanges are

14   attached to the Archdiocese's objection.  The Archdiocese

15   decided to object and it's objecting on procedural grounds and

16   constitutional grounds.  What it did not object to, there's no

17   question that you have the authority to tell this Archdiocese

18   that it cannot make prepetition, it cannot make payments on

19   pre-petition obligations.  And again, at their -- at the -- at

20   Docket 89, which was their response to the motion for

21   reconsideration, they said these are pre-petition obligations.

22           There's also an objection from one of the priests and

23   I'll deal with that, I'll deal with that now 'cause it's

24   probably a little simpler to deal with.  This is the priest who

25   is the subject of Exhibit I and this priest in his objection

1  has said in -- "Based on an accusation in 1981, the Archbishop

2  decided that I should not be disciplined."  I, I did read the,

3  the article a few days ago.  I, I think there was, a

4  determination there was insufficient evidence upon which to

5  proceed based on the 1981 accusations.  But our motion is not

6  based on the accusations against this priest from 1981.  It's

7  based on accusations against him in 2012.  I'm, I'm doing the

8  date from memory, your Honor.

9         But it was years, decades after and I would just

10  direct your attention to Exhibit I and you can -- it's not a

11  very long exhibit -- you can see the reference in the letter

12  from the Internal Review Board as to the numerous complaints

13  well after complaints that allege 1981 conduct that go to this

14  particular priest.

15         So let me go to the Archdiocese's objection.  Again,

16  I, I'm almost flummoxed that we have policies stated by this

17  Archdiocese regarding the protection of children, but also the

18  protection of people of all ages.  The Pastoral Handbook says

19  that "God condemns the abuse and the neglect of people of any

20  age."  And I understand that you're not here to tell this

21  Archdiocese how it should reconcile its behavior with its own

22  profession as to what God requires.  I, I understand that, but

23  from the Committee's perspective it is extremely hypocritical

24  and it also notes that what you can do is tell this Archdiocese

25  whether or not it can make payments of pre-petition obligations

1    or whether they've shown the circumstances that warrant that.

2           So let's deal with their procedural objections.

3    First, this is an injunction.  The answer is it's not.  We are

4    not asking you to compel Bishop Aymond to put these people on

5    the list of the credibly accused.  We don't need an injunction

6    through an adversary proceeding to stop a debtor from paying

7    pre-petition obligations.  If we did, the bankruptcy world

8    would be turned on its head.

9           They also tell you that what we're trying to do is

10   modify the wage order.  That's not true.  The wage order never

11   approved the payment of the priest retirement plan pre-petition

12   obligations.  The wage order says you can't pay certain pre-

13   petition obligations.  It says notwithstanding anything in this

14   order you can't pay retirement to the people on the credibly

15   accused list.  They did not seek approval of the payment of the

16   retirement plan.  We were being careful 'cause of our

17   experience in other cases to ensure that that wasn't going to

18   happen if one could read the order that way.  Now to the extent

19   that they argue that it was clearly implied that that's what

20   they were going to do, even though it's not what the motion

21   says, let's remember what happened at the hearing.  They

22   jumped, they ran for the exits with an order that tied the

23   payment of the retirement plan obligations to the, to the list.

24          Now I'm going to give Mr. Mintz and Mr. Vance the

25   benefit of the doubt here -- this was a first day motion.

1    Everybody was relatively new, even me -- that they didn't know

2    that there was a difference between what the Internal Review

3    Board had recommended to issue payment and, as to certain

4    individuals, and whether those were individuals actually on the

5    list, but there is someone who did know and that was the

6    Archdiocese.  It knew that the Internal Review Board had made

7    recommendations regarding certain people and certain instances.

8    Archbishop Aymond or his predecessors acted upon those, but

9    those people didn't make it to the accused list.

10          So this space between the Review findings and the list

11   arguably gave them an opportunity under the wage order to keep

12   making payments to these folks.

13          Now, you know, people talk in this case about

14   transparency.  They talk about it in every chapter 11 case, but

15   in cases like this it's really, really important.  It's

16   important from a public safety perspective.  It's important

17   given the level of disgust that understandably exists between

18   the survivors and the Archdiocese and they had an, it had an

19   obligation to say to the Committee and to say to you and to the

20   U. S. Trustee, "Hey," you know, "you need to understand what's

21   going on here.  The yardstick, which is the list, isn't

22   capturing certain conduct that we know you're concerned about

23   insofar as making retirement payments."  And they didn't do

24   that.  And when called upon to acknowledge it, the e-mail

25   exchange between Mr. Mintz and Mr. Caine, they said, "Oh, we

1    have procedural problems with this."

2              So if we get into the discussion of relief from a

3    judgment or relief, or, or trying to seek a modified wage

4    order, let's keep in mind when we got these materials and the

5    failure of the Archdiocese to be frank and upfront with

6    everybody about the implications of causing the list to be the,

7    the yardstick.

8              Your Honor, we get to the next issue, which is the

9    constitutional objection.  The debtor's constitutional

10   objection is based solely, solely, on the argument that we are

11   asking you to order Archbishop Aymond to put these men on the

12   credibly accused list.  We are not asking you to do that.

13   There is no constitutional issue for you to consider, given the

14   assumption or the premise, I should say, of the Archdiocese's

15   argument.  We are not asking you to do that.

16             Your Honor, the Archdiocese's Pastoral Handbook says

17   it all and as I said before, we find it, you know,

18   hypocritical, but, you know, that's not for you to resolve.

19   But what you should do is exercise your authority to stop these

20   retirement payments from being made to these men.  You have the

21   authority to do it.  It is in the public interest to do it and

22   it is in the interest of this estate because this debtor as we

23   go to mediation needs to confront and will, will be asked to

24   confront by the Committee and will need to confront this demand

25   of the Committee that its child protection measures -- and we

1   consider this part of a child protection measure -- have to be

2   adjusted to stop this kind of conduct, the conduct meaning

3   subsidizing to the tune of over $200,000 based on Mr. Babcock's

4   declaration if you extend his, his deadline of December 21 to

5   the present.  It's about 200 grand that these people have been

6   paid, but that has to stop.

7          So, your Honor, I'm happy to address any concerns you

8   have.  That's all I have to say on our motion.

9          THE COURT:  All right.  I'll reserve my questions

10  until after I hear from the debtor.

11         MR. MINTZ:  Thank you, your Honor.  Mark Mintz on

12  behalf of the debtor.

13         Your Honor, the title of the motion is a motion to

14  compel the debtor to cease certain payments.  That is what an

15  injunction is.  It's the definition of an injunction.  It is a

16  definition where they say to, to do it to these six individuals

17  based on the conduct that they had seen from these documents.

18  I'm not here, by the way, to defend the documents.  I'm not

19  here to defend what they did, didn't do.  I'm not arguing the

20  guilt or innocence of any of these people.  That's not my job.

21  With respect, your Honor, it's not your job.  With respect,

22  your Honor, it's also not Mr. Stang's job.  That is the job of

23  whatever law enforcement needs to be out there.  That is the

24  job of the Archdiocese as the Archdiocese does it from a

25  canonical standpoint and we are here in bankruptcy.  I

1   understand that we are here in bankruptcy court to help

2   adjudicate and come to a settlement as to these claims and we

3   have never said they're not horrific.  We have never said that

4   they didn't happen.  We have never said any of that, but there

5   are strong legal issues that surround all of it.

6          The Internal Review Board has looked at this

7   information, but it's important to understand this is a

8   canonical body that looks at it from a canonical point of view.

9   That body has been appointed to review certain allegations and

10  to make a recommendation.  I don't know if they have every

11  piece of information.  I don't know if they don't.  I know

12  additional information shows up after times.  I know that

13  certain pieces of information has come up.  They make a

14  recommendation.  My understanding of how this works -- and

15  believe me, your Honor, I recognize I'm the last person in the

16  world to tell you how canon law works and your Honor doesn't

17  even want to hear it -- but my understanding is what they do is

18  they make this determination that it's credible.  It's able to

19  be believed.  We can move forward and then it moves forward in

20  a process.

21         And that's where this second word comes in,

22  "substantiated," that your Honor did look at, that the Buffalo

23  court did look at.  So let's talk about that point because

24  Mr. Stang brought it up and I think was incredibly important.

25  And I think the reason he's brought it up 'cause he's said it's

 1   not an injunction.  I'm not here to tell anybody to do

 2   something under an injunction concept.  Again, it's a motion to

 3   compel.  I think that's what it is.  But fine, putting that

 4   aside for a second.

 5        The amended wage order -- and the words are important

 6   -- says:

 7            "Notwithstanding anything to the contrary set forth

 8            herein, nothing in this order shall authorize payment

 9            to any person against whom there have been

10            substantiated allegations of abuse of a minor or

11            vulnerable adult, as identified in the 2018 report

12            regarding clergy abuse and published on the debtor's

13            website, in respect of any pre-petition employee

14            obligation," is what your Honor said.

15        But let's go back since he keeps saying, oh, well,

16   Ms. Schubert said it, then we jump at it and forced you to do

17   it somehow, I guess.  So let's go back and look at the

18   transcript.

19        And the transcript, the relevant part was attached to

20   our opposition.  So it's Document 1539-2.  And in relevant

21   part, with, in fairness, your Honor, she certainly did say,

22   Ms. Schubert certainly did talk about this.  And then I found

23   it and then I lost it.  But what happened is, your Honor, you

24   asked, "Wait.  Is the debtor amenable to this language?"  You

25   had it.

1          So that's what we have, is on Page 84 of the

2    transcript the Court says:

3               "The issue I had is that the language that was

4               proposed in the redline does differ in important ways

5               from what's in the order out of the Western District

6               of New York.  And so while I don't have a problem with

7               the Western District of New York's order, I did have a

8               huge problem with the proposed language.

9          Mr. Mintz, are you amenable to mimicking the exact

10               language that's located in the Western District of New

11               York's order?"

12    It's a question from your Honor.

13          My response was -- actually, my response here was:

14               "I don't remember it and don't know what it is.  Can

15               you read it to me?"

16          We go to the next page and your Honor does read it and

17    it's the language that we have now put in and then we said that

18    -- we asked more clarifications about it and then after further

19    clarifications, we agreed to the language.

20          And so, your Honor, this was not sitting around going

21    we're jumping at something in order to pull one over on

22    everybody.  I, I don't know how you possibly read the

23    transcript and come to that conclusion.  'Cause it's not what

24    happened.  What did happen was that Mr. Boldissar and Mr. Stang

25    suggested certain language that was much closer, by the way, to

1   the language they're seeking today.  So let's go back to that

2   'cause they keep saying, "We're not talking about the amended

3   wage order.  It's not about this at all," except that it is.

4           So when I go to the motion that they filed, I have a

5   proposed order, when I find it.  And the proposed order, your

6   Honor, is at Docket 1389-1,  And all that they have done is

7   they state:

8               "Notwithstanding anything to the contrary set forth in

9               the Court's prior orders, the debtor is not authorized

10              to make payment to any credibly accused person in

11              respect of any pre-petition employment obligations."

12          They're going straight back to the language that your

13  Honor had already rejected.  It is directly related to these

14  points.  And yes, your Honor, everyone knew this is what we

15  were talking about, that we were talking about all of the

16  payments made under these pension plans, whether they are a

17  direct pension plan under a 401(k) plan, whatever they are.

18          So, your Honor, it gets back to we have the amended

19  wage order that we've been working under for two years and the

20  two years is important, your Honor, because that's, the two

21  years is important, your Honor, because they have to come up

22  with a reason to amend it.  Bankruptcy rules tell us that you

23  have to come up with a reason.  You can't just use the inherent

24  power of the Court to say, no.  We have an order that we've

25  been operating under, a final order.  This was not an interim

1   order where we reserve our rights to the end of the case.  It

2   was a final order.  In fact, that's actually in the transcript

3   later.  Did anyone have a problem making this a final order?

4   No one had a problem with it.

5          So we have a final order.  You can get relief from a

6   final order through the six things enumerated in Federal Rule

7   60(b) made applicable, I guess, by Rule 9023.  We know that 1,

8   2, and 3 require something to be filed within a year.  We're

9   past that.  So those don't necessarily count here.  We know

10  that 4 and 5 are not really what they are arguing here.  This

11  is not, the judgment is not void.  We know the judgment has

12  been, not been satisfied, released, or discharged.  I don't

13  think that's what they're asking for us here.  The earlier

14  judgment was not changed or vacated.  It's not really applying

15  it currently.  It's not -- I mean, they want us to -- they

16  don't want to change it entirely to the point where it goes

17  away.  So it leaves 6, which is extraordinary relief.  It's not

18  even necessarily mistake or there was new information out

19  there.  This is extraordinary relief that they are seeking.

20  They have made zero showing as to what that is.  There is no

21  evidence before your Honor regarding that, none, and it is

22  their burden to put it forward, if you're going to do that.

23          MR. STANG:  We don't, we don't need evidence.

24          THE COURT:  Again, you're, you're live in the court if

25  you do not mute your line.

1          MR. MINTZ:  So, your Honor, that right there is what

2    this motion would require, using it the way that Mr. Stang has

3    suggested it.

4          Your Honor, at this time, also, the six individuals

5    that we're talking about, as your Honor also recognized, have

6    rights in this statement as well, or in these payments.

7    Committee may not like it.  I may not like doing it, but they

8    certainly do have rights in here.

9          So when you say it's an injunction, not an injunction,

10   your Honor already said at the very beginning when this was

11   first filed and one of the reasons we had delay -- this was

12   first filed back in, I think, March -- the reason we're doing

13   this in May  and not in April is because we needed to have time

14   to serve these individuals because their rights are affected.

15   That is part of what makes this an actual injunction.  Their

16   rights are actually affected as well, what they're going to

17   get, not get.  They have due process rights.  You may not like

18   them.  The Committee may be upset about them.  That's fine, but

19   they still have those rights.  We still do need to protect

20   them.

21          The final point, your Honor, is as we talk about the

22   constitutional issue -- because it's unclear to me exactly what

23   we are talking about -- this list, whether they like it or not,

24   it is where we tied this issue.  We tied it to the list.  If

25   during the negotiations they would like to tie further areas or

1   have additional pieces of information during the plan process,

2   that's perfectly fine.  We certainly can discuss those things.

3   But as it stands today, we tied it to the list.

4           And by the way, it's not like the list is static.

5   Even after this case has shown up, the Archdiocese has

6   determined to add people to it.  And so I'm not saying it's

7   static.  I'm not saying this is frozen in time.  It certainly

8   is at it, but the rules of the game that we've been playing

9   under, that's what was the final order.

10          And so, your Honor, what I would suggest is, to the

11  extent they are saying, "Yes, these people should be added," to

12  the extent that they are saying, "Yes, stop making the payments

13  due to the fact that the IRB for its own purposes made a

14  determination," it was not made for this purpose.  It was not

15  made for the purpose of determining who should go to a law

16  enforcement agency, who should be prosecuted.  It was done for

17  canonical purposes and to turn around and now say, "Ah-ha,

18  because they said that, that is sufficient and now I want a

19  civil court to terminate the pension benefits," your Honor,

20  yes, that is a First Amendment problem.  That is asking this

21  Court to change what that, is meant by that.

22          This final point to say that we, you know, have not

23  stated any business justification for paying priests their pre-

24  petition benefits, of course we have.  It's the exact same

25  justification we made two years ago and are paying our

1 | employees their 401(k) benefits, which is we need to have the

2 | priests be secure that they will be taken care of.  If not,

3 | they're not going to work for us.  They are not going to

4 | continue to work in the Archdiocese of New Orleans to provide

5 | the care.  So I get that they're retired, but it's a, a fact on

6 | everybody.

7 |         And so, your Honor, this is not an easy issue.  I'm

8 | not saying that it is, but I am saying that in the procedural

9 | posture that we're sitting in it's not appropriate today.  If

10 | there is another way to do it, if there is an adversary, maybe

11 | that gets us somewhere.  But where we are today and the

12 | procedural posture that we are today, the motion is

13 | procedurally deficient.  Even on the substantive things of what

14 | they are actually asking for, even if they could get past the

15 | procedural headaches -- and I, honestly, your Honor, do not

16 | think they can -- but even if they could, the constitutional

17 | question is so intertwined and so close that I think it

18 | requires a lot more than we've been able to give it today.

19 |         So with that, your Honor, we're happy to answer

20 | questions.

21 |         THE COURT:  Can you tell me when the last time the

22 | list was updated?  You said it has occurred postpetition.  Do

23 | you have any idea?

24 |         MR. MINTZ:  I, I cannot, your Honor.  It was in 2021,

25 | at least the last time I know, but I can't tell you exactly

1    when.

2              THE COURT:  Okay.  And so on the day that, say, one,

3    one name went on the list, however many names went on the list

4    as of 2021, did the debtor stop paying pre-petition employment

5    benefits?

6              MR. MINTZ:  I don't know the answer to that, your

7    Honor.  I would, I would imagine we did and --

8              MR. STANG:  Your Honor?

9              MR. MINTZ:  -- if we didn't, we intended to do so.

10             MR. STANG:  Your Honor, I know the answer to that --

11             THE COURT:  Okay.

12             MR. STANG:  -- if you'll allow me.

13             THE COURT:  Go ahead.  You have to announce your name

14   for the record, please.

15             MR. STANG:  Oh, I'm sorry.  It's Mr. Stang.  I

16   apologize.

17             THE COURT:  All right.  Go ahead, Mr. Stang.

18             MR. STANG:  Since, since the petition date -- well,

19   since the last -- since the list that was being used in

20   connection with the wage motion, they've added, our count is

21   ten names and we cannot find any record of any post-petition

22   payments to those ten people.

23             THE COURT:  Okay.  All right.

24             All right.  Thank you, Mr. Mintz.

25             So, Mr. Stang, do you have a reply?

1          MR. STANG:  Short, short, your Honor.

2          THE COURT:  Uh-huh (indicating an affirmative

3   response).

4          MR. STANG:  I get to say I've been doing this for 40

5   years.  I somewhat, I wince when I say that.  I have never

6   heard that a, anyone needs to seek an injunction through an

7   adversary proceeding to stop a debtor from paying pre-petition

8   claims.  If this were the debtor entering into a post-petition

9   transaction that it argued was in the ordinary course of

10  business, post-petition transaction in the ordinary course of

11  business and someone disagreed, well, maybe you do need to get

12  an injunction to stop that.  But that's not what we're talking

13  about.  The debtor admitted in response to the motion for

14  reconsideration that these were pre-petition obligations.

15  That's it.  Is Mr. Mintz really contending that we have to sue

16  the Archdiocese to stop it+ from filing, from, from paying pre-

17  petition claims?

18         THE COURT:  Well, I mean --

19         MR. STANG:  The IRB --

20         THE COURT:  -- usually, Mr. Stang --

21         MR. STANG:  I'm sorry.

22         THE COURT:  -- usually, when you're talking about, you

23  know, a debtor wanting to pay pre-petition claims, it comes in

24  the form of, you know, a wage motion, somebody's first day

25  motions, a critical vendor motion, and you want to come

1    forward.  It would be an unwise debtor that would go ahead and

2    start paying pre-petition claims without court approval.  They

3    got the limit through the wage order.  They got the permission

4    to pay some things and they, you know, the order puts a limit

5    on, on other things and said you can't pay pre-petition

6    benefits to these persons who are on this list.  And so that's,

7    that's what they did.

8              MR. STANG:  Your Honor?

9              THE COURT:  And that's why they're not paying them.

10   But like --

11             MR. STANG:  Your Honor?

12             THE COURT:  -- like the Buffalo court, like the

13   Buffalo court, we tied it to what's on the website, what's on

14   that list.  The Buffalo court did that and that's what we did

15   as well.

16             MR. STANG:  Your Honor, if you go back and read Docket

17   7 and what they asked for, they did not expressly ask -- they

18   expressly asked for the 401(k) Plan.  They labeled it.  They --

19   if you go to that section of the pleading, they specifically

20   called it employee obligations.  They had subheadings.  One of

21   the subheadings was 401(k) Plan.  They defined what the 401(k)

22   Plan was.  They defined it as such.  They specifically

23   identified the priest plan as something else and they did not

24   ask for authority to make payments under the Plan.

25             Now what, you know, did, did everyone know they were

 1   going to?  Well, we took what we thought was prophylactic

 2   action to make sure that those people were not going to be on

 3   the list, that the people on the list --  I mean, it's not

 4   where we wanted to be, but it's where we ended up.  It's where

 5   we ended up -- that the list was going to be the yardstick.

 6          But I'll tell you, I mean, I can give you the exact

 7   dates upon which we obtained these IRB files from the

 8   Archdiocese and the notion that they somehow get to skate on

 9   this issue because it took them a long time to come forward

10   with information that, frankly, they should have volunteered, I

11   think is outrageous.

12          This Archdiocese is standing, is, is presenting the

13   due process rights of people who have not objected except for

14   the one priest to justify paying a retirement benefit to

15   someone who put holy oil on someone's genitals in some kind of

16   healing ceremony.  That's what we are talking about.  Now you

17   tell me how you're retaining employees for the purposes of your

18   reorganization by paying somebody like that.  If that's a

19   business judgment, I, I don't see it.  Good employees should be

20   retained.  Good employees who do what they're supposed to do

21   and not hurt kids and not neglect people and not abuse people

22   need to be encouraged to stay with this Archdiocese.

23          THE COURT:  Uh-huh (indicating an affirmative

24   response).

25          MR. STANG:  But people who do that sort of thing

1    should not be encouraged.  That is not a good business judgment

2    action --

3              THE COURT:  Well -- and --

4              MR. STANG:  -- to the good people in this Archdiocese.

5              THE COURT:  And the -- but -- but -- listen.

6              MR. MINTZ:  Your Honor?

7              MR. STANG:  And that kind of --

8              THE COURT:  But the Court's order says that those who

9    have, you know, "Any person against whom there have been

10   substantiated allegations of abuse of a minor or a vulnerable

11   adult, as identified in the 2018 report regarding clergy abuse

12   and published on the debtor's website," they don't get paid.

13   They don't get it.

14             MR. STANG:  Right.

15             THE COURT:  So wouldn't -- wouldn't --

16             MR. STANG:  And -- and -- and --

17             THE COURT:  Where -- that, that order is two years

18   old.  And I understand that, you know, the, the Committee has

19   received IRB reports.  I understand that and it sounds like

20   your issue is with the Archbishop who has the final say and who

21   goes on those, on the list.

22             But I'm looking at your proposed order in, that's

23   attached to the motion to compel.  And let's put aside Rule 60.

24   Let's put aside, you know, the constitutional arguments that

25   the debtor has made because like I said -- and those things are

1  important to the Court because the Court issued an order.  It's

2  a two-year-old order.  I'm not in the habit of voluntarily

3  going back and, and just, you know, redoing something just, you

4  know, the Court's orders have to be relied upon.  And so,

5  anyway.

6          So those -- I'm not minimizing Rule 60.  I'm not

7  minimizing, certainly not minimizing the constitutional

8  arguments made by the debtor, but I'm just looking at the order

9  that was attached and, you know:

10          "It is hereby ordered that" -- this is a proposed

11          order -- "the relief in the," "the relief requested in

12          the motion is granted.

13          No. 2:  Notwithstanding anything to the contrary set

14          forth in the Court's orders, the debtor is not

15          authorized to make payment to any credibly accused

16          person in respect of any pre-petition obligation,"

17          etc., etc.

18          How exactly would -- who is going to enforce that

19  order?  Is it me?  Is it -- am I now determining who's credibly

20  accused?

21          MR. STANG:  No.

22          THE COURT:  How --

23          MR. STANG:  No, your Honor.

24          THE COURT:  What does that look like?

25          MR. STANG:  Well, let me just make a point.  We got --

1   for priests who's the subject of Exhibit B, we got that file on

2   March 11, 2022.  For the priests identified in Exhibit E, we

3   got it July 2021.  For the priests identified in Exhibit I,

4   March 11, 2022.  For the priests identified in Exhibit J, July

5   2021.  So, you know, they knew what was in their Review files

6   when they showed up in your courtroom on the first day and they

7   didn't tell you about this and they knew what our concerns were

8   'cause our redline did not tie this to the list.

9          I am not asking you to make a credibility

10  determination of who should be or should not be on the list.

11          THE COURT:  Well, I --

12          MR. STANG:  I'm asking --

13          THE COURT:  The Court has to --

14          MR. STANG:  -- you to look at --

15          THE COURT:  -- enforce its own orders and I don't

16  understand how I'm going to enforce that if I can't -- if --

17  who is going to tell me that they're credibly accused?  You've

18  presented me with --

19          MR. STANG:  No.

20          THE COURT:  -- with discovery that you received from

21  the Archdiocese.  And I agree with you.  It's abhorrent, but --

22  so I've got six or seven priests now.  I'm supposed to look at

23  these IRB files and assert myself in the place of the

24  Archdiocese now to determine that not, not just substan -- now

25  it's not just someone who has allegations that can be

1    substantiated.  It's a broader term of credibly accused.  Who

2    is making that?  And I feel like you're asking me to make that.

3    I know, I hear you saying, "No, no, no.  I'm not asking you to

4    do that," but I don't understand how I m supposed to enforce

5    this order that you've put in front of me.

6           MR. STANG:  Your Honor, this is what I -- this --

7    well, we used the term "credibly accused" and it's a defined

8    term.  And so, perhaps, that shouldn't be the term.  It should

9    be identifying these men through an appropriate way 'cause of

10   the, of the confidentiality order.

11          But this is what we're asking you to do.  We're asking

12   you to determine that the payment of a pre-petition obligation

13   to these men is not warranted by the justifications that are

14   given in the wage motion or in any authority that justifies

15   payment of pre-petition claims.  You have the authority to do

16   that.  You have findings -- and we are not asking you to

17   somehow change the function of the Review Board.  The Review

18   Board's purpose is to make find, give advice to Archbishop

19   Aymond, but the fact that they made those conclusions is a fact

20   that you can consider when you determine if they have made the

21   showing necessary under the Bankruptcy Code to pay a pre-

22   petition obligation.

23          The debtor does not dispute that the Internal Review

24   Board made those findings and while Mr. Mintz holds out the

25   possibility that it could be changed and maybe someday, I mean,

1   he, he suggests -- he doesn't use their names or, or ID them --

2   that these very men could end up on the list.  Well, okay.

3   Maybe they will, maybe they won't.  That's not the point.  The

4   point is they have to make a showing that the payment of this

5   pre-petition obligation is warranted and frankly, the debtor --

6   and I'm not putting this on Mr. Mintz's lap -- the debtor knew

7   going into that hearing what the differences were between its

8   Internal Review Board processes and Bishop Aymond's

9   consideration of those and whether or not they were on the

10  list.  And frankly, a forthright debtor would have said,

11  "Judge, you need to understand the process we're going

12  through."

13        I mean, I don't -- you haven't had one of these cases

14  before and frankly, I've never had a case -- I have and I stood

15  up and I talked to you about this -- I have never -- we have --

16  we are not -- we -- I am not aware of the 17 or 18 of these

17  cases that I've done where a review board determination was

18  overridden by the bishop when they were maintaining a credibly

19  accused list.  Now not every diocese has a credibly accused

20  list, but that's why we had them in Buffalo.  We -- we -- we

21  had no inkling that the bishops were ignoring their review

22  board recommendations.

23        MR. MINTZ:  Your Honor, I'm, I'm sorry.

24        MR. STANG:  So -- so --

25        MR. MINTZ:  I, I really hate to --

1           MR. STANG:  I guess -- I guess -- we didn't know that.

2           MR. MINTZ:  -- interrupt Mr. Stang on this point, but

3  this is where it's getting beyond what the evidence is putting

4  in front of us or what we're actually asking for.  This is not

5  about that issue.  This is not about -- that's the entire

6  point.  It's not about what the Internal Review Board did or

7  didn't do.

8           We have a wage order, as your Honor has said.  They

9  knew from shortly thereafter 'cause your Honor required the

10 budget.  We started producing documents saying on -- we have

11 monthly operating reports that say what we're paying.  We have

12 bi weekly reports to BRG says what we're paying.  They know

13 what we are paying.  They knew we were paying, everyone in this

14 case has known what we were paying to priests.  That has been

15 extremely clear.  And so to say that this is out of the blue

16 and they have no way of knowing this, at this point, your

17 Honor, is getting a little bit farcical.

18          So, your Honor --

19          MR. STANG:  I'll tell you what's --

20          MR. MINTZ:  Your Honor, what I would really -- I -- I

21 -- and so at this point, of course, Mr. Stang can, can make the

22 arguments that he wants to make.  The problem is what we're

23 really talking about here is the order.  We're not talking

24 about what the investigation was, the process of the

25 investigation, how far the investigation is going to go.  If

 1  they need to do investigation as to that, the Committee needs

 2  to do so.  They have the tools to do it, but it's not through a

 3  motion to amend the wage order.

 4          THE COURT:  All right.

 5          Mr. Stang, final thoughts?

 6          MR. STANG:  Your Honor, we're not seeking to amend the

 7  wage order.  We are asking you to determine whether these pre-

 8  petition obligations should be paid.  The wage order did not

 9  authorize the payment of priest retirement obligations.  It

10  stopped them from making certain payments, but look at what

11  they asked for and they didn't ask for this.  And maybe that

12  was a mistake on behalf of counsel that their pleading didn't

13  ask for what their client wanted, but they didn't.

14          And so -- and, and I think the constitutional issue is

15  a total red herring.  It's a favored argument that religious

16  entities like to make to try to distract the court from what

17  its authority is and you have absolutely the authority to tell

18  this debtor what pre-petition payments it can or cannot make.

19          Thank you, your Honor.

20          THE COURT:  Okay.  Let me ask you this, Mr. Stang.

21  Surely you're not asking the debtor to stop paying all priest

22  retirement benefits under the, the Plan.  And I use "the Plan"

23  as a defined term that was in No. 7, the motion.

24          MR. STANG:  We are not, your Honor.

25          THE COURT:  No.  You're just asking for the carveout

1    for those who have had -- well, you know, in your proposed

2    order credibly accused.  In, in the Buffalo and in this Court's

3    order, you know, substantiated claims -- you know,

4    substantiated allegations against them.  You're just asking for

5    that carveout, correct?  Those --

6              MR. STANG:  Yes, your Honor.  That's --

7              THE COURT:  Those guys, those, those offending

8    priests.  According to the IRB and the Archdiocese, those,

9    those priests are the only ones that are carved out.  And I, I

10   guess my response is that's what we did.  That's what the order

11   says.

12             But I, I appreciate, you know --

13             MR. STANG:  Your Honor, we didn't do that.  Well, I

14   want to be clear.  The carveout we're asking for, just so we're

15   very clear 'cause, they are the priests identified in Exhibits

16   B, E, I, and J and Mr. Caine's declaration.

17             THE COURT:  Okay.

18             MR. STANG:  And what we did, what was done in the wage

19   motion, if you -- 'cause I'm, I've beaten the dead horse about

20   whether or not they asked for it in the wage motion -- but what

21   the wage motion carved out was people who had been put on the

22   list by Bishop Aymond.

23             THE COURT:  Right.

24             MR. STANG:  So that, that's what was done.  The Review

25   Board gave him a recommendation as to, you know, findings

1   regarding their particular conduct and he made a decision

2   whether or not to put them on the list.

3           THE COURT:  Right.  And that's the same --

4           MR. STANG:  That's --

5           THE COURT:  And that's the same in the Buffalo case as

6   well.  They tied it to --

7           MR. STANG:  Yes.

8           THE COURT:  -- the list.

9           MR. STANG:  Yes, that's -- yes, that's correct.

10          THE COURT:  And so the difference, according -- you

11  know, what you're, what you're asserting is the difference is

12  we didn't have these problems with a disagreement, you know.

13  We, we didn't foresee, we couldn't have foreseen.  We, it just

14  didn't happen.  We don't know.  We, you know, we're not privy

15  to the, the innerworkings of the Archdiocese in Buffalo, but we

16  suspect, according to your experience, that you didn't have a

17  recommendation by IRB that wasn't affirmed by the Archdi, the

18  Archbishop, correct?  We just didn't have that problem.

19          MR. STANG:  Yes, your Honor.

20          THE COURT:  And here --

21          MR. STANG:  We have not -- we're not -- we're not

22  aware of that.

23          THE COURT:  Right.  Right.

24          So that, that problem where there's a disconnect, an

25  alleged disconnect -- and I've -- I've -- like I said, I've

1   read all of the exhibits.  I, I know what we're talking about

2   and the disconnect that you're alleging between the IRB

3   recommendation and the fact that they didn't end up on the list

4   is solely attributable, as far as we can tell, to the

5   Archbishop and my concern is that you're asking me to replace

6   the Archbishop in that regard and essentially, in order to

7   comply with the order, put them on the list.  And that's,

8   that's my concern and that's what I need to think about.

9   Because --

10          MR. STANG:  I -- I guess -- I guess I'd put it this

11  way, Judge.  If you think that the only way under the, the

12  record in this case that these men can be, have their

13  retirement pay terminated is by putting them on the list, then,

14  yes.  I'm asking --

15          THE COURT:  Well --

16          MR. STANG:  -- you to do that, but I don't believe

17  that's the case.

18          THE COURT:  Well, there --

19          MR. STANG:  I believe --

20          THE COURT:  -- are other ways.  I mean, in order to

21  get around an order, you can move under Rule 60(b) and in this

22  case it would be 60(b)(6).  That's the catchall, you know,

23  depending on what you're asking.  It might, it might be

24  required -- I don't know.  I'd have to -- I wanted some more

25  clarification from you through this conversation about what

1   exactly is being asked before I made any sort of determination

2   on whether it falls under 7001 of the Bankruptcy Rules.

3          But definitely to unwind an order after two years, you

4   know, Rule 60 is the way to go.

5          But what I will say is that I'm not sure, even if we

6   were to go that route, I, I'm not sure that that the proposed,

7   the language in the proposed order is where I need to go,

8   either.  Because I would share the same concern that I did two

9   years ago, that the, the redline that was proposed by

10  counsel -- the Committee hadn't been formed yet -- but counsel

11  to some of the abuse claimants was overbroad, not limited.  I

12  was afraid that it wasn't tied to anything and I was afraid

13  that the Court would be responsible for making the

14  determination of who has, you know, substantiated or credible

15  allegations, you know, levied against them.  It didn't, you

16  know, the proposed language was, was not enforceable by this

17  Court and that was my concern.

18         MR. STANG:  Your Honor, I -- I under -- I understand

19  that and I guess if, if we could turn the, the clock back,

20  let's remember that the wage motion and the affidavits in

21  support of the first day motions make no reference at all to

22  any carveout for any retirement.  They don't mention that the

23  credibly -- I, I can't remember they mentioned the credibly

24  accused list at all, but it's certainly not in the context of

25  the justification for the relief under 105 to pay pre-petition

 1    claims.  It's silent on it.

 2              THE COURT:  Right.

 3              MR. STANG:  We came forward and it was us that put the

 4    redline in with the Locke Lord firm --

 5              THE COURT:  Yeah.

 6              MR. STANG:  -- and said, "Yeah, but there, there's an

 7    issue, by the way."  And they said, "Oh, okay.  Well, if you

 8    got that issue, now let's talk about the carveouts."  But they

 9    didn't come to you and say, "Hey, we've got people who our own

10    Archbishop admits are not providing any of the justifications

11    for paying pre-petition retirement, health, vacation," whatever

12    it is.

13              It's all about keeping employees.  That was their

14    justification.  They didn't come to you and tell you about the

15    warts.

16              THE COURT:  Well, like I said, you know, and I, I do

17    remember and I was grateful and I'm sure the, that class of

18    claimants was also grateful that the Locke Lord firm and your

19    firm were able to mobilize as quickly as they did to get here

20    on the first days and I appreciated the input.  And it was --

21    all of those first day motions were heavily litigated and we

22    had a model that, through the Arch, the Buffalo court.  We had

23    that model and we accepted that language.

24              So that, that's what we had.  And, you know, did we

25    have best information at the time?  Absolutely not.  Do we ever

1   have best information on first days?  Absolutely not.  We did

2   what we did based on the information that we had at the time.

3         What you're asking me to do, I have serious concerns

4   about at this stage because I'm, I'm not sure, one, I'm, I'm

5   more than a little concerned with the, the abstention doctrine

6   and if, if it's even applicable here, but I'm just concerned,

7   this Court is concerned with enforcing its orders and I want to

8   make sure that any order that, that it issues it can enforce

9   and I'm not sure what you're asking me to do is enforceable.

10  Because we would have to keep coming back over and over once we

11  get new information, new information, new information and

12  adding, adding someone to the list, which is exactly what

13  you're asking me to do.

14        So let me, let me think about it.  I would --

15        MR. STANG:  Okay.

16        THE COURT:  -- you know, I would ask the debtor to, I

17  would ask counsel to have a conversation with the client about

18  what we've heard today.

19        And in the meantime, I just need to give it some

20  serious thought, Mr. Stang, about how we can solve this

21  problem, okay?

22        MR. STANG:  Thank you, your Honor.

23        Again, I -- I just want -- I, I want to try to give

24  you an easier time.  We are not asking you to order Bishop

25  Aymond to put people on a credibly accused list.  And, and

1  honestly, if, if the effect of doing that means that those men

2  cannot perform religious functions, they're not, in a sense --

3  there's different words -- using faculties or perform

4  sacrament, that's the effect of that, I do think there's a

5  constitutional issue.  And that's why we have tried to stay

6  away from the notion that you are either ordering Bishop Aymond

7  to put someone on a list or you are putting him on the list.  I

8  think the Supreme Court has ruled that courts cannot determine

9  who is or is not a minister.  It, it was a non-Catholic

10  context.

11           I, I don't disagree with that.  That is why I tried to

12  focus this with respect to the bankruptcy world about, you

13  know, prepetition -- that's why I keep on saying "prepetition,"

14  you know.  That's -- 'cause I get the First Amendment.

15           So I just want you to appreciate, you know, when, when

16  I'm trying to make your life hard and when I'm not trying to

17  make your life hard.

18           THE COURT:  All right.  Well, thank you, Mr. Stang.

19           Mr. Mintz is standing.  Do you have any further --

20           MR. MINTZ:  I I'll let it, I'll let it go at the

21  moment, your Honor.

22           THE COURT:  All right.  Thank you.

23           All right.  I'll take this one under advisement.  I --

24  I really -- it requires serious thought and consideration, but

25  I appreciate the motion being filed and --

 1              MR. STANG:  Thank you.

 2              THE COURT:  Thank you.

 3              All right.  Mr. Mintz, is, are there any other issues

 4   for us today?

 5              MR. MINTZ:  I'm looking at Committee counsel.

 6              No, your Honor.  The -- at this point the agenda's

 7   concluded.

 8              THE COURT:  Okay.  So unless you have any emergency

 9   motions or other things that we're going to hear, we'll, during

10   the course of the next few weeks, we'll see you on June 16th at

11   our next omnibus hearing date.

12              MR. MINTZ:  I believe, actually, the next, your Honor,

13   is a, there is a motion set for June 8 on a motion to lift

14   stay.

15              THE COURT:  Okay.

16              MR. MINTZ:  Just so your Honor, everyone is, is aware

17   of that.

18              But further, your Honor, I just wanted to clarify.

19   There was confusion the last time about which dates we're all

20   going to be via video.

21              THE COURT:  Oh, yes.

22              MR. MINTZ:  Just to be clear so we could clarify that.

23              THE COURT:  Yeah, let me see.  All right.

24              MR. MINTZ:  Is it the June 16 one or is it the July

25   date?  I think you said July 14, which was not one of our

 1    dates.  That's why it was --

 2              THE COURT:  Yes.  So what I have on my calendar is

 3    that I will be here, physically present on the 16th.

 4              MR. MINTZ:  On June 16th, your Honor?

 5              THE COURT:  June 16th, yes, as well as the 8th.

 6              But I will not be physically present on July 14th.

 7              MR. MINTZ:  What about July -- well, that's not one of

 8    our dates.

 9              THE COURT:  Or July -- I don't know why this one's on

10    -- oh.  That's another deadline.  I'm sorry.  That's another

11    deadline in this case.

12              Yeah, it's the 21st.

13              MR. MINTZ:  Okay.  So you --

14              THE COURT:  So --

15              MR. MINTZ:  -- will not be here --

16              THE COURT:  -- I will not be physically present.

17              So we will --- everyone will be on the phone on July

18    21st.

19              MR. MINTZ:  Thank you, your Honor.

20              THE COURT:  All right.  Thank you very much.

21              We're adjourned.

22              COURT SECURITY OFFICER:  All rise.

23         (Proceedings concluded at 3:30 p.m.)

24

25

1                          CERTIFICATE

2          I, court approved transcriber, certify that the

3     foregoing is a correct transcript from the official electronic

4     sound recording of the proceedings in the above-entitled

5     matter.

6     /s/ *Janice Russell*                    May 23, 2022

7     Janice Russell, Transcriber               Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25