**CASE NO. 22-1740, SECT. "T"(3)**
**consolidated with CASE NO. 22-4101**
———————————————

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
———————————————

**IN RE ROMAN CATHOLIC CHURCH**
**OF THE ARCHDIOCESE OF NEW ORLEANS**
———————————————

**CIVIL APPEAL FROM ORDERS**
**OF THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**
**CASE NO. 20-10846, SECT. "A"**
**HON. MEREDITH S. GRABILL, BANKRUPTCY JUDGE**
———————————————

**CONSOLIDATED REPLY BRIEF**
**ON BEHALF OF APPELLANT RICHARD C. TRAHANT**

# UNDER SEAL

*FILED UNDER SEAL PURSUANT TO SEALING MOTION*
*AND PROPOSED ORDER FILED ON MARCH 10, 2023*

**RESPECTFULLY SUBMITTED,**

**RICHARD C. TRAHANT (#22653)**
**ATTORNEY AT LAW**
**2908 Hessmer Avenue**
**Metairie, Louisiana 70002**
**(504) 780-9891**
**trahant@trahantlawoffice.com**

**- and -**

**PAUL M. STERBCOW (#17817)**
**Lewis, Kullman, Sterbcow &**
      **Abramson**
**601 Poydras Street, Suite 2615**
**New Orleans, Louisiana 70130**
**(504) 588-1500**
**sterbcow@lksalaw.com**

**- and -**

**JACK E. MORRIS (Bar No. 22539)**
**JACK E. MORRIS, ATTORNEY**
      **AT LAW, LLC**
**4051 Veterans Boulevard, Suite 208**
**Metairie, Louisiana 70002**
**(504) 454-2769**
**jem@jemorrislaw.com**

***Attorneys for Appellant***
***Richard C. Trahant***

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    1.    The Archdiocese failed to address numerous significant legal issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    2.    Jurisdiction remains paramount . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    3.    The appellee brief contains many misrepresentations . . . . . . . . . . . . 9

    4.    The sealed status conferences tainted the UST investigation . . . . . . 20

        a.    The February 11, 2022 sealed status conference . . . . . . . . . . 22

        b.    The March 11, 2022 sealed status conference . . . . . . . . . . . . 23

        c.    The April 14, 2022 sealed status conference . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# TABLE OF AUTHORITIES

## *Statutes*

11 U.S.C. § 105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

11 U.S.C.§ 107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

28 U.S.C. § 158 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fed. R. Civ. P. 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fed. R. Bankr. P. 8001 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fed. R. Bankr. P. 8015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

LR 83.4.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## *Cases*

*A.A. Doe v. Roman Catholic Church of The Archdiocese of New Orleans*, 2022 WL 16712878 (E.D. La. 2022) . . . . . . . . . . . . . . . . . . . . . . 12

*Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410 (5th Cir. 2021) . . . . . . . . 12

*Cinel v. Connick*, 15 F.3d 1338 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . 13

*Father M v. Various Tort Claimants (In re Roman Catholic Archbishop)*, 661 F.3d 417 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Friou v. Phillips Petroleum Co.*, 948 F.2d 972 (5th Cir. 1991) . . . . . . . . . 5

*June Med. Servs., L.L.C. v. Phillips*, 22 F.4th 512 (5th Cir. 2022) . . . . . . . 12

*New York v. Ferber*, 458 U.S. 747 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980) . . . . . . . . . . . . . . . . 15

*Rutter v. Conseco Life Ins. Co.*, 2011 WL 2532467 (S.D. Miss. 2011) . . . . 5

**MAY IT PLEASE THE COURT:**

Appellant Richard Trahant, through undersigned counsel, respectfully submits this brief in reply to the consolidated brief filed by the Archdiocese of New Orleans on March 6, 2023, and in further support of his own original brief filed on February 24, 2023.[1]

### 1.   *The Archdiocese failed to address numerous significant legal issues.*

The failure to address an argument raised by an appellant constitutes a concession of the issue. *Friou v. Phillips Petroleum Co.*, 948 F.2d 972, 974 (5th Cir. 1991) ("[The issue] is not discussed in their briefs. A party who inadequately briefs an issue is considered to have abandoned the claim"); *Rutter v. Conseco Life Ins. Co.*, 2011 WL 2532467, at *5 (S.D. Miss. 2011) ("The [Plaintiffs] apparently concede the issue, having failed to address it in their Response").

The Archdiocese wholly failed even to respond to the following legal arguments advanced by Mr. Trahant in his original brief:

- • Documents and testimony that were not admitted into evidence were not properly considered by the Bankruptcy Court and cannot be considered

---

[1] As the Archdiocese was not the movant resulting in the Orders being reviewed, it is unclear whether its status is that of an appellee in this matter. The U.S. Trustee, which effectually "prosecuted" this matter, has filed nothing in these appeals.

on appeal (Orig. Br. pp. 14, 18, 29-30, 38-39, 58-59).[2]

- The $400,000 sanction against Mr. Trahant was a criminal contempt order, which required heightened safeguards that he was not provided (Orig. Br. pp. 31, 33-34, 57-58).

- Bankruptcy courts lack the power to impose sanctions so punitive that they amount to a finding of criminal contempt (Orig. Br. pp. 29, 33-34, 55-58).

- The Bankruptcy Court failed to conduct a "case-by-case, document-by-document, line-by-line" examination of any documents to determine whether their mere designation as "confidential" by the Archdiocese justified depriving the public of access to them (Orig. Br. pp. 17, 19-20, 30, 50-51).

- The Bankruptcy Court failed to identify what document(s) Mr. Trahant supposedly disclosed information from, and it made no finding that this unidentified document(s) was truly "confidential" in the first instance as required by law (Orig. Br. pp. 30, 51).

- The Bankruptcy Court failed to apply the law on mitigating circumstances when Mr. Trahant's undisputed purpose for his actions was to have a child predator removed from a high school campus (Orig. Br. pp. 31, 56).

- The Bankruptcy Court engaged in no analysis of whether the sanction it issued was the least severe sanction adequate to achieve its purpose (Orig. Br. pp. 31, 54-56).

- The Bankruptcy Court did not analyze whether the expenses it awarded were reasonable, as opposed to self-imposed, and mitigatable (Orig. Br.

---

[2] The Archdiocese falsely states at pages 28 and 29 of its brief that the "evidentiary record" includes the UST Report and attachments, transcripts of the sealed status conferences, and invoices submitted by professionals. This is a blatant misrepresentation to this Court as none of this was admitted into evidence.

pp. 31, 55-57).

- The Bankruptcy Court cited statements from counsel for the Archdiocese regarding the supposed harm that has been caused by the so-called breach of the Protective Order as evidence although they clearly are not (Orig. Br. pp. 31, 47-48).

- Other than to call it "nonsensical," the Archdiocese did not address the fact that it "waived any purported confidentiality" in the information it disclosed to specific third parties as established by the testimony and case law (Orig. Br. pp. 49-51 and notes 16-17).

- In its October 11, 2022 Order, the Bankruptcy Court invoked Fed. R. Civ. P. 37(b) for the first time, in addition to the "inherent authority" under 11 U.S.C. § 105(a) that it first invoked in the June 7, 2022 Order (R1 33-2 p. 548; R2 2-11 pp. 422-26), without specifying which portions of the sanctions award are attributable to what alleged rule violations (Orig. Br. p. 53).

Having failed to address any of these legal arguments in its appellee brief, the Archdiocese has abandoned them and conceded the correctness of Mr. Trahant's briefing of these issues.

## 2. *Jurisdiction remains paramount.*

In its "Jurisdictional Statement," the Archdiocese writes regarding Mr. Trahant's appeal of the Bankruptcy Court's June 7, 2022 Order, "However, this Court lacked jurisdiction over that appeal" (Appellee Br. p. 1). This Court previously denied the Archdiocese's motion to dismiss based on this same jurisdictional argument (Rec. Doc. 32), and the Archdiocese has never challenged that Order. The question is one

of law: whether this Court has appellate subject matter jurisdiction of these consolidated appeals pursuant to 28 U.S.C. § 158(a), LR 83.4.2, and Fed. R. Bankr. P. 8001 *et seq.* because the Bankruptcy Court issued final Orders finding contempt and imposing sanctions against Mr. Trahant, a nonparty, on June 7, 2022 (R1 33-2 p. 544-48) and October 11, 2022 (R2 2-11 pp. 400-29). With respect to the June 7, 2022 Order, this Court expressly resolved that question in the affirmative, and the same jurisdictional basis exists for the October 11, 2022 Order.

The Archdiocese effectively concedes that if this Court has appellate jurisdiction over the appeal of the June 7, 2022 Order, then the Bankruptcy Court was divested of jurisdiction to render the October 11, 2022 Order by admitting, "Because Mr. Trahant did not seek leave to appeal the June 7, 2022 Order, this Court lacked jurisdiction over the appeal, and the Bankruptcy Court was not divested of jurisdiction concerning the June 7, 2022 Order" (Appellee Br. p. 2).[3] Conversely and undoubtedly, because this Court does have appellate jurisdiction over the appeal of the June 7, 2022 Order, then the Bankruptcy Court was divested of jurisdiction to render its October 11, 2022 Order.

---

[3] Contrary to the Archdiocese's representation, Mr. Trahant expressly sought leave to appeal in the alternative and briefed that request at length in his opposition to the Archdiocese's motion to dismiss (R. Doc. 30 pp. 10-15).

Again, jurisdiction is paramount, and the Bankruptcy Court had no jurisdiction to render the October 11, 2022 Order. Any analysis of the validity of the October 11, 2022 Order should end here.

### 3. *The appellee brief contains many misrepresentations.*

The Archdiocese makes a significant misrepresentation to this Court by stating that Mr. Trahant suggested "that the UST did not find any wrongdoing" (Appellee Br. p. 32 n.21). What counsel for Mr. Trahant actually wrote was, "The UST did not find that Mr. Trahant knowingly and willfully violated the protective order. (SR2 2-16 p. 481 *ll.* 24-25)." These are two drastically different statements. In fact, as set forth in Mr. Trahant's original brief, a statement made on the record by the Bankruptcy Court supports the fact that Mr. Trahant firmly believes he did not violate the Protective Order:

> Q       ... And I also read in your deposition that (1) it became clear that you didn't think that you had violated the protective order and I would, I would just invite you -- and I think it came through that in the, in your deposition and in the text messages and all of the exhibits that I reviewed, it came, it came through that you didn't take physical documents and hand them over, but I would invite you to consider the fact that you took name and the information that you had about him – and you said you were very concerned. You had a good reason.

(SR2 2-16 p. 484) (Emphasis added).

The Archdiocese writes that the Bankruptcy Court's findings in the June 7, 2022 Order were "reconfirmed" by evidence submitted at the Show-Cause hearing (Appellee Br. p. 3). This simply is not true, especially in light of the statement by the Court referenced in the previous paragraph. And although both the Bankruptcy Court in its October 11, 2022 Order and the Archdiocese in its brief are liberal with the use of the phrases "bad faith" and "concealment," there is no evidence of bad faith on Mr. Trahant's part or that he concealed anything. Any nebulous finding of "bad faith" is in conflict with Mr. Trahant's consistent testimony and with the statement above by the Bankruptcy Court itself. Moreover, the Archdiocese filed a motion for sanctions that was pending practically for this entire time period. If the Bankruptcy Court would not speak to Mr. Trahant and the Archdiocese would not speak to Mr. Trahant, what exactly was Mr. Trahant supposed to do?

The Archdiocese references "certain highly confidential documents" and "sensitive and highly confidential information" (Appellee Br. p. 8). Once again, there is no proof whatsoever that any of these documents or information were confidential, much less sensitive and highly confidential. No such finding ever has been made relative to any specific document by any court. Further, contrary to what the Archdiocese writes, there is no proof that Mr. Trahant allegedly "had contacted the principal of the school multiple times regarding Protected Material" (Appellee Br. p.

9). Mr. Trahant does not understand the capitalization of "Protected Material," but any such details of ███████ sexual abuse of a minor came from ███████ and ███████ -- period. Everyone seems inclined to ignore these inconvenient facts, but if the ███████████ personnel had testified at an evidentiary hearing, this would have been crystal clear.

In the April 25, 2022 Order quoted by the Archdiocese (Appellee Br. p. 10), the Bankruptcy Court used the phrase "possibility of intentional dissemination" (R1 33-2 pp. 344). This is utterly contradicted by the statements the Bankruptcy Court made during the sealed status conferences that established the Court already had concluded that there was a Protective Order violation, and that Mr. Trahant was the alleged culprit.

Once again, the Archdiocese references the UST report, which it knows was not admitted into evidence (Appellee Br. p. 11 n.13). But even if it had been, Mr. Trahant takes great issue with the statement that the Report reflects the discovery and examinations (depositions) -- it does not. In fact, the June 7, 2022 Order does not even reflect the UST Report accurately. But because the report was not admitted into evidence, it requires no further comment.

The Archdiocese references the June 7, 2022 Order finding of knowing and willful conduct (Appellee Br. p. 12). But what conduct was knowing and willful? A

-11-

finding of bad faith is not exactly equal to what the Bankruptcy Court described as "planting a seed" (SR2 2-16 p. 485). The Archdiocese also refers to the Bankruptcy Court's decision to remove Mr. Trahant's four clients from the Committee a "Hobson's choice" (Appellee Br. p. 12). But as seen from the content of the sealed status conferences, counsel for the Archdiocese knew that this was not a "Hobson's choice," but a "nuclear option" and a choice the Bankruptcy Court had made long before any investigation even commenced. Finally, the Archdiocese references the Bankruptcy Court's unsealing of Mr. Trahant's deposition on the same day that it rendered its October 11, 2022, but gives no explanation as to why none of the other depositions taken in the UST investigation were unsealed, or why Mr. Trahant's deposition was so heavily redacted (Appellee Br. p. 12 n. 14).

In an attempt to explain the Bankruptcy Court's rampant sealing and redacting of documents, the Archdiocese completely ignores the leading Fifth Circuit and Louisiana Eastern District cases on this issue (Appellee Br. pp. 15-16) -- *Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410 (5th Cir. 2021); *June Med. Servs., L.L.C. v. Phillips*, 22 F.4th 512, 519-20 (5th Cir. 2022); and *A.A. Doe v. Roman Catholic Church of The Archdiocese of New Orleans*, 2022 WL 16712878 (E.D. La. 2022) (Morgan, J.).

Footnote 16 of the Archdiocese's brief requires some scrutiny because while purporting to set forth the law on sealing documents, ignores both Fifth Circuit and Louisiana Eastern District precedent. A Bankruptcy Court is not exempted by simply citing 11 U.S.C.§ 107 and broadly stating that thousands of pages of documents are "scandalous or defamatory." It cannot seriously be disputed that these depositions and documents at issue in this case concerning "sexual abuse of minors by priests" are a legitimate subject of public interest. *See, e.g., Father M v. Various Tort Claimants (In re Roman Catholic Archbishop)*, 661 F.3d 417 (9th Cir. 2011); *Cinel v. Connick*, 15 F.3d 1338 (5th Cir. 1994) (discussed *infra*). The court in *Father M* stated it plainly: "The public does, however, have a weighty interest in public safety and in knowing who might sexually abuse children." 661 F.3d at 428 (citing *New York v. Ferber*, 458 U.S. 747, 756-63 (1982)). The Archdiocese actually cited the *Father M* case in this footnote, but it does not stand for the proposition the Archdiocese believes it does.

The Archdiocese argues that Mr. Trahant did not object to the reasonableness of the invoices "filed in response to the Show-Cause Order" (Appellee Br. pp. 15-16). Surely these lawyers know better -- simply filing something does not make it evidence. Mr. Trahant was given no opportunity to challenge the authenticity or accuracy of these statements by way of cross-examination because none of these invoices were offered or accepted into evidence much less authenticated.

-13-

The Archdiocese's response to Mr. Trahant's deprivation of due process regarding the June7, 2022 Order is laid bare (Appellee Br. p. 19). The Archdiocese attempts to retroactively manufacture due process essentially by arguing that Mr. Trahant had notice that he was a "potential target" and had "an opportunity to defend himself." Glaring in its omission is Mr. Trahant's right to a hearing. Moreover, Mr. Trahant was never told that he was a "potential target," verbally or in writing. And for the Archdiocese to claim that Mr. Trahant had "an opportunity to defend himself" ignores everything that every lawyer knows about defending oneself in a criminal or civil case. The proceedings were held in secret, Mr. Trahant could not attend, he could not engage in discovery, he could not present evidence in his defense when others were questioned, he could not cross-examine witnesses, and none of these depositions or documents were introduced into evidence. These things resulted in the exact opposite of "an opportunity to defend himself."

The Archdiocese references Mr. Trahant's alleged "untenable excuses for violation of the Protective Order" (Appellee Br. p. 19). Mr. Trahant makes no excuses, and the main reason for his actions was to remove a child predator from a school campus, which is exactly what ended up happening, and ██████████ thanked him for it. For the Archdiocese to call this reason "untenable" reveals its position on protecting children from child predators.

-14-

Likewise, the Archdiocese's assertions that the Bankruptcy Court "properly calculated the sanctions award" and that it was a "reasonable, civil contempt sanction" ignore reality (Appellee Br. p. 20). This is a staggering sanction with no explanation of how 53% was calculated.

The Archdiocese acknowledges that the sanction is intended to "penalize" Mr. Trahant when it cites *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763-64 (1980) (Appellee Br. p. 22). As thoroughly set forth in Mr. Trahant's original brief (R. Doc. 79 p. 57-58), if even part of the sanction is intended to punish, then it is a criminal sanction.

The Archdiocese quotes and emphasizes a statement that the Bankruptcy Court made at the beginning of the Show-Cause hearing: "Of course, no sanctions have been awarded yet" (Appellee Br. p. 23 n.17). But it is beyond dispute that the June 7, 2022 Order sanctioned Mr. Trahant by removing him from the Committee, having his clients punished, losing access to the documents produced to the Committee, and playing a role in Committee functioning including but not limited to mediation. Also, the Archdiocese improperly caused the June 7, 2022 Order to be mailed to over 16,000 people (R2 2-8 pp. 144-300; R2 2-9 pp. 1-437). Maybe more important, the Archdiocese conflates Mr. Trahant being sanctioned with being found in violation of a protective order. Both require due process and a hearing, but there is nothing the

Archdiocese can do or say to atone for these due process violations relative to the June 7, 2022 Order.

In the second bullet point on page 27, the Archdiocese acts as if Mr. Trahant was "concealing" things during hearings and status conferences. Once again, this is inaccurate. By the March 17, 2022 hearing/status conference, Committee counsel were aware of Mr. Trahant's communications with ███████████ and ███████████ as Mr. Trahant testified during the Show-Cause hearing. By the time of the April 14, 2022 status conference, the Court already had Mr. Trahant's Declaration and ███████ ███████ discovery responses, so there was nothing to "conceal."

The Archdiocese also engages in some significant omission in the second to last bullet point on page 27. The Archdiocese fails to tell this Court what it knows from the sealed status conferences, and what Mr. Trahant learned from the unsealing of the transcripts of those status conference transcripts described below -- that the entire idea of having the UST conduct this investigation was Mr. Mintz's idea. This is likely because the Archdiocese did not want a fair and open process which would result in the ███████████ and ███████████ testifying in open court and subject to real cross-examination. Moreover, with respect to footnote 19, every word of the Trahant Declaration is true.

-16-

The arguments the Archdiocese presents at pages 28-29 are difficult to read because instead of acknowledging that none of these things were offered or accepted into evidence and being forthright with this Court, the Archdiocese speaks of "The evidentiary record" knowing full well that NONE of these things were admitted into evidence. Also, despite Mr. Trahant's counsel's prophylactic objection to the UST Report at the August 22, 2023 hearing, this was not enough of a signal to the UST, the Archdiocese, or the Bankruptcy Court to introduce or accept the report into evidence. The Archdiocese also cites to Mr. Trahant's deposition, which was not admitted into evidence.

In response to being called out because it has no factual or legal support for its failure to introduce evidence, the Archdiocese calls it "preposterous" that Mr. Trahant challenges its reliance on things that were not introduced into evidence. What is preposterous is for experienced attorneys to rely on things that were not introduced into evidence, but then to pretend like they are part of "The evidentiary record."

The Archdiocese contends that Mr. Trahant's not knowing a specific date he had not been asked about previously, but testifying he probably could pinpoint, constitutes "equivocation" and "deflection" (Appellee Br. pp. 30-31). If not remembering a specific date constitutes equivocation and deflection, every lawyer on the planet must equivocate and deflect. Likewise, the Archdiocese cites to statements

-17-

made by the Bankruptcy Court about "buts" in his deposition (Appellee Br. p. 32). Of course, neither the Archdiocese nor the Bankruptcy Court gave a single example of this, Mr. Trahant's deposition is not in evidence, and amazingly, the Archdiocese declined to cross-examine Mr. Trahant.

> The Archdiocese writes:
>
> The Bankruptcy Court, as the finder of fact, reasonably determined that Mr. Trahant's testimony was inconsistent with the timeline of events and the manner in which Committee counsel investigated the breach. In other words, the Bankruptcy Court concluded that if Mr. Trahant properly had informed Committee counsel about what had actually transpired, then there would have been no need for a costly, months-long investigation into the breach of the Protective Order.

(Appellee Br. p. 32). Again, there is no timeline of events in evidence or otherwise. Mr. Trahant's unchallenged testimony was that he informed Committee counsel (Kuebel, Knapp, Stang, Caine) about his communications with ███████████ and ███████ s prior to the February 11, 2022 status conference. Not only was he not challenged on this, but also Mr. Knapp was present in the courtroom and easily could have challenged any of Mr. Trahant's testimony. Significantly, Mr. Knapp's only objection came when the Bankruptcy Court asked Mr. Trahant when he disclosed his actions to Committee counsel. Also, the Bankruptcy Court easily could have asked Mr. Knapp whether he disputed Mr. Trahant's testimony.

Regarding the bullet points on page 36, all of this would have been done through the Archdiocese's pending motion for sanctions and evidentiary hearing that were pending at all times referenced in these bullet points. It is incredibly ironic that the Archdiocese makes these accusations against the backdrop of its own concealing of the many communications between ███████████, ████████, and several individuals at █████████. These competing interests are why there should have been fair discovery and an evidentiary hearing.

In footnote 24 at page 38, the Archdiocese contends that Mr. Trahant has waived arguments about the alleged "reasonableness of the sanctions award" because he failed to raise it in the Bankruptcy Court. Mr. Trahant had no idea what the sanctions award might be, or certainly that it would be so punitive and excessive, until the Order was rendered on October 11, 2022. And now he is appealing that Order. Mr. Trahant is at a loss to understand in what other way he could challenge a $400,000 sanction against him. There is no requirement that he move for reconsideration in order to preserve the issue for appeal.

In its brief, the Archdiocese uses clever language like "invoices submitted" or "invoices filed" (Appellee Br. p. 39 n.25). The Archdiocese is clearly evading and refuses to address head-on the fact that none of these invoices were offered or

-19-

accepted into evidence, authenticated in any manner, or subject to cross-examination by Mr. Trahant's counsel.

Again, without addressing the legal argument that the $400,000 sanction is a criminal sanction, the Archdiocese merely states that it "constitutes a civil contempt sanction" (Appellee Br. p. 40 n.27).

And finally, the Archdiocese repeatedly uses the word "deter" and derivations of it throughout its brief. But based on the totality of the circumstances and facts, the Bankruptcy Court clearly intended to punish and in fact punished Mr. Trahant, and it has done so in an irreparable manner regardless of the outcome of this appeal.

### 4. *The sealed status conferences tainted the UST investigation.*

In spite of this heavily sealed and redacted "investigation" process, the Archdiocese filed its brief without redacting a single word. The Archdiocese's failure to discuss the contents of thousands of pages of sealed records is a tacit admission that this entire secret process was flawed. Indeed, of the many individuals who were deposed and provided documentation to the UST, only Mr. Trahant's name is mentioned in the Archdiocese's brief.

The Archdiocese refers to the UST investigation as "extensive" and "independent" (Appellee Br. p. 3). It was neither. Moreover, Mr. Trahant was

completely excluded from this process with the exception of being present at his own deposition.

Again, the UST report is not in evidence, but because the Archdiocese has touted this report, Mr. Trahant is forced to reply by highlighting the events that led to and impaired this entire process. The hallmark of any impartial investigation is a completely independent investigator, not one who knows what the outcome is supposed to be.

In conformity with these secret Bankruptcy Court proceedings and the unexplained sealing of most documents on this issue, the Bankruptcy Court released the transcripts of the sealed status conferences (only 3 of the 4 were transcribed) nearly two months after Mr. Trahant testified at the August 22, 2022 Show-Cause hearing (R2 2-11 pp. 166-329). This information was concealed from Mr. Trahant until after he was sanctioned; this is not due process.

There was no explanation as to the timing of this limited unsealing or the copious redactions in the documents that were unsealed. But the information contained in these transcripts is absolutely stunning, and it was information Mr. Trahant should have had in advance of either of the Orders in this appeal.

The Bankruptcy Court made its decision to target Mr. Trahant and remove his clients from the Committee before any investigation, and the Bankruptcy Court

tainted the investigation with its conclusory statements in front of the UST, Amanda George, who consequently could not have been a fair or neutral investigator.

It is important to note that as of the times of these sealed status conferences and at any time since, there was absolutely no evidence or even a suggestion that the Committee was not functioning well. Regardless, a motion by the Archdiocese with no evidence was enough for the Bankruptcy Court and the UST to start musing about reconstituting the Committee as the unsealed transcripts reflect.

### a.    The February 11, 2022 sealed status conference

During this conference, the Bankruptcy Court referenced a long-held suspicion that "something else is going on" since the "start of this case" (R2 2-11 pp. 185-86). The Court did not explain its suspicion or what caused the Court to develop such a suspicion since the "start of this case." In discussing Mr. Gisleson's e-mail to the Court, the Court was particularly critical of Mr. Trahant and his co-counsel stating at one point, "But what you can't do is use information that you get through the committee process under that tent and then use it, you know, for your own client's benefit, your own aims" (R2 2-11 p. 187). There was not then, nor is there now, any evidence to support this statement. The entirety of the exchanges about Mr. Gisleson's e-mail depict the Court's bias toward Mr. Trahant and his co-counsel (R2 2-11 pp. 185-90).

Incredibly, the UST, who the Court later appointed to conduct an "independent" investigation, stated, "And so we are interested in the outcome of the investigation to the extent we need to look at the Committee membership and make any adjustments if necessary" (R2 2-11 p. 211). The UST essentially had jumped past the investigation and straight to the punishment – "adjustment" of the Committee.

However, maybe the most important thing discussed during this status conference was that an evidentiary hearing would be required before it could be determined whether there was a Protective Order violation. The Court stated, "Well, like I said, there's not a -- this is not set for hearing much less an evidentiary hearing" (R2 2-11 p. 214). Indeed, the Court well knew it could not render such an order without an evidentiary hearing. "However, we'll talk about the parameters of that evidentiary hearing when it comes," the Court stated. "You know, the Committee can put on, you know, its witnesses including everybody that's under your tent and line them up and do whatever we need to do" (R2 2-11 p. 217).[4]

### b.   The March 11, 2022 sealed status conference

Mr. Mintz made an astute observation at the beginning of this conference: "just because somebody said something to ████████ doesn't mean they're the ones who said it to the newspaper and we know that" (R2 2-11 p. 4). Unfortunately,

---

[4] All emphases in quotations from the sealed transcripts have been added.

nobody seemed to remember this when Mr. Trahant was the sole person found to have violated the Protective Order and sanctioned massively.

Both shocking and disappointing is a statement made by the Bankruptcy Court: "the fact that someone picked up the phone and called ███████ is a violation of the protective order" (R2 2-11 p. 5). Clearly, no investigation was necessary; the Court had made up its mind that there had been a violation irrespective of the reason the person called ███████ or what was said. This was never going to be a fair investigation.

And although this issue had dragged on for two months at this point, counsel for the Archdiocese admitted, "So, you know, we probably could have short circuited it by just doing a deposition" (R2 2-11 p. 231). This concession is critical in light of Mr. Trahant being solely blamed for the delay in resolving this.

Another surprising revelation is that counsel for the Archdiocese admitted that the Bankruptcy Court had not even seen the documents on which the ████ article was based at the time the Court was making these conclusory statements (R2 2-11 p. 235).

The Bankruptcy Court then began to muse about reconstituting the committee and getting rid of certain lawyers: "we can reconstitute the Committee and get new

counsel." And when asked if she was aware of that as an option, UST Amanda George responded, "Absolutely, Your Honor" (R2 2-11 p. 243).

The Bankruptcy Court then telegraphed exactly what it wanted the outcome of this investigation to be: "Because then, you know, the Committee from -- you know, theoretically would be solved aside from a breach with the new Committee. But, you know, it's a harsh option because there are people on the Committee that didn't do the breach. Right? And they're out" (R2 2-11 p. 244). The Court then made a statement that is completely at odds with Fifth Circuit precedent: "I don't even want to know why they did it, just that they did it. They violated the Protective Order" (R2 2-11 p. 244).

Indeed, the Bankruptcy Court blasted right past an investigation and any due process and engaged in speculation about who had contact with The Advocate:

> I fully understand the predicament that these Committee members are in and their service to this process, but it's service to the process. Okay. And if you want to get through a reorganization, calling up The Advocate ain't going to get us there.
>
> And so, yes, I understand it's a nuclear option. Believe me. But I have to protect this process and enforce court orders. And a moment's worth of frustration or whatever you want to call it and picking up the phone destroys this process. Okay?

(R2 2-11 p. 247). And if there was any ambiguity as to what the Court was talking about, the Court cleared it up: "The nuclear option is reconstituting the Committee"

(R2 2-11 p. 252). Shortly thereafter there was an unexplained off-the-record discussion (R2 2-11 p. 252).

### c.    The April 14, 2022 sealed status conference

By the time of this status conference, Mr. Trahant had been identified in ███████████ written discovery responses as one of the individuals who communicated with ██████████ . He also had submitted a Declaration, though the Court had not read it at that time. Mr. Mintz began this conference by identifying Mr. Trahant as the individual who contacted ██████████ , but he glossed over ██████████ and ███████ significant communications with ██████████ as "other communications between the Archdiocese and ████ which we would have expected" (R2 2-11 p. 256). The Bankruptcy Court admitted that it had not seen the Declarations filed into the record (R2 2-11 p. 258).

Mr. Mintz then suggested to the Court how he would like this matter to be addressed, first stating that the Court had enough to issue an order to show cause (R2 2-11 p. 265). Again, the Archdiocese acknowledged that there should have been a hearing. Mr. Mintz then suggests that the UST investigate and that the parties can participate (R2 2-11 p. 265). Mintz then says, "I'm uncomfortable honestly with the Debtor being in a position of prosecuting this in this way at this point" (R2 2-11 p. 265). Although the Archdiocese started this saga, Mr. Mintz now wanted someone

else to prosecute it. After suggesting that the UST conduct the investigation, Mr. Mintz stated that is what "we're recommending at this point" (R2 2-11 p. 268).

Mr. Kuebel, Committee bankruptcy counsel, attempted to discuss the communications between ▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ (R2 2-11 pp. 274-75). But despite having read ▮▮▮▮▮▮▮ discovery responses, <u>the Bankruptcy Court did not know who</u> ▮▮▮▮▮ <u>was</u> (R2 2-11 pp. 274-75). This demonstrates that before any investigation, the Court was focused on Mr. Trahant to the exclusion of all others.

In response, the Bankruptcy Court stated: "<u>I already told you what I was prepared to do.</u> Let's just cut to the chase and, you know, just so it and get on with it. <u>Because the process to me is more important than anybody that sits on the Committee, you know</u>" (R2 2-11 p. 277). Of course, Mr. Trahant respects the process, but victim-survivors of childhood sexual abuse, and protecting children from such abuse, are most important to him.

The Court then posed questions, which Mr. Trahant gladly would have answered and in fact already had answered in his filed Declaration: "Like why did he call up? Is it because it's relative? Is it because he wasn't satisfied with the speed of the turn around with the process? Like why did he feel the need to pick up the phone?" (R2 2-11 p. 278). "I've always had these concerns, and I have no patience for it" (R2 2-11 p. 280).

Ms. George said she had not seen the ████████ discovery responses, but that Mr. <u>Mintz</u> "explained what the responses said in summary ... the contacts were made by Mr. Trahant.... So we were informed that <u>it</u> was Mr. Trahant <u>and I reported that information immediately</u>" (R2 2-11 p. 285). This is disturbing, first because Mr. Mintz gave Ms. George *his* version of the responses with no mention of the communications between ████████████ or ████████, and second because Mr. Trahant has no idea to whom Ms. George "reported" this. Was it to the Court *ex parte*, and did Ms. George omit any reference to ████████ and ████████, just as Mr. Mintz would have wanted conveyed to the Court?

Ms. George then inquired about the scope of any investigation: "To the point of us taking over the investigation, whatever investigation that is, I'm not sure what the end goal is. <u>Is the end goal to see if Mr. Trahant violated the protective order?</u> Is it to see who contacted the Advocate? Or is it to see how much the protective order was violated? I mean, that's sort of nebulous right now" (R2 2-11 p. 286-87). But clearly, any investigation would be primarily focused on Mr. Trahant without the mention of anyone else.

The Bankruptcy Court without a scintilla of evidence stated, "it's infected the functioning of the Committee" (R2 2-11 p. 289). This definitively stated assumption was flat-wrong. But the Court then went even further when talking about document

production in the bankruptcy. Speaking of late document production by the Archdiocese, the Court said, "And we know that's what happens in every single case.... You bombard them with, you know, meaningless documents and then the tough documents always come at the last stages. And good defense counsel, that's what we do. Right?" (R2 2-11 p. 292). The Bankruptcy Court seemed to be condoning discovery games that cause delay, but then blamed all delay on Mr. Trahant.

Then Mr. Mintz jumped right past any investigation or the concept that Mr. Trahant might not have violated the Protective Order: "The question I have is should the estate pay Locke Lord for it or should Ricky Trahant pay for it as an act of -- attorneys fees are part of a sanction that your honor can look at" (R2 2-11 p. 298). Again, Mr. Mintz seemed to be greatly influencing the Court's decisions, and the Court then discussed the attorneys fee issue with the UST (R2 2-11 pp. 299-300). All of this occurred before any of what the Archdiocese now calls an "independent investigation."

The Bankruptcy Court then pondered, "And this has just been one more thing. And for what? You know for what? And we still -- we don't know if Ricky Trahant is kind of the person right now that's sort of focused on, but we don't know what else, you know. So he just had his own agenda it appears, you know" (R2 2-11 p. 300). She

then states, "So I'm happy to issue an order to show cause and get it for hearing and ask the UST to pick up the pieces, you know" (R2 2-11 p. 300). Again, the Court knew that a hearing was required. But the Court then turned on a dime and decided that it would not permit Mr. Trahant, his co-counsel, or their clients to engage in discovery: "It'll also take some of the, what's the word, intensity out of the relationship between the two parties. Right now it's the Debtor's motion, and we've got these motions that want to participate fully. And I'm just not going to have, you know, aware of, you know, discovery back and forth through that kind of contested matter" (R2 2-11 p. 301). The Court then added, "at the hearing" (R2 2-11 p. 301) This hearing never occurred.

The Bankruptcy Court then made an inexplicable statement: "And so when I hear individual committee members, well, we want to launch our, you know own set of discovery, we want to propound discovery because we have rights, it's like, I'm not sure that you do, you know" (R2 2-11 p. 302). Obviously, the Bankruptcy Court never considered anyone's due process rights.

With this, the Archdiocese suggested that it withdraw its motion "to at least keep things clear" (R2 2-11 p. 304). Mr. Mintz then made a statement which implicitly identified Mr. Trahant as a "target" as if this were a criminal investigation:

"so I'm looking for guidance as to do we name the following people who aren't targets of an order to show cause can get it" (R2 2-11 pp. 305-06).

The Bankruptcy Court then engaged in irrelevant and inaccurate speculation as to the relationship between Mr. Trahant and his co-counsel, characterizing them as "three attorneys that are longtime friends, maybe partners, maybe they're not in the same firm," who perhaps "went to high school together, perhaps they've been long-term friends for a long time" (R2 2-11 pp. 307). The Court's stated reason for such speculation is chilling: "Does it do us any good just to **cut one of them out and not the others**?" (R2 2-11 pp. 307).

Then, without having read Mr. Trahant's Declaration and without any evidence whatsoever, the Court said, "you can't get leverage on the Archdiocese by calling up the Advocate" (R2 2-11 p. 312). The Court then acknowledged that it is "understandable, honorable whatever" if there was a "legitimate concern with ... protecting children" (R2 2-11 p. 312). But then the Court stated that a "more cynical person" might have done it to gain "leverage" going into mediation by making the debtor "softer in the court of public opinion.... but we don't know" (R2 2-11 p. 313). Of course, getting a child predator off of a school campus has nothing to do with mediation, and there was no mediation scheduled when Mr. Trahant had his contacts with ███████████ or ███████████ in any event.

-31-

In light of these status conference transcripts, the UST investigation was biased, unfair, and untrustworthy, as the Bankruptcy Court had already imparted its conclusions to the UST.

## CONCLUSION

For the foregoing reasons and the reasons set forth in his original brief, Mr. Trahant respectfully prays that the Court reverse or vacate both the June 7, 2022 Order and the October 11, 2022 Order.

**RESPECTFULLY SUBMITTED,**

/s/ Richard C. Trahant

**RICHARD C. TRAHANT (#22653)**
**ATTORNEY AT LAW**
**2908 Hessmer Avenue**
**Metairie, Louisiana 70002**
**(504) 780-9891**
**trahant@trahantlawoffice.com**

**- and -**

**PAUL M. STERBCOW (#17817)**
**Lewis, Kullman, Sterbcow &**
**      Abramson**
**601 Poydras Street, Suite 2615**
**New Orleans, Louisiana 70130**
**(504) 588-1500**
**sterbcow@lksalaw.com**

**- and -**

-32-

*/s/ Jack E. Morris*

_____

**JACK E. MORRIS (Bar No. 22539)**
**JACK E. MORRIS, ATTORNEY**
      **AT LAW, LLC**
**4051 Veterans Boulevard, Suite 208**
**Metairie, Louisiana 70002**
**(504) 454-2769**
**jem@jemorrislaw.com**

***Attorneys for Appellant***
***Richard C. Trahant***

## **CERTIFICATE OF SERVICE**

I hereby certify that unredacted copies of the above and foregoing "Consolidated Reply Brief on Behalf of Appellant Richard C. Trahant," filed under seal pursuant to a sealing motion and proposed order filed on March 10, 2023, have been served on counsel of record for all interested parties, securely sealed with the container clearly labeled "UNDER SEAL," by hand delivery this ___10th___ day of _ ___March___, 2023 to:

*Counsel for the U.S. Trustee:*

Amanda Burnette George, Esq.
Trial Attorney, Office of the U.S. Trustee
400 Poydras St., Ste. 2110
New Orleans, LA 70130

*Counsel for Debtor, The Roman Catholic Church of the Archdiocese of New Orleans:*

R. Patrick Vance, Esq.
Elizabeth J. Futrell, Esq.
Mark A. Mintz, Esq.
Laura F. Ashley, Esq.
Jones Walker LLP
201 St. Charles Ave., 51st Fl.
New Orleans, LA 70170

*/s/ Jack E. Morris*
_____
**JACK E. MORRIS**

-34-

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION,
## <u>TYPEFACE REQUIREMENT, AND TYPE STYLE REQUIREMENT</u>

1.      This brief complies with the type-volume limitation of Fed. R. Bankr. P. 8015(a)(7)(B)(ii) because it contains 6,480 words *excluding* the parts of the brief exempted by Fed. R. Bankr. 8015(g).

2.      This brief complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5), and the type style requirements of Fed. R. Bankr. P. 8015(a)(6), because it has been prepared in a proportionally spaced typeface using WordPerfect 2020 in 14-point font and Times New Roman type style.

March 10, 2023                                      */s/ Jack E. Morris*

_____     _____

**Date**                                                **JACK E. MORRIS (Bar No. 22539)**
                                                        **JACK E. MORRIS, ATTORNEY**
                                                        **     AT LAW, LLC**
                                                        **4051 Veterans Boulevard, Suite 208**
                                                        **Metairie, Louisiana 70002**
                                                        **(504) 454-2769**
                                                        **jem@jemorrislaw.com**

                                                        ***Attorney for Appellant***
                                                        ***Richard C. Trahant***

-35-